1  BOTTINI & BOTTINI, INC.
   Francis A. Bottini, Jr. (SBN 175783)
2  Albert Y. Chang (SBN 296065)
3  7817 Ivanhoe Avenue, Suite 102
   La Jolla, California  92037
4  Telephone:   (858) 914-2001
   Facsimile:    (858) 914-2002
5  E-mail:        fbottini@bottinilaw.com
                  achang@bottinilaw.com
6

7  *Attorneys for Plaintiff, Andrew S. Bushkin*

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12  ANDREW S. BUSHKIN, derivatively on   ) Case No.
    behalf of PG&E CORPORATION           )
13  and PACIFIC GAS & ELECTRIC           )
    COMPANY,                             )
14                                       ) VERIFIED SHAREHOLDER
                          Plaintiff,     ) DERIVATIVE COMPLAINT FOR
15  v.                                   ) BREACHES OF FIDUCIARY DUTIES,
                                         ) WASTE OF CORPORATE ASSETS,
16  BARBARA L. RAMBO, LEWIS CHEW,        ) UNJUST ENRICHMENT, BREACH OF
    C. LEE COX, PETER A. DARBEE,         ) THE DUTY OF HONEST SERVICES,
17  ANTHONY F. EARLEY, JR., FRED J.      ) CONSPIRACY TO BREACH FIDUCIARY
    FOWLER, KENT M. HARVEY,              ) DUTIES, AND AIDING AND ABETTING
18  MARYELLEN C. HERRINGER,              ) BREACHES OF FIDUCIARY DUTIES
    CHRISTOPHER P. JOHNS, WILLIAM        )
19  D. HAYES, GEISHA J. WILLIAMS,        )
    NICK STAVROPOULOS, RICHARD C.        )
20  KELLY, ROGER H. KIMMEL, DAVID        )
    M. LAWRENCE, RICHARD A.              )
21  MESERVE, FORREST E. MILLER,          ) DEMAND FOR JURY TRIAL
    DINYAR B. MISTRY, ROSENDO            )
22  PARRA, ANNE SHEN SMITH, and          )
    BARRY LAWSON WILLIAMS,               )
23                                       )
                          Defendants,    )
24  and                                  )
                                         )
25  PG&E CORPORATION, a California       )
    corporation, and PACIFIC GAS &       )
26  ELECTRIC COMPANY, a California       )
    corporation,                         )
27                          Nominal Defendants. )
                                         )
28 _____)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## TABLE OF CONTENTS

2   I.     NATURE OF THE ACTION ...................................................................1

3   II.    JURISDICTION AND VENUE ............................................................8

4   III.   INTRADISTRICT ASSIGNMENT .......................................................8

5   IV.   THE PARTIES .......................................................................................9

6

          A.     Plaintiff..........................................................................................9

7

          B.     Nominal Defendants ....................................................................9

8

          C.     Individual Defendants ...............................................................10

9

10  V.     DUTIES OF THE INDIVIDUAL DEFENDANTS ............................30

11        A.     The Individual Defendants Are Responsible For Ensuring PG&E's Compliance with California and Federal Safety Regulations...............30

12

13        B.     The Individual Defendants Also Owed Duties to the Company With Respect to Pipeline Safety Due to Their Membership on Various Board Committees ..................................................................31

14

15        C.     Management and the Board's Duties to the Company.........................34

16  VI.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION...35

17  VII.  CONTINUING COURSE OF CONDUCT, FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING .............................................36

18

19  VIII. SUBSTANTIVE ALLEGATIONS .....................................................37

20        A.     The Individual Defendants Instilled a Culture of Putting Profits Before Safety ...........................................................................37

21

22              1.     PG&E misappropriated millions from customers and consistently cut its budget for maintenance of transmission and distribution lines ................................................................37

23

24              2.     PG&E employees were incentivized not to report or fix leaks...40

25              3.     PG&E retaliated against and ignored allegations from a whistleblower warning of PG&E's low prioritization of safety...41

26

27              4.     The Individual Defendants' culture of profits over safety have left ticking "time bombs" across Northern California ........43

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

B.     The San Bruno Incident ....................................................................46

C.     The Individual Defendants Caused PG&E to Violate California and Federal Safety Regulations, Subjecting the Company to Billions of Dollars in Damages and Fines ..............................................................47

D.     The Individual Defendants Cause PG&E To Obstruct The NTSB's Investigation ....................................................................................67

E.     PG&E Is Indicted Due To The Individual Defendants' Wrongdoing....71

F.     Defendants Breach Their Duty Of Candor And Loyalty By Causing The Company To File A False Proxy Statement ...................................73

G.     The Individual Defendants Were Aware of Numerous "Red Flag" Warnings of Safety-Related Problems at PG&E But Consciously Failed to Take Action to Resolve Safety Problems.................................74

     1.     The Individual Defendants ignored warnings of Line 132's unacceptably high risk of failure and knowingly created a high risk of catastrophic harm......................................................74

     2.     The Boards of Directors were aware of the serious safety, operational, maintenance and cultural problems at PG&E .......83

     3.     PG&E has been plagued by safety problems .............................84

     4.     The Individual Defendants ignored red flag warnings about inadequate recordkeeping at PG&E ............................................87

     5.     The Individual Defendants ignored serious red flag problems at PG&E that were identified in PG&E audits...........................91

     6.     PG&E's executive leadership was warned of catastrophic risk if PG&E continued to ignore and fail to prioritize operational safety at PG&E..........................................................93

     7.     The Individual Defendants were aware of adverse regulatory findings ........................................................................................95

          a.     An Independent Review Panel reviewed the San Bruno explosion and PG&E's conduct and found that the Company focused solely on financial performance at the expense of operational safety ..................................96

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

        b.    CPUC and Overland Consulting found that PG&E chronically dedicated insufficient resources to operational safety despite having more than sufficient money to do so ...................................................................98

           (i)    The 2011 Overland Report .......................................99

           (ii)   The 2013 Overland Report ....................................104

    8.    California Administrative Judges reprimanded PG&E for intentionally concealing inadequate recordkeeping .................116

    9.    The CPUC forced PG&E to shut down its pipeline in San Carlos because of continuing concerns that the pipeline is unsafe ........................................................................................118

IX.    DAMAGES TO PG&E AND PG&E CORP. CAUSED BY THE INDIVIDUAL DEFENDANTS .........................................................................120

X.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ........................122

    A.    Demand Is Excused Because a Majority of the Current  Board Faces a Substantial Likelihood of Liability for  Causing the Company to Obstruct the NTSB  Investigation ....................................122

    B.    A Majority of the Board Faces a Substantial Likelihood of Liability for Causing the Company to Violate Federal and State Pipeline Safety Regulations ................................................125

XI.    CAUSES OF ACTION .............................................................................133

XII.    PRAYER FOR RELIEF ...........................................................................141

XIII.   JURY DEMAND ....................................................................................143

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Andrew Bushkin ("Plaintiff"), derivatively on behalf of Pacific Gas & Electric Corporation and Pacific Gas & Electric Company (hereafter "PG&E" or the "Company"), submits this Verified Shareholder Derivative Complaint against the members of the companies' Board of Directors (the "Board") (collectively, the "Individual Defendants") for breaches of their fiduciary duties, gross mismanagement, abuse of control, unjust enrichment, and violation of the federal proxy laws.  Plaintiff makes the following allegations, except as to allegations pertaining to Plaintiff (which are based on personal knowledge), based on his investigation and the investigation of his counsel, including a review of legal and regulatory filings, press releases, analyst and media reports about PG&E, the indictment dated April 1, 2014 and superseding indictment dated July 30, 2014 filed against Pacific Gas & Electric Company by a grand jury in San Francisco, the court records and filings in *U.S.A. v. Pacific Gas & Electric Co.*, Case No. CR 14-00175-THE (N.D. Cal.), and other public statements issued by the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

In support of these derivative claims, Plaintiff alleges as follows:

## I.     NATURE OF THE ACTION

1.     This is a "double derivative" shareholder derivative action to remedy over $2 billion in damages the Company has suffered due to the wrongdoing committed by PG&E's directors and officers between January 1, 2003 and the present (the "Relevant Period").

2.     Pacific Gas & Electric Corporation operates as the holding company for Pacific Gas & Electric Company, a provider of electricity and natural gas in Northern and Central California. Both companies have their own board of directors, but the boards are comprised of the same individuals, except for Defendant Christopher P. Johns, who is a director of Pacific Gas & Electric Company but not Pacific Gas & Electric Corp.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      3.    Both companies are California corporations and thus California law

2  applies to the claims asserted in this lawsuit.

3      4.    During the Relevant Time Period, the Board of Directors and other

4  executive officers of the companies breached their fiduciary duties of candor, loyalty,

5  good faith and care to the companies and their shareholders, resulting in billions of

6  dollars of damages to the companies.  The damages continue to mount since penalties

7  imposed on the Company restrict PG&E's ability to effectuate rate hikes related to the

8  wrongdoing.

9      5.    On July 30, 2014, a Superseding Indictment was returned against Pacific

10  Gas & Electric Company related to violations of law related to a deadly 2010 gas

11  explosion in San Bruno, California (the "San Bruno Explosion") that killed eight

12  people, injured 58 more, and caused over $500 million in damages to property owners.

13      6.    On April 9, 2015, the CPUC approved final decisions in three separate

14  investigations that had been brought against PG&E relating to (1) PG&E's safety

15  record-keeping for its natural gas transmission system, (2) PG&E's operation of its

16  natural gas transmission pipeline system in or near locations of higher population

17  density, and (3) PG&E's pipeline installation, integrity management, record-keeping

18  and other operational practices, and other events or courses of conduct, that could

19  have led to or contributed to the natural gas explosion that occurred in the City of San

20  Bruno, California on September 9, 2010.  A decision was issued in each investigative

21  proceeding to determine the violations that the Utility committed.  The CPUC also

22  approved a fourth decision (the "Penalty Decision") which imposed penalties on PG&E

23  totaling $1.6 billion comprised of: (1) a $300 million fine paid to the State General

24  Fund, (2) a one-time $400 million bill credit to the Utility's natural gas customers, (3)

25  $850 million to fund future pipeline safety projects and programs, and (4) remedial

26  measures that the CPUC estimates will cost the Utility at least $50 million. The

27  Penalty Decision requires that at least $689 million of the $850 million be allocated to

28  capital expenditures and that the Utility be precluded from including these capital

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    costs in rate base.  The remainder will be allocated to safety-related expenses.

2         7.   The Individual Defendants caused the Company to engage in unlawful

3    and criminal conduct which has already damaged the Company by over $2.2 billion in

4    damages and fines relating to the San Bruno Explosion, as follows:

5         **$1.6 billion in fines** - as indicated *supra*, these fines are comprised of $300

6              million paid to California's State General Fund, a one-time $400 million

7              credit to the Company's natural gas customers, $850 million to fund

8              future pipeline safety projects, and remedial measures that the PUC

9              estimates will cost PG&E at least $50 million;

10        **$620 million in compensation** paid to settle damages claims relating to the

11             explosion, comprised of approximately $500 million to the victims and

12             families of the San Bruno accident, $50 million to the City of San Bruno

13             for costs related to recovery, and $70 million to support the city's and

14             community's recovery efforts.[1]

15        8.   In addition, as the Company has admitted in filings with the U.S.

16   Securities and Exchange Commission ("SEC"), PG&E faces a potential maximum

17   alternative minimum fine **of another $1.13 billion** for the criminal charges in the

18   Superseding Indictment.[2]  The criminal trial is scheduled to begin on March 8, 2016 in

19   San Francisco.

20        9.   After the San Bruno Explosion, the Individual Defendants caused PG&E

21   to obstruct the National Transportation & Safety Board's investigation of the

22   explosion and PG&E's role in the explosion.  As a result, the Superseding Indictment

23   ─────────────────────
   [1]    *See* July 29, 2014 PG&E press release entitled "As Government Recasts Case,
24   PG&E Reiterates Commitment to Safety and Underscores Its Position That Federal
     Charges Are Not Merited," available at http://PG&E.com/about/newsroom/
25   newsreleases / 20140729/ as_ government _recasts_case_PG&E_reiterates_
     commitment_to_safety_ and_underscores_
26   its_position_that_federal_charges_are_not_merited.shtml, last visited February 10,
27   2016.

28   [2]    *See* PG&E's Q3 2015 Form 10-Q filed with the SEC on October 28, 2015, at p. 42.

─────────────────────
- 3 -

1  added another criminal charge to the indictment for violation of 18 U.S.C. §1505 -

2  Obstruction of the NTSB's Investigation.

3          10.     After the San Bruno Explosion, the Individual Defendants also caused

4  PG&E to engage in improper *ex parte* communications with the California Public

5  Utility Commission ("PUC") in an effort to improperly influence various proceedings

6  involving the Company.  This misconduct has resulted in two separate investigations

7  of the Company by the U.S. Attorneys' Office in San Francisco and the California

8  Attorney General's Office.

9          11.     The Company is also being investigated by the U.S. Attorney's Office with

10  respect to a 2014 explosion in Carmel, CA.

11          12.     The Individual Defendants have also willfully refused to modify the

12  Company's corporate governance principles to protect the Company from further

13  harm.  After the Company was indicted by the grand jury in 2014, a shareholder

14  submitted a proposal in the Company's 2015 Proxy which asked shareholders to vote

15  in favor of separating the roles of Chairman and CEO at the Company.  The proposal

16  specifically noted that an Independent Chairman of the Board was necessary to ensure

17  the Company's compliance with safety laws and regulations.[3]  The Defendants[4]

18  opposed this proposal in the proxy, falsely stating that the proposal was allegedly

19  unnecessary because PG&E's corporate governance policies were already sufficiently

20

21  [3]     The shareholder proxy proposal stated that "PG&E was charged with 12 pipeline
22  safety violations by the U.S. government for a 2010 natural gas explosion that killed 8
    people and left a crater the size of a house. The grand jury indictment charged PG&E
23  with knowingly and willfully violating the Natural Gas Pipeline Safety Act by failing to
    test and assess unstable pipelines to determine whether they could fail. PG&E was also
24  charged with keeping incomplete and inaccurate records about the pipeline that exploded.
    PG&E was also flagged for its failure to utilize an environmental management system or
25  to seek International Organization for Standardization 14001 Certification for some or all
26  of its operations."

27  [4]     On March 25, 2015, Defendants Chew, Fowler, Kelly, Meserve, Parra, Smith,
    Johns, Earley, Herringer, Kimmel, Rambo and Williams approved the filing of PG&E's
28  and PG&E Corp.'s joint proxy statement with the SEC.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

robust and adequate to address the wrongdoing that had occurred.  The Defendants caused the following false statement to be included in the 2015 Proxy:

- It is in the best interests of the Corporation and its shareholders to have a flexible rule regarding which directors may serve as Chairman.

- PG&E Corporation's strong corporate governance practices - including the requirement of an independent lead director with specified duties - address the proponent's concern that the Board cannot properly oversee the CEO if the CEO also serves as Chairman.

13.     This statement was false and misleading, as PG&E's corporate governance principles were not "strong" or sufficient to oversee the CEO and ensure the Company's compliance with applicable laws and regulations. Specifically, the Individual Defendants knew that the Company's corporate governance principles were under scrutiny by federal and state regulators for material deficiencies.  Indeed, just ten months later, PG&E disclosed in its Q3 2015 Form 10Q that:  "On August 27, 2015, the CPUC began a formal investigation into whether the organizational culture and governance of PG&E Corporation and the Utility prioritize safety and adequately direct resources to promote accountability and achieve safety goals and standards. The CPUC directed the SED to evaluate the Utility's and PG&E Corporation's organizational culture, governance, policies, practices, and accountability metrics in relation to the Utility's record of operations, including its record of safety incidents. The CPUC authorized the SED to engage a consultant to assist in the SED's investigation and the preparation of a report containing the SED's assessment."

14.     Thus, in an effort to protect their own jobs and avoid election of an independent Board Chairman, the Individual Defendants violated their fiduciary duties of candor and loyalty by causing the Company to file a false and misleading proxy statement.

15.     The Individual Defendants also caused the Company to violate applicable record-keeping requirements with respect to its gas lines, subjecting the Company to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    further potential liability.

2         16.    Indeed, former PG&E employees have testified that PG&E Management

3    instructed them to destroy documents pertaining to the San Bruno explosion.  In its

4    Pre-Trial Conference Statement filed on February 22, 2016, the government indicated

5    that it will call former PG&E employee Leslie McNiece as a witness at the criminal

6    trial set to commence on March 22, 2016.  McNiece has testified at deposition that

7    management ordered her to destroy documents and that she found a tell-tale pre-blast

8    analysis of the relevant pipeline in the garbage at PG&E.  McNiece reported to

9    Defendant Christopher P. Johns, President of San Diego Gas & Electric Company and

10   a member of its Board of Directors.  Among other things, McNiece was hired after the

11   San Bruno explosion to help clean up PG&E's deficient record-keeping system.  She

12   prepared a new recordkeeping policy and presented it to management, but was told by

13   Defendant Johns that PG&E would not approve that policy.  McNiece was thereafter

14   laid off in 2014.

15        17.    The billions of dollars in damages to PG&E were caused by the Individual

16   Defendants' breaches of fiduciary duties and self-dealing.  Instead of spending

17   necessary money on pipeline safety improvements, the Individual Defendants caused

18   the Company to pay themselves lavish compensation and bonuses.  ***The CPUC found***

19   ***that PG&E diverted more than $100 million in gas safety and operations***

20   ***money to other uses.***  From 1999 to 2010, a CPUC audit determined that PG&E

21   regularly failed to use all the money collected to fix and maintain small gas distribution

22   lines that deliver natural gas to homes and businesses.  The CPUC audit found that

23   ineffective executive management caused the company to take money that was

24   specifically earmarked for safety and to spend it elsewhere.

25        18.    Despite the fact that PG&E is a public utility, the Individual Defendants

26   paid themselves lavishly during the Relevant Period.  Defendant Johns, who served as

27   the President of Pacific Gas & Electric Company while the Company obstructed the

28   NTSB investigation and was indicted, earned over $6 million in 2014 alone.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendant Earley, the CEO of PG&E Corp., earned almost twice as much in 2014 – $11.6 million.  Defendant Darbee, who will be called by the United States of America as a witness at the criminal trial, earned $10.5 million as the CEO of PG&E Corp. in 2009, the year before the San Bruno explosion.  In short, the Individual Defendants were handsomely rewarded despite their faithless stewardship of PG&E, which to-date has cost the Company over $2.2 billion in damages.

19.     Defendants' conduct has also caused severe reputational damage to the Company and has had a severe negative effect on the Company's operations, profitability, and earnings per share.  From September 30, 2014 to September 30, 2015, the Company's net income plummeted from $810 million to $310 million.

20.     The Department of Justice's criminal trial against the Company is set to begin March 22, 2016.

21.     On February 18, 2016, PG&E filed its Annual Report on Form 10-K with the SEC.  In the Annual Report, PG&E outlined the severe additional damage to the Company which may occur as a result of the criminal trial:

22.     "[PG&E] is facing federal criminal charges alleging that the Utility knowingly and willfully violated minimum safety standards under the Natural Gas Pipeline Safety Act and alleging that the Utility illegally obstructed the NTSB's investigation into the cause of the San Bruno accident that occurred on September 9, 2010.  The maximum statutory fine for each felony count is $500,000, for potential total fines of $6.5 million.  The federal prosecutor also seeks to impose an alternative fine which could total approximately $562 million, based on allegations that the Utility derived gross gains of approximately $281 million.  The trial currently is scheduled to begin on March 22, 2016.

23.     "PG&E Corporation and the Utility have not recorded any charges for potential criminal fines in their consolidated financial statements at December 31, 2015.  If the Utility is convicted and a fine is imposed, PG&E Corporation and the Utility will record charges when required in accordance with GAAP.  *The Utility also*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   *could incur material costs, not recoverable through rates, to implement remedial*

2   *measures that may be imposed by the court, such as a requirement that the Utility's*

3   *natural gas operations be supervised by a third-party monitor. The Utility could also be*

4   *suspended or debarred from entering into federal procurement and non-procurement*

5   *contracts and programs.*"

## II.   JURISDICTION AND VENUE

7   24.    Jurisdiction is conferred by 28 U.S.C. § 1332.  Complete diversity among

8   the parties exists and the amount in controversy exceeds $75,000, exclusive of interest

9   and costs. In addition, Plaintiff asserts a claim under §14(a) of the Exchange Act, 15

10  U.S.C. §78n(a), and SEC regulation 14a-9 promulgated thereunder.  Jurisdiction is

11  conferred by the Exchange Act.

12  25.    This Court has jurisdiction over each defendant named herein because

13  each defendant is either a corporation that conducts business in and maintains

14  operations in this District, or is an individual who has sufficient minimum contacts

15  with this District to render the exercise of jurisdiction by the District courts

16  permissible under traditional notions of fair play and substantial justice.

17  26.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a)

18  because: (i) PG&E maintains its principal place of business in this District; (ii) one or

19  more of the defendants either resides in or maintains executive offices in the District;

20  (iii) a substantial portion of the transactions and wrongs complained of herein,

21  including the defendant's primary participation in the wrongful acts detailed herein,

22  and aiding and abetting and conspiracy in violation of fiduciary duties owed to PG&E,

23  occurred in this District; and (iv) defendants have received substantial compensation

24  in this District by doing business here and engaging in numerous activities that had

25  an effect in this District.

## III.   INTRADISTRICT ASSIGNMENT

27  27.    This action is properly assigned to the San Francisco division of this

28  Court.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## IV.    THE PARTIES

### A. Plaintiff

28.    Plaintiff Andrew S. Bushkin is a shareholder of PG&E and has continuously been a shareholder of PG&E at all relevant times.  Plaintiff acquired stock in Pacific Gas & Electric Company in approximately 1984, which stock was then converted into common stock of PG&E Corporation in approximately 1997, when PG&E Corporation became the holding company for Pacific Gas & Electric Company. Plaintiff is a Trustee of the Andrew S. and Patricia A. Bushkin Trust, U/A DTD 4/12/95, in whose name the stock has been held since 1995.  Plaintiff is a citizen of Washington.

### B. Nominal Defendants

29.    Nominal Defendant PG&E Corporation is a California corporation with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California. PG&E is a holding company that conducts its business through Pacific Gas and Electric Company ("PG&E Corp.").  PG&E Corp. is a California corporation with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California.  PG&E Corp. is regulated by the California Public Utilities Commission ("CPUC") and the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA"). PG&E Corp. is the holding company for Pacific Gas and Electric Company and its subsidiaries.  PG&E Corp. is a citizen of California.

30.    Nominal Defendant Pacific Gas & Electric Company is a California corporation with principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California.  PG&E is the operating subsidiary of PG&E Corp. and is regulated by the CPUC.  PG&E provides power and energy services throughout the State of California and is the primary provider of power and energy in northern and central California.  PG&E and PG&E Corp. share all the same directors except for Defendant Johns, who is not a director of PG&E Corp. In 1997, when PG&E Corp. was

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

incorporated and became the parent company of PG&E, all the common stock of PG&E was acquired by PG&E Corp., and all of the shareholders of PG&E became shareholders of PG&E Corp.[5]

### C. Individual Defendants

31.    Defendant Christopher P. Johns ("Johns") has worked at PG&E since 1996, and has been a director of PG&E since February 2010, as well as the Company's President since August 2009. In 2015, PG&E announced that Johns would retire effective December 31, 2015 as President of San Diego Gas & Electric Company. Defendant Johns was also PG&E's Senior Vice President, Financial Services from May 2009 to July 2009; Senior Vice President and Treasurer from October 2005 to April 2009; Chief Financial Officer ("CFO") from October 2005 to May 2007; and Vice President and Controller from June 1996 to December 1999. Defendant Johns was PG&E's CFO from January 2005 to July 2009; a Senior Vice President from September 2001 to July 2009; Treasurer from October 2005 to April 2009; Controller from July 1997 to October 2005; and a Vice President from July 1997 to September 2001.   Prior to joining PG&E, Johns was a partner at accounting firm KPMG Peat Marwick.  Due to the Company's extensive gas distribution and transmission line operations, defendant Johns knew that PG&E was subject to regulation from the CPUC and Pipeline and hazardous Materials Safety Administration ("PHMSA") and guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Johns also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an integrity management program ("IMP") to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Johns was specifically charged with overseeing the Company's risk management practices, including

---

[5]     PG&E Corp. currently owns 96.24% of PG&E's stock. *See* PG&E Corp. 2015 Proxy Statement, at p. 73 (filed Mar. 25, 2015).

ensuring compliance with an IMP. Defendant Johns knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations.  Johns also approved and supported the underfunding of PG&E's pipeline and operations.

32.     Between 2004 and 2014, Johns received the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | LTIP Payouts | All Others | Total |
|------|--------|--------------|---------------|----------------------------------------|-------------------------|--------------|------------|-------|
| 2014 | $772,333 | $2,799,993 | | $704,831 | $1,682,001 | | $77,965 | $6,037,123 |
| 2013 | $750,278 | $2,261,914 | - | $753,579 | $340,133 | - | $84,591 | $4,190,495 |
| 2012 | $723,138 | $2,510,110 | - | $855,725 | $953,201 | - | $75,594 | $5,117,768 |
| 2011 | $701,250 | $3,418,732 | - | $319,245 | $614,133 | - | $79,366 | $5,132,726 |
| 2010 | $672,500 | $1,932,429 | - | - | $629,560 | - | $76,696 | $3,311,185 |
| 2009 | $593,866 | $1,880,357 | - | $684,431 | $268,077 | - | $70,999 | $3,497,730 |
| 2008 | $541,457 | $893,206 | - | $350,809 | $193,500 | - | $89,819 | $2,068,791 |
| 2007 | $523,640 | $832,935 | - | $343,010 | $156,155 | - | $88,486 | $1,944,226 |
| 2006 | $494,000 | $931,415 | $221,802 | $414,071 | $157,985 | - | $94,638 | $2,313,911 |
| 2005 | $475,000 | $231,470 | - | - | - | - | $39,542 | $746,012 |
| 2004 | $316,860 | $265,537 | - | - | - | $114,323 | $16,817 | $713,537 |

33.     Johns received substantial financial benefits from serving in his role as the President and as a director of PG&E.  These substantial financial benefits were obtained by Johns at the same time that PG&E Corp. and PG&E were underfunding and ignoring their natural gas safety obligations in breach of the Boards' fiduciary duties.  Defendant Johns is a citizen of California.

34.     Defendant Anthony F. Earley, Jr. ("Earley") is PG&E's Chairman, Chief Executive Officer, and President and has been since September 2011.  Due to the Company's extensive gas distribution and transmission line operations, defendant Earley knew that PG&E was subject to regulation from the CPUC and the PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety.

35.     Earley is also the Chair of the PG&E Corp. and PG&E Executive Committees. He is neither independent nor disinterested in the wrongdoing alleged, nor capable of evaluating a demand to bring suit. Earley made representations to the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   public after he became the President, CEO and Chairman of the Board of PG&E Corp.

2   that he would steer PG&E in a different direction, would rectify the years of

3   mismanagement at PG&E, and change the PG&E corporate culture. However, Earley

4   has not done so and has, instead, continued to lead PG&E in the same manner as his

5   predecessors, which therefore subjects PG&E to the risk of further fines, penalties and

6   lawsuits.

7   36.   Indeed, Earley's representations that PG&E has changed from its past

8   ways, when in fact PG&E has not, increases the potential liability faced by PG&E due

9   to Earley's misconduct. As the President, CEO and Chairman of the Board of PG&E

10   Corp., Earley directed PG&E's policies in July of 2013, when PG&E attempted to

11   sneak a disclosure about serious problems with one of PG&E's major transmission

12   lines past the CPUC as a "routine correction." Earley, therefore, faces substantial

13   personal exposure, and has allowed PG&E to face increased exposure, not only for

14   continuing the misconduct of the earlier PG&E Board of Directors but also for

15   misrepresenting to the public that PG&E is changing its operations and priorities.

16   37.   As the President, CEO and Chairman of the Board of PG&E Corp.,

17   Earley was in charge of overseeing and implementing an internal control system to

18   ensure that PG&E identified, corrected and mitigated any potential risks of the

19   company's pipelines causing harm in areas that could affect human safety. Earley was

20   also specifically charged with overseeing PG&E's risk management practices and

21   policies.  Earley has not only failed to change PG&E's policies, procedures and

22   practices regarding safety, but he has also misrepresented PG&E's and his efforts to

23   change those policies, procedures and practices.  Earley also approved and supported

24   the underfunding of PG&E's pipeline and operations. Earley is unable to adequately

25   and appropriately evaluate any demand on the Board of Directors since this complaint

26   alleges acts of wrongdoing for which Earley is directly liable for.

27    PG&E paid defendant Earley the following compensation as an executive:

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan | Change in Pension Value | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|---------------------------|-------------------------|------------------------|-------|
| 2014 | $1,250,000 | - | $7,500,007 | - | $1,825,200 | $955,849 | $96,160 | $11,627,216 |
| 2013 | $1,250,000 | - | $6,499,960 | - | $1,743,750 | $634,517 | $94,718 | $10,222,945 |
| 2012 | $1,250,000 | - | $6,525,721 | - | $1,715,000 | $299,995 | $158,918 | $9,949,634 |
| 2011 | $378,788 | $1,500,000 | $7,406,267 | - | - | $71,423 | $184,909 | $9,541,387 |

Defendant Earley is a citizen of California.

38.    Defendant Kent M. Harvey ("Harvey") served as PG&E's Senior Vice President and CFO and PG&E Corp.'s Senior Vice President, Financial Services from August 2009 to January 1, 2016. Harvey currently serves as PG&E Corp.'s Senior Vice President, Finance.[6]  Defendant Harvey was also PG&E's Senior Vice President and Chief Risk and Audit Officer from October 2005 to July 2009 and PG&EC's Senior Vice President, CFO, and Treasurer from January 2000 to September 2005. Due to the Company's extensive gas distribution and transmission line operations, defendant Harvey knew that PG&E was subject to regulation from the CPUC and the PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Harvey also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Harvey was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP.  Defendant Harvey knowingly, recklessly, or with gross negligence allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations. Harvey also approved and supported the underfunding of PG&E's pipeline

---

[6]    On November 6, 2015, PG&E Corp. announced that Harvey would be replaced as CFO by Jason P. Wells effective January 1, 2016, but would continue to serve as PG&E Corp.'s Senior Vice President, Finance, until approximately June 30, 2016.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and operations. PG&E paid defendant Harvey the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan | Changes in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------|---------------------------|--------------------------|------------------------|-------|
| 2014 | $624,172 | $1,499,950 | - | $518,012 | $2,246,668 | $63,318 | $4,952,120 |
| 2013 | $627,785 | $1,356,996 | - | $507,969 | $ 715,856 | $64,419 | $3,273,025 |
| 2012 | $583,417 | $1,757,077 | - | $603,744 | $1,495,540 | $59,115 | $4,498,893 |
| 2011 | $554,625 | $1,407,059 | - | $235,661 | $ 842,919 | $63,376 | $3,103,640 |
| 2010 | $537,500 | $1,011,982 | - | - | $1,009,678 | $62,876 | $2,622,036 |
| 2009 | $454,106 | $ 564,322 | - | $428,529 | $ 432,377 | $50,507 | $1,929,571 |
| 2006 | $352,085 | $ 565,087 | $182,526 | $268,290 | $ 116,713 | $44,919 | $1,529,620 |

Defendant Harvey is a citizen of California.

39.    Defendant Dinyar B. Mistry ("Mistry") has worked at PG&E since 1994. He is currently PG&E's CFO and has been since October 2011 and PG&E and PG&E Corp.'s Vice President and Controller and has been since March 2010. Defendant Mistry was also PG&E's Vice President and Chief Risk and Audit Officer from August 2009 to March 2010; PG&EC's Vice President and Chief Risk and Audit Officer from September 2009 to March 2010; PG&E's Vice President, Internal Auditing/Compliance and Ethics from January 2009 to July 2009, and PG&EC's Vice President, Regulation and Rates from November 2005 to December 2008. Mistry holds a Bachelor of Commerce in accounting and financial management from Bombay University, a Master of Business Administration from Texas Christian University and a Master of Science in taxation from Golden Gate University. He is also registered as a Certified Public Accountant in the state of California. Due to the Company's extensive gas distribution and transmission line operations, defendant Mistry knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Mistry also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Mistry was specifically

- 14 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    charged with overseeing the Company's risk management practices, including

2    ensuring compliance with an IMP. Defendant Mistry knowingly, recklessly, or with

3    gross negligence allowed PG&E to violate the CPUC and PHMSA regulations by

4    failing to implement and/or maintain adequate internal controls with respect to the

5    Company's compliance with CPUC and PHMSA regulations.  Mistry also approved

6    and supported the underfunding of PG&E's pipeline and operations. PG&E paid

7    defendant Mistry the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------------------|-------------------------|------------------------|-------|
| 2014 | $373,046 | $350,074 | $277,988 | $617,051 | $31,509 | $1,649,688 |
| 2013 | $376,779 | $316,645 | $195,109 | $31,452 | $31,237 | $951,222 |
| 2012 | $340,938 | $351,164 | $231,545 | $434,709 | $30,713 | $1,389,069 |
| 2011 | $327,825 | $307,794 | $89,546 | $264,919 | $30,123 | $1,020,207 |

Defendant Mistry is a citizen of California.

12        40.    Defendant William D. Hayes is Vice President, Gas Maintenance and

13   Construction, for PG&E.  He is responsible for distribution maintenance and

14   construction for the southern portion of PG&E's service area.  Hayes has worked for

15   PG&E for more than forty (40) years.  In the Pre-Trial Conference Statement filed by

16   the government in the criminal case on February 22, 2016, the U.S. Attorney's Office

17   identified Hayes as an expected witness to be called at trial and described Hayes' April

18   6, 2011 letter to the NTSB as being "at the heart of the obstruction count."  Prior to

19   being named to his current post in 2007, Hayes served as senior director of customer

20   field services.  Together with other defendants, Hayes submitted a false and

21   misleading submission to the NTSB that resulted in the U.S. Department of Justice

22   indicting the Company for obstruction of justice.  Hayes also approved and supported

23   the underfunding of PG&E's pipeline and operations.  Hayes is a citizen of California.

24        41.    Defendant Geisha J. Williams is President, Electric, at Pacific Gas and

25   Electric Company and a member of PG&E's board of directors.  Williams joined PG&E

26   in 2007 and was named Executive Vice President for Electric Operations in 2011.  Ms.

27   Williams supervised Defendant William D. Hayes during the Relevant Time Period,

- 15 -

1   including in 2011 when Hayes signed submissions to the NTSB regarding the

2   Company's responses to the NTSB investigation of the San Bruno explosion. Due to

3   the Company's extensive gas distribution and transmission line operations, defendant

4   Williams knew that PG&E was subject to regulation from the CPUC and PHMSA

5   guidelines for operators of natural gas pipelines in areas that could affect human

6   safety. Defendant Williams also knew that, under the CPUC and PHMSA regulations,

7   PG&E is required to implement an internal control system to ensure the

8   implementation of an IMP to ensure the identification and remediation of risks to the

9   Company's pipelines in areas that could affect human safety. In her capacity as a

10  director, defendant Williams was specifically charged with overseeing the Company's

11  risk management practices, including ensuring compliance with an IMP. Defendant

12  Williams knowingly, recklessly, or with gross negligence allowed PG&E to violate the

13  CPUC and PHMSA regulations by failing to implement and/or maintain adequate

14  internal controls with respect to the Company's compliance with CPUC and PHMSA

15  regulations.  Williams also approved and supported the underfunding of PG&E's

16  pipeline and operations. Williams is a citizen of California.

17          42.      Defendant Nick Stavropoulos is President, Gas, at Pacific Gas and

18  Electric Company and a member of the utility's board of directors. He is responsible

19  for the end-to-end delivery of safe, reliable, affordable and clean gas service to 16

20  million people across PG&E's 70,000 square mile service area in northern and central

21  California. Additionally, Stavropoulos oversees PG&E's enterprise IT and Safety &

22  Shared Services organizations.  Mr. Stavropoulos joined PG&E in 2011.  Due to the

23  Company's extensive gas distribution and transmission line operations, defendant

24  Stavropoulos also knew that PG&E was subject to regulation from the CPUC and

25  PHMSA guidelines for operators of natural gas pipelines in areas that could affect

26  human safety.  Defendant Stavropoulos also knew that, under the CPUC and PHMSA

27  regulations, PG&E was required to implement an internal control system to ensure

28  the implementation of IMP to ensure the identification and remediation of risks to the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's pipelines in areas that could affect human safety.  In his capacity as a director of PG&E, defendant Stavropoulos was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP.  Defendant Stavropoulos knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations. Stavropoulos also approved and supported the underfunding of PG&E's pipeline and operations. Mr. Stavropoulos is a citizen of California.

43.     Defendant C. Lee Cox ("Cox") is PG&E and PG&E Corp.'s Lead Director and PG&E Corp.'s non-executive Chairman of the Board and has been since September 2011 and a director of PG&E and PG&E Corp. and has been since 1996. Defendant Cox was also PG&E's interim Chairman, Chief Executive Officer ("CEO"), and President from May 2011 to September 2011; PG&E Corp.'s non-executive Chairman of the Board from January 2008 to April 2011; and lead director of PG&E and PG&E Corp. from April 2004 to April 2011.  Defendant Cox is Chairman of PG&E's Compensation Committee and a member of PG&E's Finance Committee and has been since September 2011. Defendant Cox was also Chairman of PG&E's Compensation Committee from at least March 2005 to May 2011, a member of that committee from at least March 2003 to May 2011, and a member of PG&E's Finance Committee from at least March 2004 to May 2011.  Defendant Cox served as Chairman of the Audit Committees of PG&E and PG&E Corp. until at least March 2004. Due to the Company's extensive gas distribution and transmission line operations, defendant Cox also knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety.  Defendant Cox also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety.  In his

- 17 -

capacity as a director, defendant Cox was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP. Defendant Cox knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations. Cox also approved and supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant Cox the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2011 | $660,000 | $89,970 | $125,259 | $875,229 |

and as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Other Compensation | Total |
|-------------|-------------------|--------------|--------------------|-------|
| 2014 | $64,924 | - | $96 | $65,020 |
| 2013 | $160,000 | $104,986 | $96 | $265,082 |
| 2012 | $155,250 | $89,967 | $95 | $245,312 |
| 2011 | $114,603 | $89,970 | $670,656 | $875,229 |
| 2010 | $161,500 | $90,586 | $95 | $252,181 |
| 2009 | $145,750 | $89,981 | $95 | $235,826 |
| 2008 | $140,750 | $68,667 | $95 | $209,512 |
| 2007 | $138,500 | $64,000 | $95 | $202,595 |
| 2006 | $126,500 | $48,000 | $95 | $174,595 |

Defendant Cox is a citizen of California.

44. Defendant Barry Lawson Williams ("Williams") is a PG&E director and has been since 1996 and a PG&EC director and has been since 1990. Defendant Williams is also Chairman of the Audit Committees of PG&E and PG&E Corp. and has been since at least March 2005 and a member of those committees and has been since March 2003. Defendant Williams is a member of PG&E's Compensation Committee and has been since at least March 2005 and a member of PG&E's Finance Committee and has been since at least March 2004. Due to the Company's extensive gas distribution and transmission line operations, defendant Williams knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Williams

1 also knew that, under the CPUC and PHMSA regulations, PG&E is required to

2 implement an internal control system to ensure the implementation of an IMP to

3 ensure the identification and remediation of risks to the Company's pipelines in areas

4 that could affect human safety. In his capacity as a director, defendant Williams was

5 specifically charged with overseeing the Company's risk management practices,

6 including ensuring compliance with an IMP.  Defendant Williams knowingly or

7 recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to

8 implement and/or maintain adequate internal controls with respect to the Company's

9 compliance with CPUC and PHMSA regulations.  Williams also approved and

10 supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant

11 Williams the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2014 | $170,189 | $104,984 | - | $2,596 | $277,769 |
| 2013 | $165,500 | $104,986 | - | $2,596 | $273,082 |
| 2012 | $153,000 | $89,967 | - | $893 | $243,860 |
| 2011 | $208,500 | $89,970 | - | $2,095 | $300,565 |
| 2010 | $170,500 | $90,856 | - | $2,595 | $263,681 |
| 2009 | $149,250 | $89,981 | - | $2,595 | $241,826 |
| 2008 | $171,750 | $68,667 | $25,106 | $2,595 | $268,118 |
| 2007 | $149,500 | $64,000 | $38,251 | $95 | $251,846 |
| 2006 | $137,500 | $18,000 | $51,849 | $2,595 | $209,944 |

Defendant Williams is a citizen of California.

18        45.     Defendant Barbara L. Rambo ("Rambo") is a PG&E and PG&E Corp.

19 director and has been since January 2005. Defendant Rambo is also Chairman of

20 PG&E's Finance Committee and has been since May 2008 and a member of that

21 committee and has been since January 2005.  Defendant Rambo is a member of

22 PG&E's Compensation Committee and has been since January 2005 and was

23 Chairman of that committee from May 2011 to September 2011.  Due to the

24 Company's extensive gas distribution and transmission line operations, defendant

25 Rambo knew that PG&E was subject to regulation from the CPUC and PHMSA

26 guidelines for operators of natural gas pipelines in areas that could affect human

27 safety. Defendant Rambo also knew that, under the CPUC and PHMSA regulations,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    PG&E is required to implement an internal control system to ensure the

2    implementation of an IMP to ensure the identification and remediation of risks to the

3    Company's pipelines in areas that could affect human safety.  In her capacity as a

4    director, defendant Rambo was specifically charged with overseeing the Company's

5    risk management practices, including ensuring compliance with an IMP. Defendant

6    Rambo knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA

7    regulations by failing to implement and/or maintain adequate internal controls with

8    respect to the Company's compliance with CPUC and PHMSA regulations. Rambo also

9    approved and supported the underfunding of PG&E's pipeline and operations. PG&E

10   paid defendant Rambo the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $115,500 | $104,984 | $96 | $220,580 |
| 2013 | $103,250 | $104,986 | $2,596 | $210,832 |
| 2012 | $105,250 | $89,967 | $3,393 | $198,610 |
| 2011 | $164,939 | $89,970 | $95 | $255,004 |
| 2010 | $116,750 | $90,586 | $95 | $207,431 |
| 2009 | $101,000 | $89,981 | $95 | $191,076 |
| 2008 | $95,750 | $73,500 | $95 | $169,345 |
| 2007 | $88,500 | $39,333 | $95 | $127,928 |
| 2006 | $76,500 | $30,000 | $95 | $106,595 |

16   Defendant Rambo is a citizen of Massachusetts.

17        46.    Defendant Maryellen C. Herringer ("Herringer") is a PG&E and PG&E

18   Corp. director and has been since October 2005. Defendant Herringer was also PG&E

19   and PG&E Corp.'s interim Lead Director and PG&E Corp.'s interim non-executive

20   Chairman of the Board from May 2011 to September 2011.  Defendant Herringer is a

21   member of the Audit Committees of PG&E and PG&E Corp. and has been since

22   January 2006 and was also a member of PG&E's Public Policy Committee from

23   January 2006 to at least March 2007. Due to the Company's extensive gas distribution

24   and transmission line operations, defendant Herringer knew that PG&E was subject

25   to regulation from the CPUC and PHMSA guidelines for operators of natural gas

26   pipelines in areas that could affect human safety. Defendant Herringer also knew

27   that, under the CPUC and PHMSA regulations, PG&E is required to implement an

28

- 20 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In her capacity as a director, defendant Herringer was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP. Defendant Herringer knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations. Herringer also approved and supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant Herringer the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2014 | $120,500 | $104,984 | - | $2,596 | $228,080 |
| 2013 | $122,000 | $104,986 | - | $2,596 | $229,582 |
| 2012 | $107,750 | $9,967 | - | $2,595 | $200,312 |
| 2011 | $169,434 | $89,970 | - | $2,595 | $261,999 |
| 2010 | $115,750 | $90,856 | - | $2,595 | $208,931 |
| 2009 | $96,250 | $89,981 | - | $2,595 | $188,826 |
| 2008 | $114,250 | $47,000 | $4,346 | $2,595 | $168,191 |
| 2007 | $77,500 | $26,250 | $3,617 | $2,595 | $109,962 |
| 2006 | $73,500 | $9,750 | $5,077 | $95 | $88,422 |

Defendant Herringer is a citizen of California.

47. Defendant Richard A. Meserve ("Meserve") is a PG&E and PG&E Corp. director and has been since December 2006. Defendant Meserve is also a member of PG&E's Public Policy Committee and has been since February 2007. Due to the Company's extensive gas distribution and transmission line operations, defendant Meserve knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Meserve also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Meserve was specifically charged with overseeing the Company's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

risk management practices, including ensuring compliance with an IMP. Defendant Meserve knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations. Meserve also approved and supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant Meserve the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $117,250 | $104,984 | $2,596 | $224,830 |
| 2013 | $105,000 | $104,986 | $2,596 | $212,582 |
| 2012 | $103,500 | $89,967 | $2,595 | $196,062 |
| 2011 | $104,707 | $89,970 | $1,095 | $195,772 |
| 2010 | $84,750 | $90,586 | $1,595 | $176,931 |
| 2009 | $81,250 | $89,981 | $1,095 | $172,326 |
| 2008 | $79,750 | $32,667 | $1,095 | $113,512 |
| 2007 | $67,500 | $16,000 | $95 | $83,595 |
| 2006 | $3,217 | - | $3 | $3,220 |

Defendant Meserve is a citizen of Virginia.

48.     Defendant Roger H. Kimmel ("Kimmel") is a PG&E and PG&E Corp. director and has been since January 2009. Defendant Kimmel is also a member of PG&E's Public Policy Committee and has been since April 2009 and a member of PG&E's Finance Committee and has been since May 2009. Due to Company's extensive gas distribution and transmission line operations, defendant Kimmel knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Kimmel also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Kimmel was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP.  Defendant Kimmel knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

compliance with CPUC and PHMSA regulations. Kimmel also approved and supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant Kimmel the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Option Awards | Other Compensation | Total |
|---|---|---|---|---|---|
| 2014 | $107,250 | $104,984 | - | $96 | $212,330 |
| 2013 | $91,500 | $104,986 | - | $96 | $196,582 |
| 2012 | $84,750 | $89,967 | - | $95 | $174,812 |
| 2011 | $102,250 | $89,970 | - | $95 | $192,315 |
| 2010 | $95,250 | $90,856 | - | $95 | $185,931 |
| 2009 | $88,250 | $67,481 | $24,336 | $95 | $180,162 |

Defendant Kimmel is a citizen of Connecticut.

49.    Defendant Lewis Chew ("Chew") is a PG&E and PG&E Corp. director and has been since September 2009. Defendant Chew is also a member of the Audit Committees of PG&E and PG&E Corp. and a member of PG&E's Public Policy Committee and has been since September 2009. Due to the Company's extensive gas distribution and transmission line operations, defendant Chew knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Chew also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Chew was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP, Defendant Chew knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations. Chew also approved and supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant Chew the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $110,000 | $104,984 | $2,596 | $217,580 |
| 2013 | $112,612 | $104,986 | $2,596 | $220,194 |
| 2012 | $92,500 | $89,967 | $2,595 | $185,062 |
| 2011 | $116,500 | $89,970 | $2,595 | $209,065 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 2010 | $101,250 | $90,586 | $95 | $191,931 |
| 2009 | $27,492 | - | $24 | $27,516 |

Defendant Chew is a citizen of California.

50.     Defendant Peter A. Darbee ("Darbee") was PG&E's CEO from January 2005 to April 2011; President from January 2005 to June 2007 and from September 2007 to April 2011; Chairman of the Board from January 2006 to April 2011; and a director from January 2005 to April 2011. Defendant Darbee was also PG&E Corp.'s President and CEO from September 2008 to July 2009; Chairman of the Board from January 2006 to May 2007; and a director from January 2005 to April 2011. Defendant Darbee was PG&E's Senior Vice President and CFO from September 1999 to December 2004. Due to the Company's extensive gas distribution and transmission line operations, defendant Darbee knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Darbee also knew that, under the CPUC and PHMSA regulations, PG&E was required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Darbee was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP. Defendant Darbee knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations.  Darbee was listed as one of the government's expected witnesses for the criminal trial set to commence on March 22, 2016.  Darbee also approved and supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant Darbee the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | LTIP Payouts | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | $488,896 | - | $4,435,855 | - | - | $4,116,160 | - | $50,993 | $9,091,904 |
| 2010 | $1,182,160 | | $4,966,124 | - | - | $2,137,343 | - | $107,759 | $8,393,385 |
| 2009 | $1,135,633 | - | $6,285,392 | - | $1,871,524 | $1,131,494 | - | $135,385 | $10,559,428 |
| 2008 | $1,090,833 | - | $5,733,999 | - | $1,285,002 | $1,461,189 | - | $150,210 | $9,721,233 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 2007 | $1,050,000 | - | $5,283,601 | | $1,250,550 | $1,295,034 | - | $174,364 | $9,053,549 |
| 2006 | $975,000 | - | $3,666,389 | $60,092 | $1,486,900 | $1,028,440 | - | $230,237 | $7,990,058 |
| 2005 | $850,000 | $1,239,300 | $827,481 | - | - | - | $3,472 | $217,385 | $3,137,638 |
| 2004 | $525,000 | $585,926 | $372,506 | - | - | - | $366,928 | $28,190 | $1,878,550 |

Defendant Darbee is a citizen of California.

51.     Defendant David M. Lawrence ("Lawrence") was a PG&E director from 1996 to April 2005 and a PG&E Corp. director from 1995 to April 2005. Defendant Lawrence was also a member of PG&E's Compensation Committee and Public Policy Committee from at least March 2003 to April 2005. Due to Company's extensive gas distribution and transmission line operations, defendant Lawrence knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety.  Defendant Lawrence also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Lawrence was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP. Defendant Lawrence knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations. Lawrence also approved and supported the underfunding of PG&E's pipeline and operations. Defendant Lawrence is a citizen of California.

52.     Defendant Fred J. Fowler ("Fowler") has been a director since March 1, 2012. Fowler is the retired President and CEO of Spectra Energy Corp., formerly Duke Energy Gas. He is currently Chairman of the Board of Spectra Energy Partners, which owns extensive natural gas assets. Since his election to the Board, Fowler has served on the Company's Nuclear, Operations, and Safety Committee and the Company's Finance Committee. Due to Company's extensive gas distribution and transmission line operations, defendant Fowler knew that PG&E was subject to regulation from the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Fowler also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Fowler was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP. Defendant Fowler knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations.  Fowler also approved and supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant Fowler the following compensation as an executive:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $93,250 | $104,984 | $96 | $198,330 |
| 2013 | $86,250 | $104,986 | $96 | $191,332 |
| 2012 | $66,935 | $89,967 | $71 | $156,973 |

Defendant Fowler is a citizen of North Carolina.

53.    Defendant Richard C. Kelly ("Kelly") has been a director since June 2013. Since his election to the Board, Kelly has served on the Company's Audit Committee and Nuclear, Operations, and Safety Committee.  He previously served as Chairman and Chief Executive Officer of Xcel Energy Inc. from 2005 to 2011. Prior to that, Mr. Kelly held various executive positions at Xcel, including President, Chief Operating Officer, and Chief Financial Officer. Before the merger forming Xcel Energy Inc. in 2000, he held a variety of finance-related positions at predecessor companies New Century Energies and Public Service of Colorado; Canadian Pacific Railway (transcontinental railway in Canada and the United States) (2006 to 2014); and Xcel Energy Inc. (2004 to 2011). Mr. Kelly is former Chairman of the Edison Electric Institute, a former board member of the Electric Power Research Institute and the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Nuclear Energy Institute, and a former member of the National Petroleum Council

2   and the National Advisory Council of the National Renewable Energy Laboratory. Mr.

3   Kelly also was a director of BrightSource Energy, Inc. (solar thermal technology

4   company) from 2011 to 2012. Due to Company's extensive gas distribution and

5   transmission line operations, defendant Kelly knew that PG&E was subject to

6   regulation from the CPUC and PHMSA guidelines for operators of natural gas

7   pipelines in areas that could affect human safety. Defendant Kelly also knew that,

8   under the CPUC and PHMSA regulations, PG&E is required to implement an internal

9   control system to ensure the implementation of an IMP to ensure the identification

10  and remediation of risks to the Company's pipelines in areas that could affect human

11  safety. In his capacity as a director, defendant Kelly was specifically charged with

12  overseeing the Company's risk management practices, including ensuring compliance

13  with an IMP.  Defendant Kelly knowingly or recklessly allowed PG&E to violate the

14  CPUC and PHMSA regulations by failing to implement and/or maintain adequate

15  internal controls with respect to the Company's compliance with CPUC and PHMSA

16  regulations.  Kelly also approved and supported the underfunding of PG&E's pipeline

17  and operations. PG&E paid defendant Kelly the following compensation as an

18  executive:

19

20

| Fiscal Year | Fees Paid In Cash | Stock Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $101,750 | $104,984 | $96 | $206,830 |
| 2013 | $63,479 | - | $48 | $63,527 |

21  Upon information and belief, Defendant Kelly is a citizen of Minnesota.

22       54.    Defendant Rosendo Parra ("Parra") has been a director since 2009. Due to

23  Company's extensive gas distribution and transmission line operations, defendant

24  Parra knew that PG&E was subject to regulation from the CPUC and PHMSA

25  guidelines for operators of natural gas pipelines in areas that could affect human

26  safety. Defendant Parra also knew that, under the CPUC and PHMSA regulations,

27  PG&E is required to implement an internal control system to ensure the

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   implementation of an IMP to ensure the identification and remediation of risks to the

2   Company's pipelines in areas that could affect human safety. In his capacity as a

3   director, defendant Parra was specifically charged with overseeing the Company's risk

4   management practices, including ensuring compliance with an IMP.  Defendant Parra

5   knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations

6   by failing to implement and/or maintain adequate internal controls with respect to the

7   Company's compliance with CPUC and PHMSA regulations.  Parra also approved and

8   supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant

9   Parra the following compensation as an executive:

10

| Fiscal Year | Fees Paid In Cash | Stock Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $107,250 | $104,984 | $96 | $212,330 |
| 2013 | $95,000 | $104,986 | $2,596 | $202,582 |
| 2012 | $90,000 | $89,967 | $2,595 | $182,562 |
| 2011 | $112,750 | $89,970 | $2,595 | $205,315 |
| 2010 | $91,750 | $90,586 | $95 | $182,431 |
| 2009 | $28,242 | - | $24 | $28,266 |

14   Defendant Parra is a citizen of Texas.

15       55.    Defendant Anne Shen Smith ("Smith") has been a director of PG&E and

16   PG&E Corp. since February 2015. Ms. Smith served as Chairman and Chief Executive

17   Officer of Southern California Gas Company (SoCalGas) (natural gas utility), a

18   subsidiary of Sempra Energy, from 2012 until her retirement in March 2014. She also

19   has held various other executive positions at SoCalGas, including President, Chief

20   Operating Officer, Senior Vice President - Customer Services, and Vice President of

21   Environment and Safety. Ms. Smith also served as Senior Vice President - Customer

22   Services of San Diego Gas & Electric Company, an energy utility that is also owned by

23   Sempra Energy. Since February 2015, Ms. Smith has served on the Company's

24   Nuclear, Operations, and Safety Committee, and the Company's Public Policy

25   Committee.  Due to the Company's extensive gas distribution and transmission line

26   operations, defendant Smith knew that PG&E was subject to regulation from the

27   CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that

28   could affect human safety. Defendant Smith also knew that, under the CPUC and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  PHMSA regulations, PG&E is required to implement an internal control system to

2  ensure the implementation of an IMP to ensure the identification and remediation of

3  risks to the Company's pipelines in areas that could affect human safety. In her

4  capacity as a director, defendant Smith was specifically charged with overseeing the

5  Company's risk management practices, including ensuring compliance with an IMP.

6  Defendant Smith knowingly or recklessly allowed PG&E to violate the CPUC and

7  PHMSA regulations by failing to implement and/or maintain adequate internal

8  controls with respect to the Company's compliance with CPUC and PHMSA

9  regulations.  Smith also approved and supported the underfunding of PG&E's pipeline

10  and operations. Defendant Smith is a citizen of California.

11       56.     Defendant Forrest E. Miller ("Miller") has been a director of PG&E and

12  PG&E Corp. since December 30, 2008. At all relevant times, Miller has served on the

13  Company's Audit, Compensation, and Executive Committees.  Prior to serving as

14  Group President-Corporate Strategy and Development of AT&T Inc. (2007 to 2012),

15  Mr. Miller served as Group President of AT&T Corp., the Global Enterprise division of

16  AT&T Inc., and held a variety of executive positions at SBC Communications

17  (communications holding company) and its predecessor Pacific Telesis Group. Due to

18  the Company's extensive gas distribution and transmission line operations, defendant

19  Miller knew that PG&E was subject to regulation from the CPUC and PHMSA

20  guidelines for operators of natural gas pipelines in areas that could affect human

21  safety.  Defendant Miller also knew that, under the CPUC and PHMSA regulations,

22  PG&E is required to implement an internal control system to ensure the

23  implementation of an IMP to ensure the identification and remediation of risks to the

24  Company's pipelines in areas that could affect human safety. In his capacity as a

25  director, defendant Miller was specifically charged with overseeing the Company's risk

26  management practices, including ensuring compliance with an IMP.  Defendant Miller

27  knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations

28  by failing to implement and/or maintain adequate internal controls with respect to the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's compliance with CPUC and PHMSA regulations. Miller also approved and supported the underfunding of PG&E's pipeline and operations. PG&E paid defendant Miller the following compensation as an executive:

| Fiscal Year | Fees Paid In Cash | Stock Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $133,618 | $104,984 | $96 | $238,698 |
| 2013 | $106,750 | $104,986 | $96 | $211,832 |
| 2012 | $92,500 | $89.967 | $95 | $182,562 |
| 2011 | $125,250 | $89,970 | $95 | $215,315 |
| 2010 | $95,000 | $90,586 | $95 | $185,681 |
| 2009 | $65,250 | $67,481 | $95 | $157,162 |

Defendant Miller is a citizen of Texas.

57.     The defendants identified in ¶¶ 31, 34, 38-42 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶ 43-56 are referred to herein as the "Director Defendants." Collectively, the Officer Defendants and the Director Defendants are referred to herein as the "Individual Defendants."

## V.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     The Individual Defendants Are Responsible For Ensuring PG&E's Compliance with California and Federal Safety Regulations

58.     PG&E is a public utility and thus subject to extensive state and federal regulation. In California, rules promulgated by the California Public Utility Commission ("CPUC") govern the operation of gas pipelines. The rules are codified in General Order 112E, State of California Rules Governing Design, Construction, Testing, Operation, and Maintenance of Gas Gathering, Transmission, and Distribution Piping Systems, dated September 11, 1995.

59.     Federal law dictates how gas pipelines should be built and operated, while allowing states to adopt additional requirements. The federal government delegates significant enforcement responsibilities to the states. In California, regulatory and enforcement authority rests with the CPUC.

60.     PHMSA is an agency within the Department of Transportation ("DOT") that is responsible for ensuring that pipeline operators, such as PG&E, operate safely. Pub. L. 108-426, 118 Stat. 2423 (Nov. 30, 2004). PHMSA is responsible for pipeline

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  safety regulations and enforcement. In California, the CPUC is primarily responsible

2  for enforcement of safety regulations.

3       61.    PHMSA regulations make operators of gas transmission pipelines

4  affecting a "high consequence area" ("HCA"), *e.g.* densely populated areas, responsible

5  for assessing and ensuring the integrity of their pipelines. The regulations are

6  designed to prevent the type of catastrophic incidents that occurred in Rancho

7  Cordova in 2008 and San Bruno in 2010. ***Operators are required to develop and***

8  ***adopt a written integrity management program ("IMP")*** that addresses the risks

9  on each segment of the pipeline.

10       62.    As a result of their status as officers and directors of the Company, the

11  Individual Defendants owed fiduciary duties to ensure that the Company complied

12  with the federal and state laws regulating its business.  Indeed, the business judgment

13  rule requires officers and directors to ***fully inform themselves*** of all material facts

14  before taking action on behalf of the Company.

15      **B.**    **The Individual Defendants Also Owed Duties to the Company**
                 **With Respect to Pipeline Safety Due to Their Membership on**

16                   **Various Board Committees**

17       63.    As set forth herein, many of the Individual Defendants served as

18  members of the Company's Board Committees during the Relevant Period.  Each

19  committee had specific duties, as set forth in the Company's Proxy Statement, as

20  described below.[7] For each of these committees, the applicable company's Board has

21  adopted a formal charter that sets forth the committee's duties and responsibilities;

22  the charters are available on the companies' websites.

| COMMITTEE NAME | COMPANY | PRIMARY DUTIES/SCOPE OF RESPONSIBILITY |
|---|---|---|
| **Executive** | PG&E Corporation and Utility | Exercises powers and performs duties of the applicable Board, subject to limits imposed by state law. |

---

[7]    Where a Committee exists at PG&E Corporation only, that committee's responsibilities include assisting and advising the Utility Board on matters within the Committee's scope of responsibility.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Audit[1] | PG&E Corporation and Utility | Oversees:<br>●Integrity of the company financial statements, and financial and accounting practices<br>●Internal controls, and external and internal auditing programs<br>●Selection and oversight of the companies' independent registered public accounting firm ("independent auditor")<br>●Business ethics and compliance<br>●Related party transactions<br>●With the assistance of other board committees, risk management and assessment |
|---|---|---|
| Compensation | PG&E Corporation | Oversees matters relating to compensation and benefits, including:<br>●Compensation for non-employee directors<br>●Development, selection, and compensation of policy-making officers<br>●Management evaluation and officer succession<br>●Employment, compensation, and benefits policies and practices<br>●Potential risks arising from compensation policies and practices<br>●Retention and oversight of the Committee's independent compensation consultants, legal counsel, or other advisors |
| Finance | PG&E Corporation | Oversees matters relating to financial planning, policies, and risk, including:<br>●Strategic plans and initiatives<br>●Financial and investment plans and strategies(2)<br>●Dividend policy<br>●Proposed capital projects and divestitures<br>●Financing plans<br>●Use of derivative instruments<br>●Major commercial banking, investment banking, financial consulting, insurance, and other financial relationships<br>●Major financial risk exposures |
| Nominating and Governance | PG&E Corporation | Oversees matters relating to selection of directors and corporate governance, including:<br>●Recommending Board candidates, including reviewing skills and characteristics required of Board members<br>●Selection of the chairmanship and membership of Board committees, and the nomination of a lead director of each company's Board, if necessary<br>●Corporate governance matters, including the companies' governance principles and practices, and the review of shareholder proposals<br>●Evaluation of the Boards' performance and effectiveness |
| Nuclear, Operations, and Safety | PG&E Corporation | Oversees matters relating to safety, operational performance, and compliance issues related to the Utility's nuclear, generation, gas and electric transmission, and gas and electric distribution operations and facilities ("Operations and Facilities"), |

| | | including:<br>●Principal risks arising out of the Operations and Facilities, the process used by management to analyze and identify these risks, and the effectiveness of programs to manage or mitigate these risks<br>●Utility's goals, programs, policies, and practices with respect to promoting a strong safety culture<br>●Periodically visiting the Utility's nuclear and other operating facilities |
|---|---|---|
| **Public Policy** | PG&E Corporation | Oversees public policy, sustainability, and corporate responsibility issues that could affect customers, shareholders, or employees, including:<br>●Environmental protection, quality, and compliance<br>●Community investment programs, activities, and contributions<br>●Political contributions and political activities<br>●Workforce diversity, inclusion, and development<br>●Supplier diversity |

(2) Each year, the Finance Committee presents for the PG&E Corporation and Utility Boards' review and concurrence (1) a multi-year outlook for PG&E Corporation and its subsidiaries that, among other things, summarizes projected financial performance and establishes the basis for the annual budget, and (2) an annual financial performance plan that establishes financial objectives and sets operating expense and capital spending budgets that reflect the first year of the approved multi-year outlook. Members of the Boards receive a monthly report that compares actual to budgeted financial performance and provides other information about financial performance.

64.    The current membership of PG&E Corporation's and the Utility's standing Board committees is shown in the table below.[8]

| | Executive Committees | Audit Committees | Compensation Committee | Finance Committee | Nominating And Governance Committee | Nuclear, Operations, and Safety Committee | Public Policy Committee |
|---|---|---|---|---|---|---|---|
| *Independent Non-Employee Directors*: | | | | | | | |
| L. Chew(1) | X | X | | | | | X* |
| F. J. Fowler | | | | X | | X | |
| M. C. Herringer | X | X | X | | X* | | |
| R. C. Kelly(1) | | X | | | | X | |
| R. H. Kimmel | | | | X | X | | X |
| R. A. Meserve | X | | | | X | X* | X |
| F. E. Miller(1) | X | X* | X | | | | |

[8]    *See* PG&E Proxy Statement filed Mar. 25, 2015, at p. 15.

- 33 -

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| R. G. Parra | | | | X | X | X | |
| B. L. Rambo | X | | X | X* | X | | |
| A. S. Smith | | | | | | X | X |
| B. L. Williams[1][2] | X | X | X* | X | | | |
| *Employee Directors*: | | | | | | | |
| A. F. Earley, Jr. | X* | | | | | | |
| C. P. Johns[3] | X | | | | | | |
| Number of Meetings in 2014 (PG&E Corporation/Utility where applicable) | 0/0 | 5/5 | 5 | 5 | 7 | 5 | 4 |

\*   Committee Chair

(1) Independent audit committee financial expert, as defined by the Securities and Exchange Commission ("SEC") and applicable stock exchanges, and as determined by the Boards. Background information on each audit committee financial expert can be found in the director biographies beginning on page 4.

(2) Independent lead director of PG&E Corporation and independent non-executive Chairman of the Board of the Utility.

(3) Member of the Utility Executive Committee only.

### C.    Management and the Board's Duties to the Company

65.    Moreover, all Individual Defendants, by reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of PG&E, owed PG&E and its shareholders fiduciary obligations of good faith, loyalty, candor, and care and were and are required to use their utmost ability to control and manage PG&E in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefits. Each director and officer of the Company owes to PG&E and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

66.    The Individual Defendants, because of their positions of control and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

67.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Company were required to, among other things:

- exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

- exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

- when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

68.     In addition, certain Individual Defendants assumed enhanced duties and responsibilities through their membership on the Audit Committee. The responsibilities of members of that committee includes: reviewing the adequacy of internal controls, external and internal auditing programs, business ethics, and compliance with laws, regulations, and policies that may have a material impact on the consolidated financial statements.

## VI.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  rise to primary liability, the Individual Defendants further aided and abetted and/or

2  assisted each other in breaching their respective duties.

3        70.    During all times relevant hereto, the Individual Defendants, collectively

4  and individually, initiated a course of conduct that was designed to and did enhance

5  the Individual Defendants' executive and directorial positions at the Company and the

6  profits, power, and prestige that the Individual Defendants enjoyed as a result of

7  holding these positions. In furtherance of this plan, conspiracy, and course of conduct,

8  the Individual Defendants, collectively and individually, took the actions set forth

9  herein.

10        71.    Each of the Individual Defendants aided and abetted and rendered

11  substantial assistance in the wrongs complained of herein. In taking such actions to

12  substantially assist the commission of the wrongdoing complained of herein, each

13  Individual Defendant acted with knowledge of the primary wrongdoing, substantially

14  assisted the accomplishment of that wrongdoing, and was aware of his or her overall

15  contribution to and furtherance of the wrongdoing.

16        **VII.   CONTINUING COURSE OF CONDUCT, FRAUDULENT**
          **CONCEALMENT AND EQUITABLE TOLLING**
17

18        72.    During the Relevant Period, Defendants engaged in a continuing course

19  of conduct which continues to the present.  During the entire Relevant Period, and

20  currently, Defendants have engaged in a continuous course of conduct designed to

21  breach their fiduciary duties, harm PG&E, and benefit themselves at the expense of

22  PG&E.  That continuing course of conduct has included all the acts and omissions

23  alleged herein, including causing PG&E to underspend on pipeline safety and

24  maintenance, consciously ignore urgent needs for pipeline maintenance, engage in

25  misleading conduct with respect to investigations of the San Bruno explosion and

26  other safety violations, destroy documents, retaliate against employees who

27  recommended conduct designed to bring PG&E into compliance with the law, make

28  misrepresentations to shareholders of the Company regarding the effectiveness of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Board oversight of management and the appropriateness of shareholder proposals,

2   and obstruct the NTSB investigation.  Plaintiff did not discover and could not have

3   discovered, through the exercise of due diligence, Defendants' breaches of their

4   fiduciary duties or their violations of California law because Defendants did not

5   disclose, and actively concealed, the full extent of their wrongdoing.

6       73.    Plaintiff was unaware of and had no knowledge of Defendants'

7   obstruction of the NTSB investigation.  Similarly, Plaintiff was unaware of and had no

8   knowledge of Defendants' conduct in causing PG&E to order employees to destroy

9   documents relevant to the San Bruno explosion.  This misconduct was not capable of

10  discovery until at least July 1, 2014, when the government filed a Superseding

11  Indictment against PG&E which asserted a new criminal charge of obstruction of

12  justice.  Moreover, even then, the documents publicly available were not sufficient to

13  adequately apprise Plaintiff of the specific role of each defendant named herein in the

14  wrongdoing.

15      74.    Plaintiff could not have discovered Defendants' breaches of fiduciary

16  duties and violations of law prior to filing suit because Defendants made absolutely no

17  disclosure of their wrongdoing in the Company's public filings.

18      75.    Moreover, Defendants not only failed to disclose any information

19  whatsoever that would have allowed Plaintiff, exercising due diligence, to discover the

20  unlawful conduct, but Defendants also intentionally concealed and attempted to

21  disguise the unlawful conduct to avoid detection.  Such conduct included, among other

22  things, destroying documents and instructing employees to obstruct investigations

23  into the wrongdoing.

## VIII.  SUBSTANTIVE ALLEGATIONS

### A.  The Individual Defendants Instilled a Culture of Putting Profits Before Safety

#### 1.  PG&E misappropriated millions from customers and consistently cut its budget for maintenance of transmission and distribution lines

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

76.     During the Relevant Period, PG&E collected hundreds-of-millions of dollars from customers for pipeline and infrastructure maintenance and safety. Instead of spending such money on pipeline safety improvements, however, the Individual Defendants caused PG&E to funnel the money to PG&E Corp.  At the same time, PG&E Corp. maintained quarterly cash dividends for common stock and cash dividends from retained earnings, repurchased stock, and/or provided bonuses or "incentives" to management and employees.  In other words, instead of ensuring that PG&E had a solid and well-maintained infrastructure that would be safe and dependable for years to come, PG&E left itself vulnerable to an increased risk of a catastrophic event at the same time the Individual Defendants approved lavish executive bonuses and put the funds that were allocated to infrastructure maintenance and safety to other uses. In particular, PG&E purportedly charged its customers $5 million to fix the San Bruno pipeline in 2009, but delayed the repair, citing other priorities. That same year, PG&E spent $5 million on executive bonuses.

77.     PG&E consistently cut its budget for maintenance of transmission and distribution lines and other key infrastructure. Transmission pipelines are the major pipelines that traverse the State of California. These are high pressure steel pipes that carry gas from power stations.

78.     Distribution pipelines are the smaller steel pipes that connect to the transmission pipelines and carry gas to individual locations, such as homes and businesses. This network of pipelines has been in operation for decades and requires constant maintenance to ensure that they are safe.

79.     PG&E has internal departments that are specifically responsible for handling these pipelines. For example, one department would have experts, employees, and staff who were focused on proper recordkeeping, assessments, and maintenance of the transmission pipelines, and another department would be responsible for the distribution pipelines.

80.     Each year, these departments would determine how much money was

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    needed for evaluation, testing, maintenance and/or repairs of transmission and

2    distribution lines.  These internal departmental budgets would go up the management

3    chain all the way to the Defendant directors and officers who were responsible for

4    formulating a central budget.  These Defendants routinely cut the budgets of these

5    departments without any legitimate engineering basis for believing that the budgets

6    were too high and were not necessary to maintain the pipelines.  Rather, these

7    Defendants routinely cut these budgets simply to increase PG&E's reported profits.

8    This was done to benefit the Individual Defendants and ensure that they remained in

9    their positions at PG&E and continued to reap substantial personal gain from their

10   positions.

11        81.     Furthermore, year after year, PG&E misrepresented to the CPUC the

12   amount of funds necessary to maintain PG&E's infrastructure.  PG&E is required to

13   make presentations to the CPUC about its needs in order to obtain monetary and other

14   assistance from the CPUC in order to ensure that PG&E has the financial resources to

15   maintain its pipeline network and infrastructure.  For example, PG&E's presentations

16   to the CPUC affect the rates that PG&E can charge its customers.  However, for years,

17   PG&E misrepresented the amount of money it would allot to operational and

18   maintenance needs.

19        82.     Budgeting decisions and CPUC funding requests were done through the

20   executive management committee with the oversight and final authority of the PG&E

21   Corp. and PG&E Boards of Directors.  The Individual Defendants in this case were the

22   top officers of PG&E Corp. and PG&E, members of the executive management

23   committee (which included both board members and officers) and the members of the

24   PG&E Corp. and PG&E Boards of Directors.  All of them knew of and approved

25   PG&E's budgeting for safety and maintenance, and that PG&E was diverting resources

26   purportedly pledged to safety, operations and maintenance to other corporate purposes.

27   The Individual Defendants consistently spent less and less money on operations and

28   maintenance, fully aware of the dangerous risks they were creating and the probable

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

dangerous consequences of their failure to address the risk of a catastrophic loss caused by PG&E's deficient transmission and distribution pipeline system.

**2.   PG&E employees were incentivized not to report or fix leaks**

83.     PG&E implemented an incentive program in which PG&E employees were given financial incentives not to report or fix leaks, or otherwise report any dangerous conditions that would cost PG&E money to fix. PG&E had a program in place in which supervisors and employees received bonuses for not reporting or fixing gas leaks that they found, and for keeping repair costs down. In other words, PG&E supervisors and employees had every incentive to pretend that leaks did not exist or perform the least amount of work to fix any leaks that were detected. This backwards incentive program is an example of the Defendants' "profits over safety" policies.

84.     This program resulted in the failure to detect a significant number of leaks, many of which were considered "serious" leaks.  This incentive program was not halted until the end of 2008, after the Rancho Cordova explosion.  In 2008, PG&E began rushing inspections of its gas pipeline network.  These surveys found many more leaks than had been detected in earlier surveys.

85.     According to the CPUC, virtually every leak survey that PG&E had conducted since 2004 was "not effective."  The CPUC found that because of PG&E's misconduct, the public would have to endure a "reduced level of safety" until the inspections were complete.

86.     Richard Kuprewicz, an independent pipeline safety expert, described PG&E's incentive system as "a big, big deal" and "major, major problem." Kuprewicz added that PG&E's bonus program was "training and rewarding people to do the wrong thing" and was emblematic of "a seriously broken process."  He went on to state that this "explains many of the systemic problems in this operation that contributed to the tragedy."

87.     This bonus program was created and approved by the PG&E and PG&E

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Corp. Boards of Directors in order to further the goal of cost reduction and short-term

2    profit maximization without concern about the long-term ramifications of this decision.

3    The Individual Defendants had intentionally and knowingly created a program in

4    which the risk of a catastrophic incident would increase dramatically.  Therefore, the

5    Individual Defendants breached and violated the fiduciary duties they owed to PG&E

6    and PG&E Corp.

7
8
             **3.**      **PG&E retaliated against and ignored allegations from a whistleblower warning of PG&E's low prioritization of safety**

9          88.     In August 2010, Mike Wiseman, a PG&E gas mechanic working on the

10   company's gas pipelines, filed a lawsuit against PG&E for retaliating against him for,

11   among other things, making a protected disclosure under Labor Code § 1102.5(c).

12   According to the lawsuit, Wiseman claims to have reported, and refused to participate

13   in, the many unsafe practices he observed while working on the company's gas

14   distribution system.

15          89.     In March 2009, Wiseman reported that PG&E workers at the Panoche

16   Road site were made to work in a ditch almost six feet deep, despite the fact that

17   PG&E failed to provide the workers with the required training manual, suitable

18   training, or proper equipment for the job. Wiseman also reported an incident in which a

19   supervisor forged a deficient root cause analysis, in an attempt to make it appear as if

20   it had been written by a qualified employee.  Wiseman also complained about the

21   falsification of safety records and other safety violations which are consistent with

22   PG&E's 2007 internal audit and the 2008 CPUC safety audit.

23          90.     Wiseman complained to PG&E's Director of California Gas Transmission,

24   who purportedly referred the complaint to PG&E's Equal Employment Opportunity

25   office, which took no action.  On November 5, 2009, Wiseman notified PG&E's Senior

26   Vice President and General Counsel of his legal claims against the company.  After

27   General Counsel learned of the complaints, which included serious allegations of safety

28   problems at PG&E, this should have been investigated pursuant to the company's Code

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    of Business Conduct and Ethics.  It apparently was not.

2        91.    Instead of treating Wiseman's concerns seriously, PG&E excluded him

3    from the weekly safety leader's conference calls, even though he was a safety leader.

4    This is another example of PG&E putting profits before safety, in line with the

5    expectations of the Individual Defendants and the policies they implemented.  In

6    addition, Wiseman was threatened with employee discipline, various forms of

7    retaliations, and ordered to submit to drug tests and psychiatric evaluations.

8        92.    In March 2012, PG&E Senior Gas Engineer Todd Arnett testified in a

9    deposition that gas system managers routinely ignored the concerns expressed by

10   PG&E employees that the company relied on incomplete and inaccurate records

11   contained in its geographic information system.  Arnett testified that, over the course

12   of several years, he raised the issue of poor data integrity to his supervisors, but his

13   concerns were ignored.  The presence of six "pups"[9] from an unknown source welded

14   together on the pipe segment which failed in San Bruno on September 9, 2010 would

15   have been noted on accurate geographic information system reports.  This would have

16   prevented the tragedy that occurred in September 2010.  According to experts, six pups

17   of unknown source welded together would have raised immediate red flags with

18   engineers.  However, because of PG&E's notoriously incomplete and inaccurate

19   recordkeeping, the defect went unreported.

20       93.    Internal company e-mails indicate the existence of flawed records for the

21   San Bruno pipeline.  A March 2009 e-mail from PG&E engineer Drew Kelly indicates

22   that there were "tons of errors" in the geographic information system for transmission

23   Lines 101, 109, and 132.  Those inaccurate records were relied upon to research long-

24   term management plans for Line 132.  In its August 2011 report, the NTSB expressed

25   concern that PG&E's geographic information system still contained a large percentage

26   of assumed, unknown or erroneous information.  That lack of complete or accurate

27   ───────────────
     [9]     "Pups" are short sections of pipe of 5 feet or less in length welded onto the
28   circumference of a  larger pipe.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    information prevented PG&E's IMP from being effective in preventing the San Bruno

2    disaster and continues to hamper the ability of PG&E to appropriately identify and

3    correct potential future disasters.

4           94.    The allegations of Wiseman, Arnett and Kelly about poor and inaccurate

5    record keeping at PG&E are consistent with the internal and external audits which

6    found falsification of records, poor record keeping, and failure to properly train and

7    equip workers.  Each of these incidents and reports were warnings that PG&E should

8    have paid attention to.  If PG&E had taken appropriate action in response to these

9    warnings, it could have prevented the San Bruno explosion.  The Individual

10   Defendants, through their mismanagement of PG&E, ignored serious red flags and

11   continue to operate PG&E in a dangerous and unsafe manner.

12          **4.    The Individual Defendants' culture of profits over
             safety have left ticking "time bombs" across Northern
13           California**

14          95.    PG&E's Senior Vice President of Engineering and Operations, who

15   oversaw PG&E's ERM program, confirmed that the formal ERM program fell under

16   the Chief Risk and Audit Officer but the operational ERM program (meaning day-to-

17   day risk management in the field) was under his purview.  He revealed that PG&E

18   already realized by the Spring of 2007 that it needed to "shift culture," develop greater

19   "operational discipline" and "build an integrity from top to bottom of the organization."

20   When that same official reviewed PG&E's Enterprise Risk Management Program for

21   Energy Delivery and Engineering and Operations shortly after joining PG&E in May of

22   2007, he concluded:  the program seemed "unactionable because almost everything is

23   broken . . . need to triage."  Presciently, he concluded that: ***PG&E lacks a well-***

24   ***defined documented risk policy/standard at the enterprise level.  One that***

25   ***explains PG&E's overall risk assessment methodology; defines the lines of***

26   ***business roles and responsibility; specifies the requirements for performing***

27   ***and documenting risks; links risk assessments to controls, self-assessment,***

28   ***reviews and audits; and specifies the requirements for metrics to track the***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   ***risks.***"   When the Senior Vice President of Engineering and Operations joined PG&E

2   in 2007, Defendants Darbee and Johns, on behalf of the PG&E Corp. and PG&E Boards

3   of Directors, informed him that PG&E's risk management protocols were woefully

4   deficient.

5   96.    Following the deadly gas pipeline explosion on September 9, 2010, in San

6   Bruno, PG&E has faced increasing demands to release internal company information

7   about any other dangerous sections of gas pipeline in northern and central California.

8   On September 20, 2010, PG&E reluctantly released a "top 100" list showing that

9   Northern Californians are sitting on a number of gas explosion "time bombs."  PG&E

10  refused repeated requests for the list of risky sites for days, invoking "security"

11  concerns.  PG&E changed its mind three days after state energy regulators ordered

12  PG&E to hand it over with the intent of making it public.

13  97.    The list shows high-priority pipeline segments clustered between

14  Livermore and Fremont, where significant ground movement during earthquakes is

15  likely.  Isolated segments also appear throughout the Bay Area, in or near highly

16  populated areas such as San Rafael, Novato, Napa, San Pablo, San Carlos, Menlo Park,

17  Stanford University, Milpitas, and San Jose.  However, only two of the sites on the list

18  have repairs or replacements underway.

19  98.    CPUC commissioner Paul Clanon acknowledged that the list contains a

20  collection of "high-risk" sites.  South San Francisco City Manager Barry Nagel told the

21  media that PG&E never told him about the risky sections of pipe sitting under the city:

22  "We found out about it in the newspaper."  The PG&E list was prepared based on data

23  from the end of 2009 and includes limited information about each of the dangerous

24  sections of gas pipeline, but it paints a frightening picture.

25  99.    Included in the list is a section of gas pipeline stretching several dozen

26  miles from Tracy in the San Joaquin Valley to South Fremont in the San Francisco Bay

27  Area that has been deemed the "highest risk" section.  This decrepit pipeline was

28  originally installed in 1930 and passes through several major population centers.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  PG&E said in a prior funding request that 10 segments of the Tracy-Fremont line (Line

2  107) have a "high likelihood of design materials initiated failure."

3      100.    On Line 107, there is an especially hazardous section 10 miles long

4  between Livermore and Sunol.  Company reports say the pipeline in this area is at risk

5  because of corrosion, aging materials and ground movement, according to the *Bay

6  Citizen*.  Doug Burkhart, who runs Livermore's Smith Denison Construction Company,

7  which works with gas pipes, told the *Bay Citizen* that such old pipes do not have

8  "cathodic protection" to resist corrosion like most pipes made since the late 1960s,

9  when regulators began to require such protection.

10     101.    Another six-mile stretch of gas pipeline between Salinas and Hollister is

11 included in PG&E's "top 100."  PG&E cites "poor quality welds and outdated, low

12 quality main line valves" - eerily similar to the issues associated with the San Bruno

13 explosion - as the reason for the section's inclusion.  This line was also installed 80

14 years ago and crosses the San Andreas Fault.  PG&E told the CPUC that the cost of

15 rerouting the line would be no more than $8.5 million.  This job, however, has been put

16 off until 2015.

17     102.    Among the most disturbing sections on the list are a length of 4.3 miles in

18 Fremont - classified by PG&E as the second-highest risk line in the Bay Area - and

19 another 8-mile long section between Ripon and Stockton, which the company calls "the

20 highest risk pipeline in the San Joaquin Valley."  Of this section, PG&E says, "the

21 consequence of failure makes the risks unacceptably high."  Unacceptably high risks,

22 however, have not, as a general rule been a strong motivator for PG&E to act.

23     103.    As evidence of PG&E's ingrained lack of concern about safety, the

24 individual who was tasked with evaluating the San Bruno explosion and determining

25 what steps could be taken to prevent future tragedies of this nature, Kirk Johnson,

26 admitted that he did not even read the entire NTSB post-explosion investigatory report

27 regarding the San Bruno explosion.  After the NTSB hearing, PG&E said it would "take

28 to heart" the findings of the NTSB "thorough and independent investigation" of the San

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Bruno explosion.  However, not only did Johnson fail to read the entire NTSB report, he was not sure what PG&E had done specifically in response to the NTSB report to prevent a future catastrophic incident.

**B.      The San Bruno Incident**

104.    PG&E is a pipeline operator that provides natural gas to customers through the use of over 6,000 miles of natural gas transmission pipelines and over 40,000 miles of distribution pipelines. Gas transmission pipelines are highly-pressurized, large-diameter lines that carry natural gas to smaller, less pressurized distribution pipelines that bring natural gas into homes, commercial buildings, and other facilities.

105.    The Relevant Period begins in 2003 because that was the year, as demonstrated below in detail, that PG&E began to intentionally take steps to circumvent and violate federal safety rules and record-keeping requirements applicable to its gas transmission lines and pipelines.

106.    Line 132 was a high-pressure gas transmission pipeline owned and operated by PG&E in the Northern District of California. Line 132 ran underground from Milpitas, California, to San Francisco, California, passing through the City of San Bruno, California.

107.    Line 132 was originally installed in or about and between 1944 and 1948 and consisted of hundreds of individual segments, the majority of which were in suburban or urban areas.

108.    On September 9, 2010, at approximately 6:11 p.m., a portion of Line 132 (Segment 180) ruptured in a residential neighborhood of the City of San Bruno (the "San Bruno explosion"). Gas escaping from the rupture ignited, causing a fire that killed eight people and injured 58 others.  The fire also damaged 108 homes, 38 of which were completely destroyed.

///

///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2

**C.      The Individual Defendants Caused PG&E to Violate California and Federal Safety Regulations, Subjecting the Company to Billions of Dollars in Damages and Fines**

3
4
5
6
7
8

109.    PG&E is a public utility and thus subject to extensive state and federal regulation. In California, rules promulgated by the California Public Utility Commission ("CPUC") govern the operation of gas pipelines.  The rules are codified in General Order 112E, State of California Rules Governing Design, Construction, Testing, Operation, and Maintenance of Gas Gathering, Transmission, and Distribution Piping Systems, dated September 11, 1995.

9
10
11
12

110.    Federal law dictates how gas pipelines should be built and operated, while allowing states to adopt additional requirements. The federal government delegates significant enforcement responsibilities to the states. In California, regulatory and enforcement authority rests with the CPUC.

13
14
15
16
17

111.    The Natural Gas Pipeline Safety Act of 1968 ("PSA") established minimum safety standards for pipeline transportation and for pipeline facilities.  The purpose of the PSA was to protect against risks to life or property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation.

18
19
20

112.    In 1970, pursuant to Chapter 601 of the PSA, the Secretary of Transportation issued regulations codified in Section 192 of Title 49 of the Code of Federal Regulations, Subparts A through M ("Section 192").

21
22
23

113.    In 1979, Congress amended the PSA to add criminal penalties for knowing and willful violations of any regulation or order issued pursuant to Chapter 601 of the PSA.  49 U.S.C. § 60123.

24
25

114.    PHMSA is an agency within the Department of Transportation ("DOT") that is responsible for ensuring that pipeline operators, such as PG&E, operate safely.

26
27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Pub. L. 108-426, 118 Stat. 2423 (Nov. 30, 2004).[10] PHMSA is responsible for pipeline safety regulations and enforcement. In California, the CPUC is primarily responsible for enforcement of safety regulations.

115.    PHMSA regulations make operators of gas transmission pipelines affecting a "high consequence area" ("HCA"), *e.g.* densely populated areas, responsible for assessing and ensuring the integrity of their pipelines. The regulations are designed to prevent the type of catastrophic incidents that occurred in Rancho Cordova in 2008 and San Bruno in 2010. ***Operators are required to develop and adopt a written integrity management program ("IMP")*** that addresses the risks on each segment of the pipeline.

116.    An IMP is required to include, among other things:

- A Baseline Assessment Plan that: identifies potential threats to each covered segment; identifies methods to assess integrity based on the threats identified for each covered segment (*e.g.*, internal inspection, pressure testing, direct assessment, or other technology); identifies a schedule for completing the assessments including the risk factors used in determining schedule priorities; contains a direct assessment plan, if applicable (including the gathering and integration of risk factor data, indirect examination or analysis to identify areas of suspected corrosion, direct examination of the pipeline in these areas, and post assessment evaluation) appropriate for the threats identified for the covered segments; and includes a procedure for ensuring that the baselines assessments are conducted in a manner that minimizes environmental and safety risks;

---

[10]    Congress amended the PSA by enacting the Pipeline Safety Improvement Act of 2002 ("PSIA"). The Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued the Gas Transmission Integrity Management regulations ("IM regulations"), 49 C.F.R. Part 192, referred to as Subpart 0, to implement the requirements of the PSIA.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Identification of threats to each covered segment, including by the use of data integration and risk assessment;

- Provisions for remediating conditions found during integrity assessments;

- A process for continual evaluation and assessment;

- A confirmatory direct assessment plan, if applicable;

- A process to identify and implement additional preventive and mitigative measures;

- A performance plan including the use of specific performance measures;

- Recordkeeping provisions;

- Quality Assurance process;

- A Communication Plan; and

- Procedures for providing to regulatory agencies copies of the risk analysis or integrity management program.

117.    A pipeline operator's IMP must document minimum qualification requirements for the following people: (i) supervisory personnel; (ii) persons who carry out integrity assessments and evaluate assessment results; and (iii) persons responsible for additional preventive and mitigative actions. A pipeline operator's IMP must also identify and evaluate all potential threats to the covered segment. The operator must collect and integrate data from the entire pipeline that could be relevant to the covered segment and conduct a risk assessment. If an operator identifies any of the following threats, it must take specific actions to address the threats:

- Third Party Damage - Operators must use data integration from the assessment of other threats to identify potential third party damage and take additional preventive and mitigative actions;

- Cyclic Fatigue - Operators must use cyclic fatigue analysis to

- 49 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

prioritize baseline assessments and reassessments;

• Manufacturing and Construction Defects - Operators must prioritize a segment containing manufacturing or construction defects as high risk segments unless it shows by analysis that the defect is stable and that the risk of failure is low;

• ERW [Electric Resistance Welded] Pipe - Covered segments containing low frequency electric resistance welded pipe or lap welded pipe must be prioritized as a high risk segment for the baseline assessment or reassessment, and assessed using technologies proved to be capable of assessing seam integrity and of detecting seam corrosion anomalies; and

• Corrosion - If corrosion is identified, all similar pipeline segments (both covered and non-covered) with similar coating and environmental characteristics must be evaluated and remediated, as necessary.

118. With respect to the Baseline Assessment Plan, the IM regulations required pipeline operators to prepare, no later than December 17, 2004, a Baseline Assessment Plan ("BAP") that identified all the pipeline operator's covered segments, the known or potential threats to each covered segment, the methods selected to assess the integrity of the pipeline for each covered segment, and deadlines for conducting an initial assessment and re-assessment.  49 C.F.R. § 192.919.

119. Thereafter, pipeline operators like PG&E were required to complete the baseline assessment of 50% of their covered segments beginning with the highest risk segments, by December 17, 2007 and 100% of their covered segments by December 17, 2012. High pressure gas pipelines (pipelines operating at above 30% SMYS ("Specified Minimum Yield Strength")) must be reassessed pursuant to an allowable reassessment method at least every seven years. 49 C.F.R. § 192.939(a).

120. Once the known and potential threats were identified on a covered

- 50 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

segment, the IM regulations required pipeline operators to assess the integrity of the pipeline in each covered segment by using an assessment method that was capable of addressing the specific identified threats. 49 C.F.R. § 192.921(a). The four assessment methods available to assess whether a covered segment was susceptible to the identified threats were:

(1)  Subpart J pressure testing:  a method of testing the strength of a pipeline by pressurizing a portion of the pipeline to a specified test pressure and monitoring that portion of the pipeline for leaks or ruptures.  The test had to comply with the requirements of Subpart J of Section 192. When the test was performed with a liquid, this method was also known as a "hydrotest" or a "Subpart J hydrotest." 49 C.F.R. § 192.921(a)(2).

   i.  Starting in 1970, all new gas transmission pipelines had to be pressure tested or hydrotested before being placed into service in order to ensure the pipeline's integrity.  Pursuant to Section 192.619 of Title 49 of the Code of Federal Regulations, gas transmission pipelines installed before 1970 that were found to be in "satisfactory condition" were grandfathered in and did not have to be pressure tested or hydrotested unless otherwise required by law.

   ii.  A pressure test or hydrotest was the only assessment method that could test the strength of a pipeline.  Performing a pressure test or hydrotest on a gas transmission pipeline necessitated the expense and inconvenience of taking the pipeline out of service temporarily.

   iii.  Pressure testing or hydrotesting assessed the integrity of a pipeline for such potential threats as external damage, external corrosion, internal corrosion, stress corrosion cracking, and manufacturing and construction threats, such as seam defects and seam corrosion.

(2)  In-line inspection ("ILI"): a method of examining the internal characteristics of a pipeline by sending a computerized inspection tool,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    often called a "pig," through the inside of the pipeline.  49 C.F.R. §
2    192.921(a)(l).

3    i.    Like pressure testing or hydrotesting, ILI assessed the integrity of
4          the pipeline for such potential threats as external damage, external
5          corrosion, internal corrosion, stress corrosion cracking, and
6          manufacturing and construction threats.  ILI, however, could not test
7          the actual strength of a pipeline.

8    (3)   Direct assessment ("DA"):  a process used to detect the presence of
9          corrosion and assess the potential threat to the integrity of the pipeline.
10         49 C.F.R. § 192.921(a)(3). The three methods of DA were:

11   i.    External corrosion direct assessment or "ECDA," which tested the
12         outside of pipelines for external corrosion and third party damage
13         using an electrical or magnetic technology above ground and then
14         following up with interspersed excavations to uncover the portions of
15         the pipelines most likely to have external corrosion. Because ECDA
16         only assessed the outside of pipelines, it could not assess the integrity
17         of pipelines for potential internal threats such as manufacturing or
18         construction defects;

19   ii.   Internal corrosion direct assessment ("ICDA"), which tested for
20         corrosion inside the pipeline; and

21   iii.  Stress crack corrosion direct assessment ("SCCDA"), which was only
22         applicable to pipelines operating over 60% of SMYS and thus not
23         applicable in most HCAs.

24   (4)   New Technology:  any technology that a pipeline operator demonstrated
25         could provide an understanding of a pipe's condition that was equivalent
26         to the understanding that could be gained using pressure tests or
27         hydrotests, ILI, or DA.  Operators could only use a new technology if
28         PHMSA approved its use. 49 C.F.R. § 192.921(a)(4).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Regulations Related to the Prioritization of Manufacturing Threats

2        121.    The IM regulations required operators to prioritize the risk level of

3    covered segments in the BAP.  49 C.F.R. § 192.917(e)(3)(i)-(iii). Operators were

4    required to prioritize covered segments with unstable manufacturing threats as "high

5    risk." Covered segments with manufacturing threats were considered unstable if the

6    operating pressure of the pipeline containing that segment increased above the

7    maximum operating pressure experienced by that segment in the five years before the

8    segment was identified as being in an HCA (the "5-year MOP"), the maximum

9    allowable operating pressure ("MAOP") increased, or the stresses leading to cyclic

10   fatigue increased. 49 C.F.R. § 192.917(e)(3)(i)-(iii).

11       122.    Pipeline operators also had to prioritize as high risk and select an

12   assessment method capable of assessing seam integrity and seam corrosion anomalies

13   for covered pipeline segments that contained:

14       a)    low-frequency electric resistance welded ("ERW") pipe;
         b)    lap welded pipe; or
15       c)    other pipe that satisfies the conditions specified in ASME/ANSI B31.8S,
               Appxs. A4.3 & A4.4; and had experienced either:
16
         d)    a seam failure; or
17       e)    an increase in operating pressure over the 5-year MOP.

18   49 C.F.R.§ 192.917(e)(4).

19       123.    For pipelines with unstable manufacturing threats, operators had to use

20   an assessment method that was capable of evaluating manufacturing threats, such as

21   a hydrotest.  49 C.F.R. § l 92.917(e)(3) and (4).  ECDA could not be used because ECDA

22   does not assess manufacturing threats. 49 C.F.R. § 192.923(a).

23   Regulations Related to Continuous Evaluation of Covered Pipeline Segments

24       124.    Pipeline operators like PG&E were required to periodically evaluate the

25   integrity of each covered segment.  The periodic evaluation included considering and

26   integrating past and present integrity assessment results, integrating data and

27   assessing risk of the entire pipeline, and reviewing decisions regarding remediation,

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   additional prevention, and mitigation actions. Operators were required to use the

2   results from these periodic evaluations to identify the threats specific to each covered

3   segment and the risk represented by these threats. 49 C.F.R. § 192.937.

4        125.   After an initial assessment, pipeline operators had to re-assess their lines

5   using an assessment method capable of assessing a particular threat or combination of

6   threats including new threats, and within a certain time period depending on the

7   results the periodic evaluations, but not to 7 exceed seven years. 49 C.F.R. §§ 192.937

8   and 192.939.

9   Regulations Related to Strength Test Pressure Records

10        126.   Pipeline operators were required to pressure test the strength of certain

11   pipelines newly installed or returned to service after 1970. 49 C.F.R. §192.503.

12   Specifically, pressure tests were required for (a) segments of steel pipelines that

13   operated at a hoop stress of 30 percent or more of the SMYS (49 C.F.R. § 192.505), and

14   (b) segments of steel pipelines that operated below 30 percent of SMYS, but at a

15   pressure greater than 100 psi (49 C.F.R. § 192.507).

16        127.   Pipeline operators were also required to keep records of the pressure tests

17   conducted pursuant to Sections 192.505 and 192.507 for the useful life of the pipeline.

18   49 C.F.R. § 192.517(a).  The test records were required to contain at least the following

19   information:

20         the test medium used;
21         the test pressure;
      the test duration;
22         pressure recording charts;
      elevation variations, if significant;
23         leaks and failures noted and their disposition, and
      the name of the employee performing the test.
24

25   PG&E's Practices Relating to Gas Transmission Pipelines

26      **General Recordkeeping**

27        128.   Starting at a time unknown to Plaintiff, and continuing until the San

28   Bruno explosion, the Individual Defendants learned that PG&E did not have complete

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   data for its gas transmission pipelines due to missing records and errors and
2   omissions in existing records.

3        129.   The Individual Defendants received notice of PG&E's recordkeeping
4   problems through employees, through regulatory agencies including the National
5   Transportation Safety Board ("NTSB") and the California Public Utilities Commission,
6   and from third party auditors and consultants.

7        130.   Despite knowledge of these deficiencies, the Individual Defendants failed
8   to cause PG&E to create a recordkeeping system for gas operations that would ensure
9   that pipeline records were accessible, traceable, verifiable, accurate, and complete.
10   PG&E's recordkeeping deficiencies included:

11       •     PG&E did not maintain accurate and complete leak records for its gas
12           transmission pipelines.

13       •     PG&E did not maintain accurate and complete records regarding
14           encroachment of population along gas transmission pipelines.

15       •     PG&E did not maintain repair records for its gas transmission pipelines
16           in a traceable and accessible manner.

17       •     PG&E did not retain or maintain weld maps and weld inspection records
18           for its gas transmission pipelines.

19       •     PG&E did not maintain complete records of the manufacturer of its gas
20           transmission pipelines in service.

21       •     PG&E did not retain or maintain Subpart J pressure test records for the
22           life of all of its gas transmission pipelines.

23       •     PG&E did not maintain accurate, complete, or accessible "job files," that
24           contained, among other things, pipe specifications, construction records,
25           pressure test records, and purchasing records.

26   Integrity Management Program

27        131.   In the late 1990s, in advance of the enactment of the IM regulations,
28   PG&E created a computer database called the Geographic Information System (the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"GIS database"). PG&E intended that the GIS database would contain information about each natural gas transmission pipeline segment, such as pipe specifications and pressure test data, and would be used to make integrity management decisions.

132.   To create the GIS database, PG&E relied on pipeline survey sheets that contained erroneous and incomplete information.  In creating the GIS database, PG&E undertook no quality control or quality assurance to ensure the data taken from the pipeline survey sheets was accurate.  From GIS's inception, PG&E was aware that the database contained erroneous and incomplete information.

133.   PG&E relied on information in the GIS database to make integrity management decisions, including the identification of threats to each covered segment contained in the initial BAP.

Threat Identification

134.   In identifying and evaluating threats as required by Sections 192.917(a) and (b), PG&E failed to gather and integrate all relevant data for many of its older transmission lines, including, but not limited to:

- past incident history for both covered and non-covered segments, including leaks with unknown causes ("unknown" because PG&E either had no records, or could not or did not locate such records);

- pipeline history for covered and non-covered segments that were greater than one mile away from the covered segments being analyzed for manufacturing and construction threats;

- maintenance history, including repairs;

- accurate and complete pipeline data, including wall thickness, diameter, seam type, manufacturer, and date of manufacture;

- pressure fluctuations;

- validated normal, maximum, and minimum operating pressures;

- threats created by cyclic fatigue; and

- threats created by internal corrosion.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Assessment Method Selection**

135.    PG&E relied on inaccurate and incomplete records to select assessment methods to assess the integrity of covered segments for known or potential threats as required by Section 192.921(a).

136.    In 2004, PG&E created a written policy on compliance with the IM regulations regarding data gathering that instructed PG&E employees to rely on available, verifiable information or "information that c[ould] be obtained in a timely manner."

137.    In 2004, PG&E also created a written policy that proscribed, with certain limited exceptions, the use of hydrotesting or pressure testing as an assessment method for assessing the integrity of covered segments.  Pursuant to this policy, the only two options (other than a PHMSA-approved new technology) for assessing threats on covered segments were ILI and ECDA.  PG&E instituted this policy having determined that, due to economic considerations and the physical attributes of its transmission lines, ILI was not a feasible assessment method for approximately 80% of its transmission lines that were subject to the IM regulations.

138.    For the approximately 80% of the gas transmission pipelines where PG&E determined that ILI was not economically or physically feasible, PG&E selected ECDA to assess threats on those pipelines.  PG&E chose ILI as an assessment method for the approximately 20% of its remaining natural gas transmission pipelines.

139.    The Individual Defendants who contributed to the wrongdoing during this time period include:

(a)    Defendant Harvey, who has worked for PG&E and PG&E Corp. at all relevant times, including for the past 33 years.  Harvey served as PG&E Corp.'s Senior Vice President, CFO, and Treasurer from January 2000 to September 2005, and also served as PG&E's Senior Vice President and Chief Risk and Audit Officer from October 2005 to July 2009.  Harvey also later served as PG&E Corp.'s CFO until January 1, 2016

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    and continues to serve as PG&E Corp.'s Senior Vice President, Finance.[11]  Defendant

2    Harvey knowingly, recklessly, or with gross negligence allowed PG&E to violate the

3    CPUC and PHMSA regulations by failing to implement and/or maintain adequate

4    internal controls with respect to the Company's compliance with CPUC and PHMSA

5    regulations.

6            (b)     Defendant Christopher P. Johns ("Johns"), who is and has been a director of

7    PG&E since February 2010, as well as the Company's President since August 2009.

8    Defendant Johns was also PG&E's Senior Vice President, Financial Services from May

9    2009 to July 2009; Senior Vice President and Treasurer from October 2005 to April 2009;

10   Chief Financial Officer ("CFO") from October 2005 to May 2007; and Vice President and

11   Controller from June 1996 to December 1999. Defendant Johns was PG&E's CFO from

12   January 2005 to July 2009; a Senior Vice President from September 2001 to July 2009;

13   Treasurer from October 2005 to April 2009; Controller from July 1997 to October 2005;

14   and a Vice President from July 1997 to September 2001.  Due to the Company's extensive

15   gas distribution and transmission line operations, defendant Johns knew that PG&E was

16   subject to regulation from the CPUC and Pipeline and hazardous Materials Safety

17   Administration ("PHMSA") and guidelines for operators of natural gas pipelines in areas

18   that could affect human safety. Defendant Johns also knew that, under the CPUC and

19   PHMSA regulations, PG&E was required to implement an internal control system to

20   ensure the implementation of an integrity management program ("IMP") to ensure the

21   identification and remediation of risks to the Company's pipelines in areas that could

22   affect human safety. In his capacity as a director, defendant Johns was specifically

23   charged with overseeing the Company's risk management practices, including ensuring

24   compliance with an IMP. Defendant Johns knowingly or recklessly allowed PG&E to

25   violate the CPUC and PHMSA regulations by failing to implement and/or maintain

26

27   [11]    On November 6, 2015, PG&E Corp. announced that Harvey would be replaced as
     CFO by Jason P. Wells effective January 1, 2016, but will continue to serve as PG&E
28   Corp.'s Senior Vice President, Finance, until approximately June 30, 2016.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    adequate internal controls with respect to the Company's compliance with CPUC and

2    PHMSA regulations.

3          (c)     Defendant Dinyar B. Mistry ("Mistry"), who was PG&E Corp.'s Vice

4    President, Regulation and Rates from November 2005 to December 2008, and who is

5    PG&E Corp's CFO and has been since October 2011 and PG&E and PG&E Corp.'s Vice

6    President and Controller and has been since March 2010. Defendant Mistry was also

7    PG&E's Vice President and Chief Risk and Audit Officer from August 2009 to March

8    2010; PG&E Corp.'s Vice President and Chief Risk and Audit Officer from September

9    2009 to March 2010; PG&E's Vice President, Internal Auditing/Compliance and Ethics

10   from January 2009 to July 2009. Due to Company's extensive gas distribution and

11   transmission line operations, defendant Mistry knew that PG&E was subject to

12   regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines

13   in areas that could affect human safety. Defendant Mistry also knew that, under the

14   CPUC and PHMSA regulations, PG&E was required to implement an internal control

15   system to ensure the implementation of an IMP to ensure the identification and

16   remediation of risks to the Company's pipelines in areas that could affect human safety.

17   In his capacity as a director, defendant Mistry was specifically charged with overseeing

18   the Company's risk management practices, including ensuring compliance with an IMP.

19   Defendant Mistry knowingly, recklessly, or with gross negligence allowed PG&E to violate

20   the CPUC and PHMSA regulations by failing to implement and/or maintain adequate

21   internal controls with respect to the Company's compliance with CPUC and PHMSA

22   regulations.

23         (d)     Defendant C. Lee Cox, who has been a director of PG&E and PG&E Corp. at

24   all relevant times, and at least since 1996, and who has served as  PG&E and PG&E

25   Corp.'s Lead Director and PG&EC's non-executive Chairman of the Board since

26   September 2011. Defendant Cox was also PG&E's interim Chairman, Chief Executive

27   Officer ("CEO"), and President from May 2011 to September 2011; PG&E Corp.'s non-

28   executive Chairman of the Board from January 2008 to April 2011; and lead director of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  PG&E and PG&E Corp. from April 2004 to April 2011.  Defendant Cox is Chairman of

2  PG&E's Compensation Committee and a member of PG&E's Finance Committee and has

3  been since September 2011. Defendant Cox was also Chairman of PG&E's Compensation

4  Committee from at least March 2005 to May 2011, a member of that committee from at

5  least March 2003 to May 2011, and a member of PG&E's Finance Committee from at least

6  March 2004 to May 2011.  Defendant Cox served as Chairman of the Audit Committees of

7  PG&E and PG&E Corp. until at least March 2004. Due to the Company's extensive gas

8  distribution and transmission line operations, defendant Cox also knew that PG&E was

9  subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas

10  pipelines in areas that could affect human safety.  Defendant Cox also knew that, under

11  the CPUC and PHMSA regulations, PG&E is required to implement an internal control

12  system to ensure the implementation of IMP to ensure the identification and remediation

13  of risks to the Company's pipelines in areas that could affect human safety.  In his

14  capacity as a director, defendant Cox was specifically charged with overseeing the

15  Company's risk management practices, including ensuring compliance with an IMP.

16  Defendant Cox knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA

17  regulations by failing to implement and/or maintain adequate internal controls with

18  respect to the Company's compliance with CPUC and PHMSA regulations.

19       (e)     Defendant Barry Lawson Williams ("Williams"), who has been a PG&E

20  director at all relevant times, including since at least 1996, and a PG&E Corp. director

21  since 1990. Defendant Williams is also Chairman of the Audit Committees of PG&E and

22  PG&E Corp. and has been since at least March 2005 and a member of those committees

23  and has been since March 2003. Defendant Williams is a member of PG&E's

24  Compensation Committee and has been since at least March 2005 and a member of

25  PG&E's Finance Committee and has been since at least March 2004. Due to Company's

26  extensive gas distribution and transmission line operations, defendant Williams knew

27  that PG&E was subject to regulation from the CPUC and PHMSA guidelines for

28  operators of natural gas pipelines in areas that could affect human safety. Defendant

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Williams also knew that, under the CPUC and PHMSA regulations, PG&E is required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety. In his capacity as a director, defendant Williams was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP.  Defendant Williams knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations.

(f)       Defendant Barbara L. Rambo ("Rambo"), who is a PG&E and PG&E Corp. director and has been since January 2005. Defendant Rambo has also been a member of PG&E's Finance Committee since January 2005 and Chairman of such committee since May 2008.  Defendant Rambo is a member of PG&E's Compensation Committee and has been since January 2005 and was Chairman of that committee from May 2011 to September 2011.  Due to the Company's extensive gas distribution and transmission line operations, defendant Rambo knew that PG&E was subject to regulation from the CPUC and PHMSA guidelines for operators of natural gas pipelines in areas that could affect human safety. Defendant Rambo also knew that, under the CPUC and PHMSA regulations, PG&E was required to implement an internal control system to ensure the implementation of an IMP to ensure the identification and remediation of risks to the Company's pipelines in areas that could affect human safety.  In her capacity as a director, defendant Rambo was specifically charged with overseeing the Company's risk management practices, including ensuring compliance with an IMP. Defendant Rambo knowingly or recklessly allowed PG&E to violate the CPUC and PHMSA regulations by failing to implement and/or maintain adequate internal controls with respect to the Company's compliance with CPUC and PHMSA regulations.

///

///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Assessment Avoidance on Older Transmission Lines**

**Planned Pressure Increases**

140.   When the IM regulations went into effect, the Individual Defendants knew that thousands of miles of PG&E's gas transmission pipelines had never been subjected to a Subpart J pressure test, because the pipelines were installed before 1970 and were grandfathered in or because PG&E had not maintained a record of such a pressure test.  As PG&E knew, many of these pipelines had a known or potential manufacturing threat due to their age, manufacturer, and/or history.

141.   In order to maintain the then-current operating pressures of these pipelines without having to subject the pipelines to a Subpart J pressure test, PG&E adopted a practice in 2003 called planned pressure increases ("PPIs").  To conduct a PPI, PG&E intentionally raised the pressure in several old highly-pressurized gas transmission pipelines located in HCAs to the pipelines' maximum allowable operating pressures' (MAOP) for two hours. In so doing, PG&E at times exceeded the lines' 5-year MOPs and/or MAOPs.  PG&E failed to review the history of the pipelines or verify the accuracy of its data prior to executing the PPIs to determine whether intentionally increasing the pressure on these older pipelines would affect the integrity of the pipeline.  PG&E periodically conducted PPIs from 2003 until the San Bruno explosion.

142.   PG&E executed PPIs on a number of its high pressure gas transmission pipelines, including lines 132, 101, 107, and 109, all of which had covered segments with manufacturing threats that had never been subject to a Subpart J pressure test or for which records of such a test were not available.  From 2002 until the San Bruno explosion, PG&E assessed these pipelines with ECDA.

Unplanned Pressure Increases

143.   PG&E was aware that hundreds of covered segments totaling over 80 miles of gas transmission pipelines had never been subject to a Subpart J pressure test and had manufacturing threats that could be considered unstable due to planned

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   and/or unplanned pressure increases that exceeded the pipelines' respective 5-year

2   MOPs.  These covered segments were found on numerous gas transmission pipelines

3   operated by PG&E, including, but not limited to, segments on Lines 132, 153, 109,

4   191-1 and 7 DFM 1816-01.

5          144.   Section 192.917(e) required PG&E to prioritize the covered segments

6   with unstable manufacturing threats as high risk and assess them using an

7   assessment method that evaluated the integrity of the covered segment to determine

8   the risk of failure from the unstable manufacturing threats, such as a Subpart J

9   pressure test.  For all of these covered segments, despite knowledge of the

10  requirements of Section 192.917(e), PG&E chose not to reprioritize these pipelines as

11  high risk and/or properly assess the integrity of each segment to determine the risk of

12  failure.  Instead, PG&E continued to choose ECDA to assess the integrity of these

13  pipelines even though PG&E knew ECDA did not assess unstable manufacturing

14  threats.

15         145.   To avoid having to prioritize these pipelines as "high risk" and properly

16  assess the pipelines for the known threats, PG&E chose only to consider a

17  manufacturing threat unstable if the pressure on the pipeline exceeded the 5-year

18  MOP by 10% or more. This practice was documented in PG&E's Integrity

19  Management program as Risk Management Instruction-06, and was known to

20  members of Integrity Management as RMI-06.  PG&E adopted and implemented this

21  approach despite knowing that it was in direct contravention of Section 192.917(e) and

22  guidance issued by PHMSA in or about 2004 and 2005 in the form of frequently asked

23  questions and answers ("FAQs"). In FAQ 221, PHMSA made clear that "any pressure

24  increase, regardless of amount," destabilized a manufacturing threat and required

25  PG&E to prioritize the pipeline as high risk and to properly assess the pipeline PG&E

26  maintained this practice until April 2011.

27         Line 132

28         146.   When identifying threats on Line 132, and when determining the

- 63 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  appropriate assessment technology to use in evaluating those threats, PG&E did not

2  know the thickness of the pipeline walls for approximately 42% of Line 132, either

3  because PG&E did not have records describing wall thickness or it could not or did not

4  access records with this information.

5      147.    PG&E did not know the manufacturer for approximately 80% of the

6  hundreds of segments on Line 132 either because PG&E did not have such records, or

7  could not or did not access such records with this information.

8      148.    PG&E did not know the depth of cover for approximately 80% of Line 132

9  because PG&E did not have such records, or could not or did not access such records

10  with this information.

11      149.    PG&E used improper yield strength or SMYS values for several segments

12  of pipe on Line 132 with unknown yield strengths.

13  <u>Segment 180</u>

14      150.    Segment 180, the portion of Line 132 that ruptured, was located in an

15  HCA and ran through a densely populated suburban development in the City of San

16  Bruno. Segment 180 consisted of six short lengths or "pups" of 30-inch diameter pipe

17  along with normal lengths of pipe.  The date of manufacture of these pups is unknown,

18  but the manufacture date was prior to 1956. The pups were welded together and

19  installed in approximately 1956 in a manner that violated industry standards

20  concerning fabrication of gas transmission pipelines in effect at the time.  One or more

21  of the pups had a defective seam weld.  The segment, in part due to the defective pup

22  or pups, had a yield strength significantly less than the yield strength that PG&E

23  recorded and relied upon for integrity management purposes.

24      151.    PG&E's records reflected the following for Segment 180:

25          •    The pipe was seamless.
            •    The SMYS was 42,000 psi.
26          •    The depth of cover was unknown.
            •    The manufacturer of the pipe was unknown.
27          •    The manufacture date of the pipe was 1956.
28          •    A pressure test had been performed in 1961.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1          •      The MAOP was 400 psi.

2          152.   In fact, the pipe in Segment 180 was seamed, not seamless. The SMYS

3    was unknown, but measured after the San Bruno explosion at significantly less than

4    42,000 psi for four of the six pups. The pipe manufacturer date was unknown, but

5    occurred well before 1956. No records of a pressure test existed showing that any

6    pressure test, let alone a Subpart J pressure test, had been performed on Segment

7    180.  Other records in PG&E's files also showed the MAOP for Line 132 as 375 and

8    390 psi.

9          153.   At no time between installation of the defective pup or pups and the San

10   Bruno explosion did PG&E check or confirm whether its records accurately reflected

11   the data relevant to assessing the integrity of Segment 180, even though PG&E knew

12   that GIS contained incomplete and inaccurate data.

13   Integrity Management For Line 132

14         154.   PG&E identified segments of Line 132 as being in an HCA in 2002 and

15   began conducting ECDA on Line 132 in 2002.  PG&E also conducted ECDA on Line

16   132 in 2003, 2004, 2006, 2007, 2009, and 2010.

17         155.   In identifying the threats that existed on Line 132 and choosing an

18   assessment method to assess those identified threats, the Individual Defendants

19   caused PG&E to knowingly rely on erroneous and incomplete information from the

20   GIS database and to fail to gather and integrate, among other things, the following

21   data and information:

22         •      Leak data, including the cause of over 30 prior leaks on segments of Line
                  132; instead PG&E adopted a practice that it would not consider leaks
23                with "unknown" causes when deciding if ECDA was a proper assessment
24                method;

25         •      Industry and PG&E data that showed that double submerged arc weld
                  "DSAW" pipe manufactured by Western Consolidated Steel, which was
26                found on segments of Line 132, including Segment 181, had pipe body
                  and longitudinal seam defect issues;
27

28

- 65 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- A seam weld defect in DSAW pipe that was discovered on a different segment of Line 132, and was similar to pipe on both Segment 180 and Segment 181, and was repaired in 1988;

- Multiple longitudinal seam cracks found during radiography of girth welds on portions of Line 132 that were constructed in 1948;

- A longitudinal seam weld defect in DSAW pipe discovered on a different segment of Line 132 in 1992 when a tie-in girth weld was radiographed;

- A defective weld found on Segment 186 of Line 132 in 2009.  The segment was originally fabricated by Consolidated Western using pipe similar to Segment 180 and Segment 181 and installed in 1948, at or near the time when Segment 180 was originally installed;

- A field girth weld defect found on Segment 189 in 2009.  Segment 189 was also originally fabricated by Consolidated Western using DSAW pipe installed in 1948;

- Whether any salvaged or re-used pipe, for which PG&E did not keep records, including manufacturer, dates of use, and history of the pipe, had been used on Line 132;

- Documents related to the design, manufacturer, construction, or testing of Segment 180 when it was relocated in 1956, including whether any salvaged pipe was used;

- Information from the 1956 construction file related to the six pups installed on Segment 180 by PG&E;

- The potential impact of cyclic fatigue or other loading conditions on Line 132 from planned or unplanned pressure fluctuations; and

- Additional construction defects on Line 132.

Integrity Management for Other Transmission Lines

156.    The Individual Defendants also caused PG&E to knowingly fail to gather and integrate the following relevant data from similar gas transmission pipeline segments as required by 49 C.F.R. § 192.917(b):

- A seam leak in DSAW pipe found on Line 3008 in 1958;

- A root cause analysis for an explosion on Line 109 in 1963;

- A 1977 report concerning a leak on the long seam of Line 109;

- A characterization evaluation of nearby Line 109 girth welds in 1994;

- A Subpart J pressure test failure in 1974 of a seam weld with lack of penetration on DSAW pipe found on Line 3008, and which was similar to DSAW pipe found on Segment 180 and Segment 181;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- •     Laboratory test reports from 1975 relating to Line 101 girth welds; and
- •     Cracking of a seam weld in DSAW pipe in 1996 on Line 109 which paralleled Line 132.

157.   Relying on inaccurate and incomplete information regarding the pipeline attributes and history of Lines 132 and 109, the Individual Defendants caused PG&E to knowingly choose ECDA as the assessment method to assess the integrity of covered segments on Line 132, including Segment 180, starting in 2002 and for Line 109 starting in 2003, and continuing until the San Bruno explosion.

158.   In 2003 and again in 2008, as part of PG&E's PPIs, PG&E intentionally raised for a two-hour period the pressure of Line 132 at least 25 psi above the normal operating pressure the pipeline had experienced for decades in order to maintain a current MOP for Line 132 without having to conduct a Subpart J pressure test. PG&E undertook this practice without conducting any review of the pipeline's history, including past leaks and the cause of such leaks, or verification of the pipeline's specifications in order to assess whether intentionally increasing the pressure on Line 132 more than 25 pounds higher than the line had experienced in decades would affect the integrity of the pipeline.

159.   On July 23, 2009, Line 132, at a point north of Segment 180, experienced an unplanned pressure increase that exceeded that segment's 5-year MOP.  That segment of Line 132 had a known manufacturing threat that was destabilized when the pipeline experienced this pressure increase. Despite knowledge of this pressure excursion and the requirement to properly assess unstable manufacturing threats, PG&E chose to assess that segment of Line 132 in 2009 using ECDA even though PG&E knew that ECDA could not assess unstable manufacturing threats.

**D.**     **The Individual Defendants Cause PG&E To Obstruct The NTSB's Investigation**

160.   The NTSB is an independent federal agency dedicated to promoting aviation, railroad, highway, marine, pipeline, and hazardous materials safety. Established in 1967, the agency is mandated by Congress through the Independent

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Safety Board of 1974 to investigate transportation accidents, determine the probable

2   cause of accidents, issue safety recommendations, study transportation issues, and

3   evaluate the safety of government agencies involved in transportation. The NTSB

4   makes public its actions and decisions through accident reports, safety studies, special

5   investigation reports, safety recommendations, and statistical reviews.

6       161.   The NTSB began an investigation immediately after the San Bruno

7   explosion on September 9, 2010. NTSB investigators were on-site for approximately

8   two weeks after the explosion. In addition, NTSB investigators issued numerous

9   requests for information and documents, interviewed witnesses, examined the

10  ruptured pipe and the events leading to the explosion, and held three days of public

11  hearings. The NTSB issued a public report on or about August 30, 2011, and

12  concluded, among other things, that PG&E's Integrity Management program was both

13  deficient and ineffective, and was a probable cause of the accident.

14      162.   The NTSB's investigation revealed that among other deficiencies, PG&E's

15  records related to the establishment and calculation of the MOP and MAOP for Line

16  132 were incomplete and inaccurate.  As a result, on January 3, 2011, the NTSB

17  issued three safety recommendations, two of which were designated "urgent."   The

18  first urgent recommendation directed PG&E to "[a]ggressively and diligently search"

19  for records related to pipelines in HCAs that did not have the MAOP established

20  through prior hydrostatic testing. The second directed PG&E to calculate (based on

21  the records found in response to the first urgent recommendation) the valid MAOP for

22  pipelines that did not have the MAOP established through hydrostatic testing.

23      163.   Additionally, in or about September 2010, through in or about December

24  2010, the NTSB sent PG&E a series of data requests concerning instances where

25  PG&E' s planned and unplanned pressure increases exceeded the 5-year MOPs and/or

26  MAOPs of pipelines in HCAs.

27      164.   On February 22, 2011, as part of its response to the NTSB's data

28  requests, PG&E attached a version of RMI-06 that provided that PG&E would only

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    consider a manufacturing threat as unstable if the pressure on the line exceeded the

2    5-year MOP by 10% ("the 10% Version").  The cover sheet to the 10% Version indicated

3    that it was prepared in February 2008, and approved in March 2008.

4         165.   As set forth above, beginning in or about 2009, PG&E adopted the

5    practice documented in the 10% Version, which was in direct contravention of Section

6    192.917(e) and guidance issued by PHMSA.  The consequence of this practice was that

7    PG&E did not prioritize as high-risk, and properly assess, many of its oldest

8    transmission lines in HCAs, including Line 132, that had never been hydro tested

9    because of the grandfather clause.

10        166.   On April 6, 2011, PG&E sent a letter to the NTSB, signed by Defendant

11   William D. Hayes, withdrawing the 10% Version sent in February 2011, claiming it

12   was an unapproved draft.  The letter attached the original version of RMI-06 approved

13   in 2008, and a version of RMI-06 approved on April 5, 2011, neither of which included

14   the 10% language.  In the letter, PG&E claimed it had recently discovered that the

15   10% Version submitted to the NTSB included the cover sheet for the original version

16   of RMI-06 approved in 2008, and that PG&E had no indication that the version with

17   the 10% language was ever approved.

18        167.   Defendant Hayes, who signed the letter, reported at the time directly to

19   Geisha Williams, who is on the Board of Directors of PG&E.   Geisha reported directly

20   at the time to Peter Darbee, who was PG&E Corp.'s CEO, President, and Chairman of

21   the Board.  Both Hayes and Darbee were identified by the U.S. Attorney as expected

22   trial witnesses at the criminal trial set to commence March 22, 2016 in the

23   government's Pre-Trial Conference Statement, filed February 22, 2016.[12] Upon

24   information and belief, given the gravity of the NTSB investigation and the fact that

25   eight people died in the San Bruno explosion, Hayes cleared his submissions to the

26   NTSB, including the February 22, 2011 and April 6, 2011 submissions, with both

27   _____

[12]      The government's February 22, 2016 Pre-Trial Conference Statement indicates that
28   Hayes' April 6, 2011 letter is "at the heart of" the obstruction of justice charge.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Williams, Darby, and the PG&E Corp. Board of Directors before finalizing and

2   submitting them to the NTSB.  Defendants and current Board Members Chew,

3   Herringer, Kimmel, Meserve, Miller, Parra, Williams, and Rambo, therefore, all of

4   whom were directors of PG&E Corp. at the time and responsible for the Company's

5   conduct with respect to the NTSB investigation, knew and approved of the misleading

6   submissions to the NTSB.

7         168.   Moreover, the government has also deposed a former PG&E employee,

8   Leslie McNiece, who was hired after the 2010 San Bruno explosion to clean up the

9   Company's records.  McNiece reported to Defendant Christopher P. Johns, who was

10   President of Pacific Gas & Electric Company at the time and also a member of its

11   Board of Directors.[13]  McNiece testified that PG&E Management instructed her to

12   **destroy records** relating to the San Bruno explosion, and that she also found a

13   tell-tale pre-blast analysis of the relevant pipeline in the garbage at PG&E.  The

14   government has listed McNiece as a witness expected to be called at the criminal trial

15   commencing March 22, 2016 in San Francisco.

16         169.   Specifically, the U.S. Attorney has indicated in court filings in the

17   criminal case pending in San Francisco that, in order to attempt to fulfill her job

18   responsibilities of rectifying PG&E's highly deficient recordkeeping system after the

19   San Bruno explosion, she was hired to start a new department called Information

20   Management Compliance.  The purpose of this new department was to address the

21   highly deficient recordkeeping issues identified in the Duller-North Report.

22         170.   The U.S. Attorney has stated that McNiece is expected to testify at the

23   criminal trial commencing March 22, 2016, that after drafting a new recordkeeping

24   policy and presenting it to PG&E management, Defendant Christopher P. Johns told

25

26

---

27   [13]      Johns continued to serve as President of PG&E until December 31, 2015, when he

28   retired.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

her that PG&E would not approve the policy.[14]  Johns stated to McNiece that if the policy had been approved, PG&E would immediately be out of compliance.  McNiece is also expected to testify at trial about the pushback she received throughout her tenure at PG&E from management, who did not want her to improve PG&E's recordkeeping system.

171.    The United States has also indicated that McNiece is also expected to testify at the criminal trial about specific instances when she received specific instructions to destroy documents, such as from PG&E V.P. of Gas Operations Sumeet Singh, and the financially-motivated pushback she received when she attempted to organize PG&E records or move them from an Iron Mountain storage facility.  This "pushback" is direct evidence of the Individual Defendants' violations of recordkeeping deficiencies, including the specific conduct of the President of the Company, Defendant Johns.

172.    McNiece has also indicated that, among the PG&E documents she found discarded in a dumpster, she found a Line 132 survey sheet with a notation on it which stated "leak info not in GIS."  The notation was dated 12/8/2003.  This note is probative of the fact that PG&E's GIS system was deficient, that the Individual Defendants were aware of the deficiencies, and that by discarding this original map, PG&E was failing to maintain records, as required, for the life of a pipeline.

173.    Because of her efforts to do the right thing and bring PG&E into compliance with the law, McNiece was laid off in 2014, while Defendant Johns was still her supervisor and President of PG&E and a member of its Board.

**E.    PG&E Is Indicted Due To The Individual Defendants' Wrongdoing**

174.    On April 1, 2014, Pacific Gas and Electric Co. was indicted on 12 federal criminal counts related to the 2010 San Bruno gas pipeline explosion.  The indictment

---

[14]    *See* United States of America Motions in Limine filed January 11, 2016, *U.S.A. v. Pacific Gas & Electric Co.*, Case No. CR 14-00175 THE (N.D. Cal.), Docket No. 236, at p. 10.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  charged PG&E with failing to conduct required inspections that could have prevented

2  the disaster.

3  175.    The indictment alleges that PG&E repeatedly violated the federal

4  Pipeline Safety Act, which mandates that operators maintain accurate records about

5  their gas pipes, identify risks to lines, and inspect or test when pipe pressures exceed

6  the legal maximum.

7  176.    The indictment alleges that, rather than follow the law, PG&E

8  "knowingly relied on erroneous and incomplete information" in avoiding the type of

9  inspections that could have exposed a badly manufactured seam weld on the gas

10  transmission line and saved San Bruno from disaster.

11  177.    The indictment also alleges that, in the 54 years that the weld leaked in

12  the ground beneath the City of San Bruno, PG&E never conducted an inspection that

13  could have detected it. In part, that was because it lost records that showed the most

14  basic characteristics of the pipe, including whether it had seams.

15  178.    On July 30, 2014, the grand jury filed a Superseding Indictment that

16  greatly expanded the list of alleged crimes.  In addition to adding additional violations

17  of federal pipeline safety laws, the Superseding Indictment charges PG&E with

18  obstruction of the NTSB investigation.

19  179.    Defendant Hayes, who signed the letter, reported at the time directly to

20  Geisha Williams, who is on the Board of Directors of Pacific Gas & Electric Company.

21  Geisha reported directly at the time to Peter Darbee, who was PG&E Corp.'s CEO,

22  President, and Chairman of the Board.  Upon information and belief, given the gravity

23  of the NTSB investigation and the fact that eight people died in the San Bruno

24  explosion, Hayes cleared his submissions to the NTSB, including the February 22,

25  2011 and April 6, 2011 submissions, with both Williams, Darby, and the PG&E Corp.

26  Board of Directors before finalizing and submitting them to the NTSB.  Defendants

27  and current Board Members Chew, Cox, Herringer, Kimmel, Meserve, Miller, Parra,

28  Williams, and Rambo, therefore, all of whom were directors of PG&E Corp. at the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    time, knew and approved of the misleading submissions to the NTSB.

2         **F.   Defendants Breach Their Duty Of Candor And Loyalty By
3              Causing The Company To File A False Proxy Statement**

4         180.   On March 25, 2015, Defendants Chew, Fowler, Kelly, Meserve, Parra,

5    Smith, Johns, Earley, Herringer, Kimmel, Rambo and Williams issued, caused to be

6    issued, and participated in the issuance of materially false and misleading written

7    statements and material omissions to shareholders that were contained in the 2015

8    Proxy Statement (the "Proxy Statement") filed jointly by PG&E and PG&E Corp.  The

9    Proxy soliciting materials included a proposal submitted by a shareholder calling for

10   the establishment of an Independent Board Chairman at the Company.  Defendants

11   Chew, Fowler, Kelly, Meserve, Parra, Smith, Johns, Earley, Herringer, Kimmel,

12   Rambo and Williams caused the Company to include materials in the Proxy

13   recommending AGAINST the proposal.

14        181.   The Proxy Statement was false and misleading.  The shareholder

15   proposal specifically stated that the proposal was necessary in order to strengthen

16   Board oversight of the CEO and other employees, in light of the fact that "PG&E was

17   charged with 12 pipeline safety violations by the U.S. government for a 2010 natural

18   gas explosion that killed 8 people and left a crater the size of a house. The grand jury

19   indictment charged PG&E with knowingly and willfully violating the Natural Gas

20   Pipeline Safety Act by failing to test and assess unstable pipelines to determine

21   whether they could fail. PG&E was also charged with keeping incomplete and

22   inaccurate records about the pipeline that exploded. PG&E was also flagged for its

23   failure to utilize an environmental management system or to seek International

24   Organization for Standardization 14001 Certification for some or all of its operations."

25        182.   Defendants opposed this proposal in the proxy, falsely stating that the

26   proposal was allegedly unnecessary because PG&E's corporate governance policies

27   were already sufficiently robust and adequate to address the wrongdoing that had

28   occurred.  The Defendants caused the following false statement to be included in the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2015 Proxy:

"• It is in the best interests of the Corporation and its shareholders to have a flexible rule regarding which directors may serve as Chairman.

• *PG&E Corporation's strong corporate governance practices – including the requirement of an independent lead director with specified duties – address the proponent's concern* that the Board cannot properly oversee the CEO if the CEO also serves as Chairman."

183.   Defendant Johns signed the 2015 Proxy on behalf of Pacific Gas & Electric Company, and Defendants Chew, Fowler, Kelly, Meserve, Parra, Smith, Earley, Herringer, Kimmel, Rambo and Williams approved the Proxy on behalf of PG&E Corp.

184.   By causing the Company to issue false and misleading material statements in the joint 2015 Proxy Statement, Defendants Chew, Fowler, Kelly, Meserve, Parra, Smith, Johns, Earley, Herringer, Kimmel, Rambo and Williams breached their duties of candor and loyalty.  As a direct and proximate result of these Defendants' wrongful conduct, the Company misled and/or deceived its shareholders by falsely portraying the corporate governance principles of the Company as being adequate and sufficient and "already addressing" the concerns of the shareholder proposal regarding the need for an Independent Chairman in order to monitor the CEO and address highly material safety and other violations by the Company.

**G.   The Individual Defendants Were Aware of Numerous "Red Flag" Warnings of Safety-Related Problems at PG&E But Consciously Failed to Take Action to Resolve Safety Problems**

**1.   The Individual Defendants ignored warnings of Line 132's unacceptably high risk of failure and knowingly created a high risk of catastrophic harm**

185.   PG&E is one of the largest public utilities in the country, with over 15 million customers and after-tax net income of over $1 billion and assets of over $46 billion.  Its vast northern and central California service territory requires an extensive

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   underground pipeline infrastructure that, if not maintained properly, threatens lives

2   everywhere.  Yet, for decades, PG&E's corporate culture has emphasized financial

3   performance over customer safety, consciously disregarding industry pipeline safety

4   practices and willfully circumventing pipeline safety laws and regulations.  While

5   PG&E's profit-first emphasis has no doubt served the financial interests of its highly-

6   paid executives, the deadly, devastating San Bruno explosion and fire of September 9,

7   2010, was a predictable, preventable and reprehensible consequence.

8          186.   Despite the fact that the San Bruno pipeline that exploded had been in

9   operations for decades, PG&E spent little to no resources on required risk management

10  practices to ensure that it would not explode.  During the rapid post-World War II

11  population expansion, PG&E constructed new gas lines, including Line 132, which

12  runs from Milpitas to San Francisco.  In 1956, PG&E relocated Segment 180, a 1,851-

13  foot, 30-inch diameter gas transmission pipeline.  The pipe was made of flat steel that

14  was rolled and then welded together. The section of pipe also included an otherwise-

15  unknown configuration of six pups manufactured from an unknown source.[15]

16         187.   In 1956, PG&E knowingly buried its pipeline in a subdivision intended

17  for development into a residential neighborhood. Government standards at the time

18  required the longitudinal seams to be welded from both the exterior and the interior of

19  the joint, penetrating the entire depth of the pipe and overlapping one another.

20  Contrary to these legal requirements, Segment 180's pups contained seams with only

21  an exterior weld, a defect visible to the eye. PG&E engineers knew or should have

22  known that such incomplete seams were vulnerable to rupture from pressure

23  fluctuations.

24         188.   Despite this knowledge, PG&E failed to keep accurate records required

25

26

27  [15]        PG&E engineers cannot identify any other project that incorporated such a
    configuration of six short pieces of pipe.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

by federal regulations concerning the installation.[16] Moreover, even though PG&E knew that records regarding its pipeline system were incomplete and inaccurate, it relied on these records to make risk assessments that resulted in unwarranted conclusions about pipeline safety. Rather than follow federally mandated integrity verification measures mandated by its lack of records, PG&E managers simply ignored the Company's lack of information and assumed the pipeline was safe.

189.    Egregiously, the Individual Defendants caused PG&E to repeatedly fail to perform hydrostatic tests or to inspect Segment 180 of Line 132 as industry practice, and later, federal regulations, required.  Beginning at its installation and continuing throughout its nearly fifty-five year life, PG&E repeatedly avoided required hydrostatic testing of Line 132. Operating in a culture in which safety was optional, these decisions were made in order to protect PG&E's bottom line, despite the risk to human life and health.  As such, PG&E consciously circumvented these safety regulations and the expensive hydrostatic tests they required by artificially spiking pipeline pressure to create the illusion of pipeline integrity.[17]  Had PG&E conducted the required tests and inspections, the defect would have been discovered and the damage avoided.

190.    The NTSB determined that the immediate cause of the rupture was a two-hour increase in the pipeline pressure above its maximum actual operating pressure.  During the course of maintenance at PG&E's Milpitas terminal, backup systems lost power.  This power loss caused valves to move to a wide open position, resulting in dangerously-increased pipeline pressures.  High pressure alarms were triggered for lines in and out of Milpitas, including Line 132.  Around 6:00 p.m., the pressure on Line 132 near the rupture site hit a maximum of 386 pounds per square inch, significantly in excess of the maximum actual operating pressure.

---

[16]    For example, this pipe was incorrectly described in pipeline risk management records as seamless 30-inch diameter steel, despite PG&E engineers' knowledge that 30-inch-seamless pipe did not exist in the 1950s.

[17]    No other pipeline operator artificially spiked its pipelines in such a manner as PG&E.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

191.    Minutes later, one of Line 180's defective pups ruptured, creating a 72 foot by 26 foot crater and igniting the residential San Bruno neighborhood.  PG&E took over an hour and a half to shut off the gas.  Had PG&E installed automatic shut-off valves on Line 132, the gas could have been quickly shut off, reducing fire damage. Due to the lack of these shut off valves, PG&E responders faced delays dispatching and driving through congested streets to collect necessary shut-off tools from PG&E in order to activate the manual shut-off valves.

192.    "Natural gas pipeline engineering design employs, at its core, the goal of *zero significant incidents*.  That is, if a pipeline is constructed, operated, and maintained according to its design, then it should operate without safety risk to the public – notwithstanding it transports a combustible product because the pipeline is buried, it is not susceptible to direct inspection on an ongoing basis."  In other words, average or pretty good isn't good enough.  This standard is also state law.  *See* Public Utilities Code section 451.[18]   Yet rather than adhere to this standard, PG&E placed profits over safety.  For decades, PG&E has failed to do what was necessary and legally required to protect the safety of its customers, either because of expense or perceived trouble.

193.    The Individual Defendants knew but consciously disregarded the "probable dangerous consequences" of these failures – a pipeline explosion with loss of life and catastrophic damage.  During the Relevant Period, PG&E's officers and its Board of Directors have known of the need to test and replace Line 132 yet consciously failed to do so, as demonstrated by the following:

- As far back as 1984, PG&E managing agents, including the head of Gas System Design and the PG&E Management Committee, were told that

---

[18]    The section reads in part: "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

PG&E failed to allocate adequate funds to "assure" system integrity, and that the risk of failure escalated as these facilities age.

- In 1987, Bechtel warned the head of Gas Pipeline Integrity that a project for the collection of data for PG&E's gas transmission lines had identified various pipeline segments without records to validate information regarding the characteristics of PG&E's pipelines; Bechtel proposed digging up these pipeline sections to obtain missing information; however PG&E refused to spend the money to dig up the lines.

- In or about 2000, PG&E's managing agents transferred the GPRP for gas transmission lines into its Risk Management Program, which PG&E alleged was to prioritize and manage risks but was in effect to avoid necessary compliance expenditures for line replacement and pressure testing.

- PG&E officers as well as its Board of Directors were aware of the need to test and/or replace its aging pipelines, including Line 132, more than two decades before this incident.

- PG&E's head of Gas System Design proposed hydrostatically testing Line 132 more than 30 years before this explosion.

- PG&E managing agents were warned that there were over 1.7 million feet of transmission lines in populated areas that had no hydrostatic test records, including Line 132.

- PG&E's Management Committee was informed that it had deferred over $17.0 million in pipeline projects involving safety, code compliance and systems reliability.

- PG&E's head of Gas System Design alerted PG&E's officers and Board in the late 1970s and early 1980s of the need to replace PG&E's aging gas pipelines and proposed instituting the Gas Pipeline Replacement Program ("GPRP") to facilitate the replacement.

- PG&E managing agents including PG&E's Management Committee and Officers were warned that pipelines installed prior to 1950 (PG&E pipe for Segment 180 had been identified with pipe held as salvage from pipe acquired as early as 1947-1948), were "suspect" and "required attention."

- In 1984-1985, PG&E Officers and its Board of Directors were advised that Line 132 needed to be replaced along with two other gas transmission lines serving the San Francisco Bay Region.

- PG&E Officers and the Board understood the most immediate priority for replacement of pipelines was in areas where the lines were 30 to 100 feet from residences, and that the lines in these areas should be replaced in 5-7 years.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- The head of Gas System Integrity warned the PG&E Management Committee that the foreseeable risk of failing to commit to the replacement of aging pipelines was death, injury and property damage to those living near the pipeline.

- PG&E's officers and managing agents were warned of the dangerous consequences of injury, death and/or property damage that would occur to heavily populated areas if pipelines like Line 132 were not replaced.

- PG&E misrepresented to the CPUC that terminating their "GPRP" to replace it with their Risk Management Program ("RMP") would not result in significant cuts to pipeline safety and reliability.

- Secretly, in the Spring of 1999, the PG&E GT&S Capital Program Review indicated that use of the Risk Management Program would save PG&E $60 million over the life of the GPRP.

- In fact, the Risk Management Program became a cost reduction measure, resulting in PG&E replacing only miles of pipeline, as opposed to 165 miles of pipeline that would have been required had the Gas Pipeline Replacement Program instituted in 1985 remained in place.

- In the Spring of 2001, PG&E's California Gas Transmission Program indicated that its Risk Management Program would save PG&E over $200 million over twenty years by avoiding regulatory and safety required pipeline verifications and/or risk management analysis of all gas pipelines, utilizing smart pigging or hydrotesting in high consequence areas to comply with federal law.

- From 2008 to 2010, PG&E placed excessive emphasis on financial goals set by executive management in its budgeting process. At the same time, PG&E reduced compliance and other Integrity Management expenses by consciously deciding to defer projects, in particular by deferring or down grading assessment methods to inadequate and less costly techniques; moreover, PG&E ceased preparing metrics, goals or annual reports for its gas transmission pipeline Risk Management Program. The Overland CPUC review concluded that risk management continued to be a separate program "in name only after 2004."

- The approved budgets for Integrity Management were slashed nearly 50% from what was requested in 2008 for its compliance and integrity activities, and PG&E's Fall Program Review noted that "expected flat funding in 2009 and 2010 will drive the program into non-compliance in 2012."

- Budget cuts for safety programs continued in 2008, 2009 and 2010. Actual 2008 for compliance and safety funding was 35% below the initial request and 16% below "minimum funding to achieve 2012 compliance." PG&E's maintenance budget was 47% below the initial request and 25% below the "recommended minimum level."

- 79 -

- Integrity Management budget cuts for 2009 resulted in deferring or eliminating replacement of over 44 miles of gas transmission pipelines in HCAs. PG&E also deferred 41 miles of integrity management assessments of gas transmission pipelines.

- The PG&E 2010 budget was reduced, for the third straight year. The 2010 budget was set at $6.7 million below already constrained 2009 actual expense levels.

194. According to documents released by The Utility Reform Network ("TURN"), PG&E contemplated replacing a 7,481 foot segment of Line 132 north of San Bruno in 2007. TURN, however, alleges that PG&E deferred maintenance on a wide variety of its pipelines and equipment in recent years. At the time of the 2007 request, PG&E had already identified that section of Line 132 as one of the 100 riskiest pipelines in PG&E's system. PG&E was awarded $5 million of ratepayer money to replace the line. The replacement was scheduled to be completed by October 2009. This work was included in a list of projects that PG&E submitted to the CPUC to justify a rate-hike request related to natural gas transmission and storage. Rather than conduct the repairs, PG&E repurposed the money and left the old segment in place. Especially troubling is that, according to TURN, in 2009 PG&E spent nearly $5 million on bonuses for six of its top executives, nearly the same amount that PG&E was awarded to replace an extremely risky segment of Line 132. In this case, PG&E did not just put profit before safety; it put personal benefit before safety.

195. Even worse, that same project appeared again in 2009 on a list of projects that PG&E submitted to the CPUC in a "Capital Project Summary." PG&E again sought $5 million for the same project. PG&E justified the project and second request for $5 million in funding by characterizing the risk of failure to replace Line 132 as follows:

> If the replacement of this pipe does not occur, risk associated with this segment will not be reduced. Coupled with the consequences of failure of this action of pipeline, the likelihood of a failure makes the risk of a failure at this location **unacceptably high**.

196. One PG&E document noted in an apparent reference to an explosion that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  it "has a potential impact radius of 415 feet and is located in a heavily urbanized

2  area." In 2009, the $5 million was awarded again to PG&E and again the project was

3  deferred. Line 132 has been a concern for years, PG&E knew that the risk was

4  "unacceptably high" and could result in a deadly explosion. The Individual Defendants

5  knew of the risk, and were using that risk to obtain more money from ratepayers, yet

6  they continued to delay necessary repairs that they knew about.

7          197.   In early 2009, PG&E became aware that "significant amounts" of

8  compressor oil and water was accumulating in Line 132 and three other transmission

9  lines in the Peninsula area south of San Francisco connected to the Milpitas terminal.

10  The liquids were, according to Pacific Gas & Electric Company, "an ongoing concern for

11  internal corrosion." The liquids were appearing in filters in distribution stations

12  served by the pipelines, and originated at the Milpitas terminal. The likely cause was a

13  mechanical failure.

14          198.   Pooling liquids within a gas transmission pipeline can lead to

15  microbiologically induced corrosion, which can rapidly corrode a pipeline and degrade

16  its integrity, leading to catastrophic failure.

17          199.   PG&E did not use a special internal probe called a pipeline inspection

18  gauge, or "pig," that can measure pipe thickness and detect internal corrosion and

19  cracking using ultrasound vibrations or magnetic field waves, to clean Line 132 or

20  check for internal corrosion because the pipeline had too many bends, which

21  themselves can be a location for liquid pooling and corrosion. Nor did PG&E use

22  hydrostatic testing with water pressure, which would have required shutting down the

23  line. PG&E instead relied on direct assessments to inspect for internal corrosion, to

24  the extent it conducted such inspections. "Direct assessment" means testing for

25  corrosion by running an electric current between two measuring devices inserted into

26  the ground. If corrosion is present in the pipe, a weaker than normal signature should

27  register. The test is not completely effective for detecting corrosion, and it is it not

28  effective in finding metal fatigue, stress corrosion, cracking, excessive gas line

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  pressure, and other dangers.  Most experts consider it an outdated technology.

2      200.   In November 2009, PG&E installed separators at its Milpitas terminal to

3  stop the flow of compressor oil into its transmission pipelines.  University of California

4  – Berkeley Professor Robert Bea said the pictures of the ruptured San Bruno pipeline

5  "clearly show internal corrosion."

6      201.   PG&E did not conduct mandatory risk assessment on Line 132 or did so

7  inadequately, because none of the PHMSA-identified "additional measures" (such as

8  installing ASV, RCV, or a computerized monitoring and leak detection system, or

9  replacing segments with heavier wall pipe) were implemented despite the obvious need

10  to take steps to prevent or mitigate a catastrophic leak in PG&E's aging metal pipes

11  carrying extremely flammable natural gas at high pressure through densely populated

12  San Bruno, a risk that PG&E knew was "**unacceptably high**."

13      202.   Especially troubling is PG&E's failure to determine "based on a risk

14  analysis, that an ASV or RCV would be an efficient means of adding protection to [San

15  Bruno] in the event of a gas release."  All the factors that must be considered –

16  swiftness of leak detection and pipe shutdown capabilities, the type of gas being

17  transported, operating pressure, the rate of potential release, pipeline profile, the

18  potential for ignition, and location of nearest responsible personnel – should have led

19  PG&E to conclude that ASV or RCV were required on Line 132.  Moreover, PG&E

20  completely ignored the lesson it should have learned from the 1981 San Francisco gas

21  pipeline rupture about the need for fast pipeline shut-off capability.

22      203.   The enforcement action taken by CPUC, the reports from the NTSB, and

23  the publicly-known concerns about PG&E likely represent a small percentage of

24  noncompliance issues of which PG&E and the Individual Defendants were aware or

25  should have been aware of, because pipeline operators, such as PG&E, have primary

26  responsibility for safety management within HCAs.

27      204.   As of 2010, considerably less than 10% of PG&E's HCA natural gas

28  transmission pipelines were inspected by use of pigs.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

205.   PG&E's safety budget cuts, project safety deferrals, adoption of ineffective and less costly assessment methods and decisions to dodge compliance with regulations and pipeline industry standards, guides, and recommended practices were not the result of profitability constraints.  PG&E revenues exceeded the amount needed to earn the authorized rate of return by $430 million.  The low priority PG&E gave safety and reliability requirements in the 2008-2010 budget process was well outside standard industry practice.

206.   Rather, PG&E budget cuts for safety related projects were motivated by financial performance.  Relatedly, PG&E executive officer compensation for the period 2000-2010 (the period when PG&E terminated its GPRP and adopted the RMP) was over $281 million.  By comparison, the cost to hydrotest the one-third mile Segment 180 of Line 132 would have been approximately $125,000.   Public filings also show that in early 2010, PG&E chose to spend $45 million of ratepayer dollars in a failed bid to block public power. This money could have been used and should have been used to repair pipelines in the San Francisco peninsula that PG&E knew could explode and where the risks were "unacceptably high."

### 2. The Boards of Directors were aware of the serious safety, operational, maintenance and cultural problems at PG&E

207.   Prior to the 2010 San Bruno explosion, the Boards of Directors of both PG&E Corp. and PG&E were fully aware of the serious safety, operational, maintenance and cultural problems at PG&E. The Boards of Directors of PG&E Corp. and PG&E sponsored investigations and reviews revealing that PG&E was in a "crisis" mode due to lack of process focus, quality control, operational discipline, planning and resource allocation. Between at least 2007 and 2010, the Boards at PG&E Corp and PG&E were specifically informed of and knew about the following:

- Assertions of management improprieties in PG&E's gas operations by employees at the 2007 Annual Shareholders' Meeting;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- The explosion and failure of network transformers in July 2007 and the subsequent discovery of maintenance and engineering breakdowns.

- A business transformation failure in October of 2007 that impacted primarily work flow processing in T&D.

- System-wide problems in the recordkeeping relating to gas matters, such as leak surveys, maintenance process records, and emergency valve and regulation station records.

- Repeated meetings with the City and County of San Francisco due to explosions and significant service outages.

- Multiple Direct Current ("DC") system failures in San Francisco, which culminated in the Polk and O'Farrell event and which led to PG&E's retirement of its extremely old DC system.

- In 2008 and 2009, the Diablo Canyon electric yard events relating to high voltage bushing explosions and transformer issues.

- The Rancho Cordova explosion on December 24, 2008 and the subsequent NTSB investigation.

- The accelerated leak survey from late 2008 through early 2010, which resulted in record levels of work being executed in a compressed timeframe.

- Findings and records problems relating to Transfer Ground Rocker Arm.

- Main ("TGRAM") and Transfer Ground Rocker Arm Line ("TGRAL") oil filled switches.

### 3.    PG&E has been plagued by safety problems

208.    The Individual Defendants have been well aware of PG&E's long history of incidents with its pipeline networks, beginning with problems in 1980s and 1990s that accelerated throughout the first decade of the 2000s. Much of this history has been documented by regulatory authorities.

209.    As early as 1981, for example, a 16-inch natural gas main operated by PG&E in downtown San Francisco ruptured.  This caused the release of a gas that contained highly toxic PCBs.  It took workers nine hours to stop the flow of gas because

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    of difficulties in closing the manual shut off valves.

2        210.    In 1984, the Manager of Gas Systems Design for PG&E made a request

3    directly to PG&E's Board of Directors to spend $47 million on pipeline replacement in a

4    year that PG&E had made over $1.8 billion.  The Manager warned the PG&E Board of

5    the severe negative consequences of failing to adopt the GPRP.  PG&E's Manager also

6    warned the PG&E Board that the foreseeable risk of failing to commit to the

7    replacement of aging pipelines was death, injury and property damage to those living

8    near the pipeline.  He concluded by providing the PG&E Board with several

9    alternatives to evaluate.  The first alternative was to do nothing; however, PG&E's

10   Manager warned that this alternative "will eventually result in a reduction in safety

11   and reliability of gas service to customers.  If a program to replace this aging piping is

12   not adopted, only a small portion will be replaced on an unplanned basis as this piping

13   deteriorates in the future.  Doing this work on an unplanned basis will be at least 25%

14   more costly."  The second option was a thirty-year program with an estimated total cost

15   of $1.52 billion or a twenty-year program with a higher cost in the initial years.  The

16   PG&E Board chose the least burdensome approach and approved the program for three

17   years because "no exception to the budgetary process seems warranted."  After three

18   years, the PG&E Board was to reevaluate the usefulness of the program.

19       211.    In a 1987 letter to PG&E, the outside company contracted to collect the

20   pipeline data for the GPRP advised that, because of inadequate recordkeeping

21   practices, information on the manufacturer, type of soil and condition of pipe would be

22   hard to obtain unless the pipe is uncovered.  However, PG&E chose not to uncover the

23   pipe because of cost considerations.

24       212.    In approximately 2000, the pipeline replacement program was shifted

25   under the Risk Management Program ("RMP").  The RMP resulted in replacing only

26   twenty-five miles, as opposed to the one hundred sixty-five miles of pipeline that would

27   have been required under the 1985 GPRP.  In 2001, PG&E's California Gas

28   Transmission Program indicated that its RMP would save PG&E more than $200

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  million over twenty years by avoiding regulatory and safety required pipeline
2  verifications and/or risk management analysis of all gas pipelines and avoiding smart
3  pigging and hydrotesting in high consequence areas as necessary to comply with
4  federal law.

5      213.   Christopher Hart, the Vice Chairman of the NTSB, said that the agency
6  had put PG&E on notice regarding issues with manual shut off valves.  Nevertheless,
7  documents show that PG&E, for at least 20 years, has failed to spend the funds
8  required to replace aging gas pipelines or install modern equipment such as automatic
9  shut-off valves, which would have significantly reduced the fire damage following the
10 San Bruno explosion.  The Individual Defendants were aware of the need for repairs
11 and chose not to pay for those repairs.

12     214.   In 1995, the CPUC admonished PG&E for collecting more funds from
13 ratepayers to replace gas transmissions than it actually spent for those tasks.  A utility
14 commission member in 1995 wrote the following in regards to a CPUC decision on
15 PG&E's requested gas and electric rates: "Despite consistent under spending in
16 previous years, we granted PG&E's full funding request . . . on the basis that PG&E
17 should continue replacing old pipelines 'as quickly as possible' in the interest of safety."
18 The commission member also explained, "We stated our expectation that PG&E should
19 use the authorized funds for their intended purpose and even accelerate the pace of the
20 program," adding "[b]etween the time we issued the last general rate case decision and
21 the filing of this one, PG&E has fallen short of our stated expectations."

22     215.   PG&E had requested and been granted the right to continue to charge
23 ratepayers high rates purportedly for repairs even though PG&E had a history of
24 underfunding its pipeline operations and safety.  This state of affairs continued as
25 PG&E persistently failed to spend the money it had been approved on pipeline
26 operations, maintenance, and safety.  This happened despite the repeated notices and
27 warnings to PG&E to increase and improve its spending on pipeline operations,
28 maintenance and safety.  The Individual Defendants were aware of these warnings.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

216.   In 1998, the CPUC reported that PG&E had a history of collecting funds for repairs and diverting those monies for other purposes.  In that 1998 report, the CPUC found that PG&E  had collected $77.6 million that was supposed to be spent trimming trees near power lines, which is important for safety purposes, and used those monies for other reasons.

217.   From 2004 through 2009, California gas utilities tallied nearly 700 "probable violations" of federal or California state pipeline safety rules, from shoddy maintenance records to worker errors.  The Individual Defendants were aware of these serial violations.

218.   From 2004 through 2009, PG&E was cited 410 times for unsafe practices in its gas operations, whereas all the other utilities in California combined were cited only 287 times. During that time period, although PG&E operated only 41% of the gas pipelines in California, it was responsible for 59% of the probable violations.  The Individual Defendants were aware of these violations.

219.   According to federal safety data, between 2004 and 2010, PG&E had more reportable incidents than any other gas delivery company in the United States.  A reportable incident, according to the PHMSA, is an incident that results in more than $50,000 of property damage, injury requiring hospitalization, or death.  The Individual Defendants were aware of this embarrassing track record.

220.   In July 2005, a residence in Los Altos was destroyed by a natural gas explosion that was caused by corrosion in a PG&E pipe installed in 1948.  That incident resulted in property damage and personal injury to the occupants of the residence, resulting in $463,784 in damages. The subsequent investigation identified pipe corrosion as the cause of the explosion.  The Individual Defendants were aware of this explosion and its cause.

### 4. The Individual Defendants ignored red flag warnings about inadequate recordkeeping at PG&E

221.   PG&E internal corporate memos reveal that the Defendants knew, no

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    later than 1993, that PG&E was losing track of documents for its gas-transmission

2    system and that a catastrophe was not only possible, but likely, which would result in

3    serious financial and reputational harm to PG&E, not to mention potential property

4    damage and loss of life.

5        222.    These internal memos came from Larry Medina, PG&E's then-head of

6    information and records management.

7        223.    In a December 1992 memo, Medina warned PG&E's senior executives that

8    PG&E was creating potentially "incomplete or inaccurate" records.  Medina urged the

9    company to devote more money and staffing to the problem.  Medina went to PG&E

10   first to warn of his concerns, but he was ignored.  The following is an excerpt from the

11   December 1992 Medina memo:

12           One thing that will become apparent when reviewing this document is
             that many of the functions that were transferred to the DBU side (with
13           headcount and funds) have not been performed or kept current for some
             time now.  Prime examples would be the Pipeline History files for
14           Strength Test and Pressure Reports for the DBU Transmission lines, the
             regular issuance of Gas Standards, the Estimator's manual and a
15           decision made jointly by GSBU and DBU after the formal transfer of
             responsibilities for the Mapping function to no longer update or keep
16           current the Pipeline Plat Sheets, due to the extensive backlog and the
             perceived lack of importance of the data reflected on the drawings.
17
             The failure to maintain the data formally on the Plat Sheets and the
18           decision not to generate Plat Sheets for new work may be costly to PG&E
19           in the future and it may be difficult to defend the non-existence of the
             data.  Recent changes placed the responsibility for maintaining the data
20           on the Divisions and/or Regions, by continuing to "pencil post" any
             changes to the last versions of the Plat Sheets issued to them.
21

22

23       224.    In a March 1993 internal PG&E company memo, Medina further warned

24   PG&E executives about the "ripple effects" of a company reorganization that was going

25   on at PG&E in that time period.  As part of that reorganization, PG&E eliminated a

26   unit in the company that was responsible for tracking pipeline records.  As Medina

27   warned in his March 1993 memo, some critical records had already been lost.  As the

28   memo goes on to state, PG&E's recordkeeping functions "have not been performed or

- 88 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    kept current for some time now."  Amongst the records that were not maintained were

2    results for tests of pipeline strength, obviously critical information to preventing

3    pipeline explosions and ensuring public safety.

4         225.   The memo from Medina also warned that system maps with crucial

5    information about pipelines were not being updated because of "the perceived lack of

6    importance of the data." This directive came from the top leadership of PG&E.  As

7    Medina went on to say, the failure to keep such information may be "costly to PG&E in

8    the future, and it may be difficult to defend the nonexistence of this data."

9         226.   When Medina's memos were provided to PG&E's executives, they were

10   ignored, and Medina's position in the company was eliminated.

11        227.   The two memos from Medina warning PG&E's top management of the

12   serious recordkeeping problems were publically released by the CPUC in the aftermath

13   of the San Bruno pipeline explosion.

14        228.   Years later, PG&E Senior Gas Engineer Todd Arnett admitted in a

15   deposition that PG&E's recordkeeping was notoriously incomplete and inaccurate and

16   that this issue was raised to the highest levels of the company.  Arnett also testified

17   that PG&E's incomplete and inaccurate records affected the quality of the decisions

18   engineers were making in conducting risk assessments.  Arnett admitted that it was

19   well known at PG&E prior to the 2010 San Bruno explosion that the Geographic

20   Information System ("GIS"), a recordkeeping database used to keep track of the aging

21   and quality of the pipes, was incomplete and inaccurate.

22        229.   As set forth above, the 2010 San Bruno explosion was the result of an

23   incomplete seam weld in a pipe that PG&E claimed it did not know was part of the

24   line because its database listed the pipe as "seamless." The importance of accurate

25   recordkeeping is critical to ensuring the safety of the public and to ensure that PG&E's

26   gas transmission network is safe and secure. Because of the inaccurate recordkeeping,

27   PG&E never investigated the seam weld on the pipe because its records indicated

28   there was no seam. The fact that the Individual Defendants knew that recordkeeping

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  was incomplete and inaccurate is, therefore, directly linked to the gas pipeline

2  explosions that have caused PG&E significant harm. The fact that such deficiencies

3  were widely known throughout the Company for over a decade prior to the San Bruno

4  explosion, while Defendants refused to act to remedy this error, is also directly linked

5  to the gas pipeline explosions that have caused PG&E significant harm. PG&E's own

6  senior gas engineers, as Arnett admitted, knew that they were making difficult

7  decisions based on incomplete and inaccurate information, a situation that the

8  Defendants knew about and condoned. Arnett's testimony confirms what Medina had

9  identified in memos as early as 1992.

10       230.    In the aftermath of the 2010 San Bruno explosion, PG&E has publicly

11  admitted that it still does not have complete records vouching for the safety of about

12  500 miles of gas transmission pipeline running in and near urban areas.

13       231.    Federal and California state investigators have found that PG&E had

14  inaccurate or nonexistent records for much of its more than 1,000 miles of urban gas

15  transmission lines.

16       232.    In response to the release of the Medina memos, PG&E spokeswoman

17  Brittany Chord said only that the state's decision to make the memos public "speaks

18  for itself," and did not directly address their contents.

19       233.    Representative Jackie Speier (D-San Mateo), in describing Mr. Medina's

20  memos, stated, "[h]e [Larry Medina] was alerting the leadership that if they pursued

21  the route they were heading down, it would be very detrimental, that [PG&E] had to

22  take safeguards to make sure the system was safe."

23       234.    Representative Speier went on to say that "[i]t underscores what we have

24  already come to find out: safety was not in the lexicon at PG&E before the explosion.  It

25  was a second thought or a third thought, and the recordkeeping was and is in

26  shambles."

27  ///

28  ///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### 5. The Individual Defendants ignored serious red flag problems at PG&E that were identified in PG&E audits

235.   In 2007, PG&E conducted an internal safety audit of its Sonoma County residential gas distribution system.  The audit report revealed major issues with how PG&E reported gas leaks, including falsification of records and inadequate training of inspectors.  The problems were of such high severity that PG&E followed up with another survey, which found gas leaks in 28 of the 32 residential areas that were tested, including all four of the residential distribution lines in the Peninsula area south of San Francisco.  The underreporting of gas leaks was a known problem at PG&E for years and the entire PG&E Board of Directors knew of this problem no later than May 2007.

236.   William Marcus, a principal economist for JBS Energy Inc. testified before the CPUC that "[w]hat happened is that Pacific Gas and Electric Company's gas leak detection and repair program fell apart."

237.   In May 2008, regulators notified PG&E that it was not properly tracking external corrosion problems on pipelines and were not ensuring that the individuals performing this work were properly qualified.

238.   In a 2008 audit of PG&E's Sacramento division, regulators noted that PG&E failed to meet its deadlines for fixing leaks or inspecting repairs in 23 instances over two years.  That audit also revealed that PG&E could not prove they were doing annual drills on shutting down gas during emergencies.

239.   In August 2008, the CPUC conducted an audit of PG&E's Fresno division and concluded that PG&E did not have sufficient training and/or appropriate equipment for its workers to deal with outdoor pipeline leaks.  That safety audit, conducted under the authority of GO 112-E, included a review of the Fresno division's records and involved a field inspection of various segments of its gas distribution systems.  The audit found a number of major violations of safety regulations established by PHMSA.

240.   The audit also found that PG&E's procedures did not define what constituted a "hazardous" leak, meaning that there were no standards for PG&E field service representatives to determine the severity of outdoor leaks in response to customer calls about the smell of gas.  In addition, the procedures did not provide for or require field service representatives to be qualified in the use of gas detection equipment or to possess knowledge needed to properly grade an outdoor leak. Consequently, field service representatives were left on their own to make subjective decisions, without being able to rely on any standards, regarding to severity of outside leaks and whether or not to notify on-call construction personnel.

241.   The audit revealed issues with PG&E's corrosion control record keeping. CPUC's inspector expressed frustration with PG&E, noting that the company had promised nearly two years earlier to fix the corrosion problems, but failed to do so.

242.   In its response, three months after being cited for these violations, PG&E promised to update its protocols before the end of 2008 to better define "hazardous" leaks, and stated it would negotiate with the labor union representing field service representatives and would add grading outdoor leaks to their job classification and, if successful, to train, qualify, and provide them with the necessary equipment.

243.   PG&E also promised to conduct a "special survey" to detect gas leaks as a result of a 2007 internal survey and the 2008 CPUC audit.  Under this survey, it would accelerate all mandatory surveys that were due in 2011 and 2012 so that they would all be completed by the end of 2010.  After the CPUC had determined that PG&E had conducted inadequate surveys of gas leaks for decades, PG&E finally decided to rush through surveys.

244.   According to PG&E's 2009 Annual Report, it had incurred "approximately $100 million of costs to perform accelerated natural gas leak surveys and associated remedial work" which according to the 2009 10-K, was expected to be completed in April 2010.  However, information discovered years after the San Bruno explosion in 2010 showed that PG&E did not meet its obligations.  PG&E again began downgrading

1    the amount of money it would spend on gas leak surveys in the months leading up to

2    the tragic San Bruno incident.  Moreover, the required gas leak surveys did not occur

3    by April of 2010, as PG&E had promised.

4         245.    In October 2008, CPUC engineer Dennis Lee stated publicly that PG&E

5    was not keeping proper logs of pressure problems in the gas distribution system.

6         246.    The Individual Defendants were aware of the foregoing audits and

7    findings.

8              **6.    PG&E's   executive   leadership   was   warned   of
                catastrophic risk if PG&E continued to ignore and fail
9              to prioritize operational safety at PG&E**

10        247.    PG&E was well aware of serious problems with the risk management

11   policies at PG&E.  In May 2007, an internal PG&E report identified the fact that

12   PG&E "lacks a well-defined, documented risk policy/standard at the enterprise level

13   that 1) explains PG&E's overall risk assessment methodology, 2) defines the lines of

14   business roles and responsibilities, 3) specifies the requirements for performing and

15   documenting risks, 4) links risk assessments to controls, self-assessment, reviews and

16   audits, and 5) specifies the requirements for metrics to track the risks."  The internal

17   PG&E report also found that "Energy Delivery and Engineering & Operations do not

18   have an integrated, documented, consistent approach with clear organizational roles

19   and responsibilities for dealing with their risk and associated corrective actions."

20        248.    Internal PG&E documentation from as early as 2006 identified a "Gas and

21   Electric Distribution System Safety Conditions" as a medium to high probability risk

22   that had medium to high consequences for PG&E.  In other words, a dangerous and

23   catastrophic explosion was a well-known risk at PG&E.  PG&E also knew that such an

24   incident would dramatically affect PG&E. PG&E even noted that imprudent decision-

25   making in this area could create medium to high cost exposure to PG&E.  Despite

26   knowledge of this risk as early as 2006, the Individual Defendants continued to operate

27   PG&E in a lax and imprudent manner in violation of their fiduciary duties to the

28   company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

249.   According to Bill Manegold, a PG&E gas system official, PG&E's integrity management system was not complied with.  The RMP-1 (Risk Management Program) was supposed to be reviewed annually.  Defendant Johns, however, testified that he was not aware that it had not been reviewed for five years.  Defendant Johns, as the President of PG&E, the operating subsidiary of PG&E Corp., certainly should have reviewed the RMP-1 or ensured that it was reviewed annually.  The failure of Defendant Johns to ensure that basic risk management procedures were followed demonstrates that risk management and safety was not a priority at PG&E.

250.   In 2007, PG&E, at the direction of Defendants Darbee and Johns, brought in a new Senior Vice President of Engineering and Operations to manage the Enterprise Risk Management ("ERM") program, even though he had no experience at an energy company and his experience was in telecommunications.  Despite his inexperience, the new Vice President determined immediately, in 2007, that PG&E's risk management problems were "unactionable" because almost everything at PG&E in regards to safety was "broken."  In fact, soon after he took the job, the new Vice President was personally told by Defendants Darbee and Johns that PG&E had a long history of safety and operational problems that were deeply ingrained into the corporate culture and management style.

251.   Moreover, by at least 2009 and 2010, the executive management committee at PG&E (which included senior officers and directors such as Defendants Darbee and Johns) was well aware that the company faced a significant risk of a single major catastrophic event.  In a document entitled "Enterprise Risk Management Risk Review," it was identified to PG&E's executive management that one of the "top" enterprise risks was the risk of a "system safety" event.  However, although PG&E's executive leadership was well aware that a gas pipeline explosion, or a "system safety" event as PG&E called it, was a possibility, no effort was made to determine if a manufacturing defect could be the cause of a gas pipeline explosion.  Despite this being a commonsense possibility of what could cause a pipeline to explode, PG&E did not

1  make any effort to analyze that possibility and therefore had no plan in place to

2  mitigate that risk.

3      252.   The executive management committee, in putting together this

4  "Enterprise Risk Management Risk Review," determined that the financial impact of

5  risk mitigation was $100 to $500 million.  The executive management committee

6  considered the reputational and environmental impact of risk mitigation, but

7  dismissed the impact on human lives that would happen if there was a failure to

8  mitigate the risk of a catastrophic "system safety" event.  In the work performed by

9  PG&E, they referred to a catastrophic event that could cost human lives as a

10  "significant event in a high density area," which is a euphemism for an explosion in a

11  place where people live and work.

12         **7.**    **The Individual Defendants were aware of adverse**
             **regulatory findings**

13

14      253.   On January 12, 2012, the CPUC released to the public its Incident

15  Investigation Report on the PG&E Pipeline Rupture in San Bruno, California. It

16  concluded that the incident was caused by PG&E's failure to follow accepted industry

17  practice when constructing the section of the pipe that failed, PG&E's failure to

18  comply with integrity management requirements, deficiencies in PG&E's systems and

19  emergency response actions, and "a systemic failure of PG&E's corporate culture to

20  emphasize safety over profits."

21      254.   As the CPUC and Overland noted in their respective reports (as discussed

22  below), PG&E treated **safety as a "low priority"** and chose to use surplus revenues

23  for "general corporate purposes" rather than improved gas safety.  By cutting back on

24  pipeline-replacement projects and maintenance, laying off workers, using cheaper but

25  less effective inspection techniques and trimming other pipeline costs, PG&E saved

26  upward of 6% of the money designated for pipeline safety, maintenance and operations

27  program.  PG&E diverted customers' fees from safety and long-term sustainable

28  growth to short-term profit.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3

           **a.**     **An Independent Review Panel reviewed the San Bruno explosion and PG&E's conduct and found that the Company focused solely on financial performance at the expense of operational safety**

4
5
6
7
8

     255.   An Independent Review Panel (the "Panel") was created soon after the 2010 San Bruno explosion to investigate the causes of the explosion and the role of PG&E in that explosion. The chairman of the Panel was Larry N. Vanderhoef, Chancellor Emeritus of the University of California - Davis. The other members of the Panel were Patrick Lavin of the International Brotherhood of Electrical Workers 7th District International Executive Council; Karl S. Pister, Chair of the Governing Board of the California Council on Science and Technology and Chancellor Emeritus of the University of California - Santa Cruz; Paula Rosput Reynolds of PreferWest, LLC; and Jan Schori from Downey Brand LLP. The Panel was assisted by several experts, including Jacobs Consultancy, Inc. The task of the Panel was to investigate the San Bruno pipeline explosion and the culture of PG&E and its operational policies.

9
10
11
12
13
14

     256.   The central conclusion of the Panel was that PG&E's corporate culture needed to be thoroughly changed because the top leaders of PG&E, including the Individual Defendants in this case, lacked the expertise and knowledge to properly handle operational and process safety at PG&E and had demonstrated no desire to learn. The top leaders of PG&E were focused solely on financial performance and consistently sacrificed safety for profit. This mismanagement is reflected in an anecdote that is contained in the Panel's report. When a top executive was asked how safety could be improved at PG&E, the top executive stated that if PG&E could recover the costs of safety improvements that would improve safety. This perhaps best illustrates the massive cultural cancer at PG&E that the Individual Defendants created and fostered. In other words, PG&E's basic position is, "Sure, we'll improve safety, as long as someone else pays for it."

15
16
17
18
19
20
21
22
23
24
25
26

     257.   The Panel also found that PG&E lacked core technical expertise and that

27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the expertise it did have was being lost.  The Individual Defendants had allowed that

knowledge base to be lost while increasing layers of management, in which

businessmen and lawyers were essentially running one of the nation's largest utilities.

The Individual Defendants themselves came largely from financial and legal

backgrounds and had no understanding or knowledge of process or system-wide safety

at PG&E.  Despite being informed that more money was needed for overall safety, the

Individual Defendants consistently rejected those recommendations in order to cut

costs.  The Individual Defendants were well aware that the company lacked the

technical expertise needed to ensure process and operational safety.  However, since

the Individual Defendants were ignoring PG&E's own experts in setting budgets, it did

not matter to the Individual Defendants that the company lacked the expertise needed

to operate a utility of the size and scope of PG&E.

258.   The Panel identified several key problems with PG&E's corporate culture:

- <u>Excessive levels of management</u> - In certain silos, there were as many as nine levels between the CEO and the front-line employee. As a result, the management that is setting the direction is distant from those who know the business the best.

- <u>Inconsistent presence of subject matter expertise in the management ranks</u> - Repeated reorganizations, the interchange of gas and electric supervisors and managers, the homogenization of gas transmission and distribution personnel, the large presence of telecommunications, legal and finance executives in top leadership positions, and the under representation of engineers and professionals with significant operating experience in the natural gas utility industry have impaired the effectiveness of the organization.

- <u>Appearance-led strategy setting</u> - In a business with the complexity of PG&Es, there is no substitute for long-term planning and careful execution, but there appears to be an elevated concern about the company's image that may get in the way of concentrating resources on the most important things. For example, PG&E announced Pipeline 2020 a few weeks after the San Bruno Incident, but the plan is grossly underdeveloped. We realize PG&E has to manage its relations with the media. However, putting forth a major initiative without having done the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

necessary work underneath ultimately undermines the company's credibility with its employees as well as the public.

- <u>Insularity</u> – In many instances over its long and storied history, PG&E has been an industry innovator and leader, but no company can maintain its edge without a certain degree of humility and an outward focus, both of which enable it to learn from and be influenced by others. As a large company with many different disciplines represented, it is a challenge to be sure one is listening to outside colleagues as attentively as it does to internal voices. Beginning in 2000, when PG&E went through its bankruptcy, much of the outside interaction - participation in industry conferences, committees, testing programs and colloquia - was curtailed. One consequence of this lapse is there appears to be an insular mindset in many of the individuals we interviewed. The mindset, if not addressed, can breed a corporate myopia that stands in the way of an honest assessment of the company's strength, weaknesses, and performance relative to others. Absent a realistic view of a company's performance, the drive for continuous improvement is diminished.

- <u>Overemphasis on financial performance</u> - While the company has multiple stated goals, top management may be overly focused on financial performance. Certainly the company must be financially healthy to fulfill its mission, but when top management focuses on financial performance and does not appear to be engaged in operational safety and performance, leadership may dampen the willingness of the organization to challenge the priorities or resources put in place by upper management.

259.    As the Panel found and documented in its report, the Individual Defendants had mismanaged PG&E for almost a decade.  Despite knowing that they lacked the experience and expertise to manage a public utility, the Individual Defendants continued to overemphasize financial performance (profits) over operational and process safety (safety).

**b.    CPUC and Overland Consulting found that PG&E chronically dedicated insufficient resources to operational safety despite having more than sufficient money to do so**

260.    The CPUC initiated its own investigation and retained an independent firm, Overland Consulting, LLC ("Overland"), to review PG&E's gas transmission

- 98 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

safety-related activities from a financial and regulatory audit perspective.  While the

San Bruno pipeline explosion itself was a key part of the investigation, Overland also

reviewed and audited PG&E's regulatory and financial compliance.  The CPUC and

Overland examined PG&E's natural gas transmission and storage expenditures over

the prior 15 years to determine whether the amounts that the CPUC had authorized

for gas pipeline safety investments were actually spent on safety investments.

Authorized revenue was compared with actual costs for operations and maintenance

expenses, capital expenditures, and rate-base expenditures.  Overland's audit also

compared authorized revenue requirements to actual revenue and actual return-on-

equity to authorized levels.

261.    Overland issued two separate reports, one in 2011 and the other in 2013.

### (i) The 2011 Overland Report

262.    In December 2011, Overland issued its first report to the CPUC (the

"2011 Overland Report"). Among other things, Overland found that actual revenues

collected from customers exceeded adopted revenues by $224 million over the twelve-

year study period. The audit also showed that P&E was provided rate recovery for

pipeline transmission operations and maintenance, but that every year since 1996,

PG&E spent $39 million less than the CPUC authorized over the period 1997 to 2010.

***In other words, for over a decade, PG&E intentionally spent less money on***

***maintenance and operations than it represented was necessary to ensure that***

***PG&E's pipelines and infrastructure were safe***.

263.    Chapter 2 of the 2011 Overland Report titled "**Background and**

**Approach**" described the scope of the audit:

> The catalyst for the audit was the gas transmission pipeline rupture  that
> occurred in a residential area of San Bruno, California, on September 9,
> 2010.  The natural gas released by the rupture ignited and caused a fire
> that destroyed 38 homes and damaged 80.  Eight people were killed and
> many more were injured. The audit focused on PG&E's gas transmission
> safety-related activities from a financial and ratemaking perspective.  The
> audit is intended to complement, rather than duplicate, the engineering
> and operations analysis conducted by the CPSD Staff, the Independent

Review Panel and the National Transportation Safety Board.  A review of the gas distribution system was outside the scope of the audit.

264.   The work performed during Overland's focused audit included:

- Comparing actual gas transmission safety-related O&M [operations and maintenance] expenses and capital expenditures to the levels included in rates.

- Investigating the reasons for variances between the actual and adopted amounts.

- Reviewing PG&E's planning documents for evidence that gas transmission safety resources were constrained for financial reasons.

- Reviewing gas transmission staffing levels and operational  metrics for evidence of resource constraints impacting gas safety.

- Reviewing the financial performance of PG&E's gas transmission business to determine if earnings were sufficient to support investments in gas safety.

265.   Chapter 3 of the 2011 Overland Report titled **O&M Expenses** concluded that:

During the period 1997 to 2010, total GT&S functional O&M expenses were 3.8% lower than adopted.  PG&E's pipeline safety costs are included in the transmission function.  Transmission O&M expenses were 5.0% lower than adopted.[19]

Actual transmission O&M was $39 million lower than adopted over  the fourteen-year study period.  Actual transmission O&M was lower than adopted in all but one of the years in the study period. The average annual difference was $2.8 million. **The consistent underspending on transmission O&M had negative implications for gas pipeline safety.**

PG&E's transmission maintenance costs (MWC BX) increased at an average annual rate of 1.2% between 1997 and 2009.[20]  Pipeline maintenance requirements increase as facilities age, system throughput

---

[19]   Actual O&M expenses were adjusted to eliminate costs that are excluded from GT&S base rate cases, including the San Bruno incident costs incurred by PG&E in 2010.

[20]   PG&E incurred $21.8 million in O&M expenses related to the San Bruno incident in 2010. Overland excluded those costs from 2010 actual costs.  Overland excluded 2010 from the  transmission O&M trend analysis because it may have been distorted by the diversion of resources to San Bruno related work. Actual 2010 transmission O&M expenses, excluding San Bruno  related costs, were 7.9 percent lower than 1997 costs.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

increases and the system grows.  The low rate of escalation in transmission maintenance costs is an indication of resource constraints in pipeline maintenance.

266.    Chapter 5 of the 2011 Overland Report titled **Return on Equity** found that:

The GT&S operations have been highly profitable since the Gas Accord Structure was implemented in March 1998.  The actual return on equity (ROE) earned by GT&S operations averaged 14.2% during 1999 through 2010. PG&E's authorized ROE averaged 11.2% over that same period.

PG&E's GT&S revenues were $430 million higher than the amounts needed to earn the authorized return during the twelve-year study period.  The surplus revenues averaged $36 million a year. **PG&E could have used the surplus revenues, at least in part, to improve gas safety. Instead PG&E chose to use the surplus revenues for general corporate purposes**.

267.    Chapter 6 of the 2011 Overland Report titled **Staffing and Metrics** concluded that:

The total headcount in PG&E's GT&S organizations decreased from 513 in December 1996 to 474 in December 2010.  The union headcount decreased from 284 to 220.  The union headcount in GT&S District Operations and Centralized Maintenance (DCM) organizations decreased by from 205 in 1996 to 146 in 2010.  The large reductions in DCM headcount imply resource constraints in pipeline maintenance.

PG&E's local transmission lines are maintained by its gas distribution divisions.  The total headcount in PG&E's gas distribution divisions fell by 28% between 1996 and 2010. PG&E discovered serious safety related deficiencies in its gas distribution operations in 2007, 2008 and 2009. **The large distribution headcount reductions and safety-related deficiencies have negative implications for local transmission pipeline safety.**

PG&E significantly reduced the use of In-Line Inspections [("ILI")] in 2009 and 2010.  During 2005 to 2008, ILI accounted for 53% of the total miles assessed.  In 2009 and 2010, ILI only accounted for 13% of the miles assessed.

PG&E no longer prepares metrics, goals or annual reports for its gas transmission pipeline risk management program.  PG&E does not prepare separate risk management plans or track risk management projects.  Risk continues to be a factor in prioritizing projects. **However, the evidence suggests risk management continued to be a separate program in name only at some point after 2004.**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

PG&E does not monitor the miles of pipeline it leak surveys on a centralized basis.  PG&E cannot provide actual leak survey mileage statistics for its backbone and local transmission systems.  The inability to monitor leak survey miles on a centralized basis is an indication of a weakness in policies and procedures and safety-related resource constraints.

PG&E reported a large increase in the number of transmission  pipeline leaks in 2009 and 2010.  Those leaks were discovered in special leak surveys implemented in response to the discovery of serious systematic deficiencies in PG&E's leak survey program and the San Bruno Incident.  **The large number of leaks discovered in the special leak surveys indicates that leak survey resources were inadequate prior to 2009.**

The corrective work order backlog in PG&E's GT&S operations  districts increased significantly in 2008 through 2010.  The increase in the backlog indicates significant resource constraints in those years.

268.    Chapter 7 of the 2011 Overland Report titled **1996-2008 Resource Constraints** reported that:

The planning documentation reviewed by Overland does not contain many references to significant budget constraints prior to 2007.  **The 1999 through 2001 documentation shows that the gas transmission pipeline Risk Management Program was viewed internally as a cost reduction initiative.**

PG&E discovered serious safety-related deficiencies in its gas distribution operations in 2007, 2008 and 2009.  Those deficiencies adversely impacted local transmission safety and are indicative of safety-related resource constraints.

GT&S was under significant pressure to reduce expenses in 2008, 2009 and 2010.  The budget documentation for those years shows significant resource constraints directly impacting pipeline safety funding.

Actual 2008 Integrity Management spending was 35% below the  initial budget request that GT&S submitted to the Finance Department.  Actual 2008 maintenance spending was 21% below the initial request.

PG&E reduced 2008 Integrity Management expenses in two basic ways.  It changed the assessment method for some projects from ILI to ECDA and it deferred some projects from 2008 to 2009.  PG&E's internal documentation clearly shows that resource constraints were driving the deferrals and assessment method changes.

Maintenance spending was reduced by cutting the 2008 budget for maintenance projects.  The budget request for maintenance projects was $25.2 million.  The approved project budget was $13.4 million. **The 2008**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**approved maintenance project budget was 47% below the initial request and 25% percent below the recommended minimum level.**

269.    Chapter 8 of the 2011 Overland Report titled **2009 Resource Constraints** determined that:

> GT&S was under significant pressure to reduce expenses for the second straight year in 2009.  PG&E's 2009 budget documentation shows significant resource constraints directly impacting pipeline safety funding.

> The Integrity Management expense budget was set 32 percent below  the initial budget request.  The integrity management budget was reduced by an additional 10 percent in May 2009 to offset unplanned maintenance costs.  Actual 2009 integrity management expense was only 2.4 percent higher than the already constrained 2008 actual spending level.

270.    PG&E reduced integrity management spending in two basic ways in 2009. It changed the assessment method for some projects from In-line Inspections ("ILI") to External Corrosion Direct Assessments ("ECDA"), and it deferred some projects to 2010.  The February 2009 Expense Program Review indicates integrity management "altered inspection methods to significantly reduce costs from $23 million to $17 million in 2009."  PG&E also deferred 41 miles of HCA assessments from 2009 to 2010. Those miles were deferred to "help manage 2009 GT expense spend."  In other words, PG&E chose not to conduct assessments on 41 miles of pipelines in High Consequence Areas, such as densely populated urban and suburban areas, in order to boost short-term profits.

271.    Chapter 9 of the 2011 Overland Report titled **2010 Resource Constraints** reported that:

> GT&S was under significant pressure to reduce expenses for a third straight year in 2010.  The 2010 budget was set $6.7 million below the already constrained 2009 actual expense level.

> The 2010 maintenance budget was set 24% below the amount  requested initially by GT&S. The Integrity Management budget was set 11% below the initial request.

> PG&E cut the 2010 Integrity Management budget in two basic ways.  It deferred projects to future years and it reduced the scope of the program

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

by changing the definition of the covered pipelines.[21]

GT&S developed 21 formal cost reduction initiatives to bridge the gap between its budget request and the budget target set by management. PG&E adopted a cost reduction initiative to change Integrity Management assessment methods from ILI to ECDA.  The assessment method change initiative created "headroom" in 2011 and 2012 that allowed PG&E to defer Integrity Management projects from 2010 to those years.  The assessment method changes and project deferrals were clearly driven by resource constraints. Preparing for the May 2010 CPUC audit of PG&E's Integrity Management program consumed about two thirds of the Integrity Management organization's time for six months.  The amount of effort required to prepare for the audit is an indication of a large backlog of incomplete work - apparently due to significant staffing shortages.

The cost reduction initiatives developed to meet management's budget target included several initiatives to reduce maintenance spending.  One of the initiatives adopted by PG&E deferred all maintenance project work that was not required by code or contractual obligation.  The 2010 maintenance project budget was set at $13.0 million, which equaled the heavily constrained 2009 project budget. PG&E also reduced maintenance spending by deferring corrective maintenance.

GT&S expenses were heavily constrained in 2010 and those constraints directly impacted pipeline safety funding.

### (ii)   The 2013 Overland Report

272.    On May 31, 2013, Overland issued a second report.  The 2013 Overland Report found that there were serious deficiencies in PG&E's pipeline and infrastructure network that had existed for almost a decade.  The 2013 Overland Report found that PG&E consistently spent less on operations and maintenance than it should have.  PG&E adopted a higher amount for O&M expenditures, meaning it told the CPUC that it would spend a higher amount of money for O&M than what it actually spent.  This was a consistent trend for PG&E.  According to the 2013 Overland Report, "[t]he pervasiveness of the deficiencies [at PG&E] demonstrates that their ultimate root cause was ineffective or unresponsive executive management."  For almost a decade, ineffective and unresponsive executive management, for which the

---

[21]    After the budget was adopted, PG&E decided not to change the definition.  The budget was not increased to reflect that decision.

1    Individual Defendants must take responsibility, explains why there have been

2    consistent deficiencies in PG&E's operations.

3        273.   The 2013 Overland Report was focused on auditing the financials of

4    PG&E, specifically in regards to how monies earmarked for safety were actually spent.

5        274.   The work performed during this second audit by Overland included:

6        •   Comparing actual gas distribution O&M expenses and capital

7              expenditures for the years 1999 to 2010 to the amounts adopted in

8              PG&E's General Rate Cases and documenting the reasons for significant

9              differences between the actual and adopted amounts;

10       •   Comparing the actual return-on-equity earned by PG&E's gas

11             distribution to its authorized return-on-equity from 2003 to 2010;

12       •   Reviewing gas distribution staffing levels and operational metrics for

13             evidence of resource constraints from 2003 through 2010;

14       •   Reviewing PG&E's budget process and internal planning documents for

15             evidence that gas distribution resources were constrained for financial

16             reasons from 2003 through 2010;

17   and

18       •   Reviewing PG&E's internal documents for indications of gas distribution

19             management deficiencies and estimating the impact of such deficiencies

20             on actual spending from 2003 through 2010.

21       275.   One of the key findings of the 2013 Overland Report was that PG&E's

22   "[e]xecutive leadership, process controls, internal communication, staffing, training,

23   supervision, record keeping, auditing, information systems, asset knowledge, metrics

24   reporting, and data analysis were all deficient. The result was substandard work

25   quality and widespread non-compliance with PG&E's own standards."

26       276.   The 2013 Overland Report added that "PG&E significantly underfunded

27   its gas distribution operations prior to 2008.  Resource constraints were a significant

28   root cause of the deficiencies.  At the same time, the profits made by the gas

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

distribution operations exceeded the levels authorized by the Commission." **In other words, the Individual Defendants were knowingly and intentionally underfunding PG&E's critical gas distribution operations, even though the company was making higher profits than what was authorized by the CPUC**. As such, Defendants cannot claim they lacked the resources to maintain PG&E's transmission and distribution pipelines.  Defendants simply chose not to do so, in violation of their fiduciary duties and obligations to PG&E.

277.   The key findings of the 2013 Overland Report were:

- **PG&E identified serious deficiencies in its gas distribution operations in 2007 and 2008.  The evidence suggests the deficiencies date back to the mid-1990s.** Management failed to detect, or chose to ignore, these deficiencies until employees publicly raised issues at PG&E's annual shareholders meeting in April 2007.

- **PG&E underfunded and understaffed its gas distribution operations from the mid-to-late 1990s through 2007**. Resource constraints were a significant contributing factor to the deficiencies in management, policies and procedures.

- PG&E began corrective actions starting in October 2007. However, these corrective actions produced mixed results, as demonstrated by PG&E's own internal reviews.

- PG&E's actual O&M expenses were 13% lower than adopted from 1999 to 2007.  The underspending averaged $18 million a year during that period. Spending increased in 2008 and again in 2009 as PG&E implemented corrective actions.

  From 2008 through 2010, actual O&M was 25% higher than adopted.

- Actual capital expenditures were 6.5% lower than adopted from 1999 to 2010.  PG&E spent $168 million less than adopted during that twelve-year period.  **The underspending was concentrated in safety-related categories.  Safety-related capital expenditures were 13.3% lower than adopted.**

- PG&E's gas distribution operations earned an average actual return-on-equity (ROE) of 12.7% from 2003 to 2010 stated on a regulatory basis. PG&E's authorized ROE averaged 11.3% over the same period. **PG&E's gas distribution revenues were $202 million higher than the amount needed to earn its authorized ROE over the eight-year study period.**

278.   The reference to "adopted" is essentially what PG&E stated was the

1    amount of money it would need to properly operate and maintain its pipeline network.

2    This is what the CPUC understood was the amount of money needed to properly

3    operate and maintain PG&E's pipeline network.  When PG&E spends less than

4    adopted, that means it is spending less money than what it represented was necessary

5    for the company.  For almost a decade, PG&E consistently spent less in actual dollars

6    for safety than what it represented was necessary.  This was all approved by the

7    Defendants who had created and endorsed practices that fostered a high likelihood of a

8    catastrophic incident in its operations.

9         279.    The 2013 Overland Report continued by stating that "[t]he pervasiveness

10   of the deficiencies demonstrates that their ultimate root cause was ineffective or

11   unresponsive executive management.  The executives in charge of PG&E's gas

12   distribution operations placed excessive emphasis on cost containment and inadequate

13   emphasis on work quality and public safety prior to 2008."  In other words, profits over

14   safety was not just an aspirational goal for PG&E under the leadership of the

15   Individual Defendants but a policy implemented by the Individual Defendants.

16        280.    With regard to O&M (operations and maintenance) expenses, the 2013

17   Overland Report found that "[d]uring the period 1999 to 2007, actual spending was

18   12.9% lower than adopted.  The underspending averaged $17.7 million per year during

19   that period.  Resource constraints imposed by management were a significant

20   contributing factor to the underspending during those years."  Simply put, the reason

21   that PG&E was spending less money on safety was because management, particularly

22   the Defendants, were making an active and conscious decision to sacrifice safety for the

23   sake of short-term financial performance.

24        281.    In regards to capital expenditures, the 2013 Overland Report found that

25   "actual gas distribution functional capital expenditures were 6.5% lower than adopted.

26   PG&E spent $168 million less than adopted over the entire study period."  In other

27   words, PG&E was routinely spending significantly less in capital expenditures for its

28   gas distribution network than what it was representing was necessary.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

282.     The 2013 Overland Report found that the **underspending on capital expenditures was concentrated in safety-related categories**.  According the 2013 Overland Report, "[a]ctual safety-related capital expenditures were 13.3% lower than adopted.  Safety-related capital expenditures were $159 million lower than adopted during 1999 to 2010."

283.     The 2013 Overland Report found that "[s]afety related capital expenditures were lower than adopted in every year from 1999 to 2006, except for 2003. Safety-related capital expenditures were $274 million lower than adopted in 1999 to 2006."

284.     The 2013 Overland Report also found that PG&E made long-term gas safety a low priority.  "PG&E assigned a low funding priority to long-term gas safety programs during the audit period.  PG&E generally viewed long-term gas safety programs as discretionary spending that could be deferred to meet its overall budget targets.  The GPRP [Gas Pipeline Replacement Program], MPP [Meter Protection Program] and ISSP [Isolated Steel Services Program] were poorly funded throughout the audit period."  Only the CSRP (Copper Services Replacement Program), which began in 2006, was funded.

285.     In regards to return on equity, the 2013 Overland Report found that "PG&E's total gas operations earned an average actual ROE of 12.8% during the period 2003 to 20010, stated on a CPUC regulatory basis. PG&E's authorized ROE averaged 11.3% over the same period." PG&E therefore routinely earned a higher return on equity than was authorized by the CPUC.  This money could have been earmarked for safety but was not. Simply put, PG&E had the resources to ensure that its gas pipeline network and other infrastructure were safe but chose to divert the money somewhere else.

286.     According to the 2013 Overland Report, "PG&E reduced its gas distribution staffing by 29% between December 1996 and December 2010.  During the same period, the number of gas distribution customers grew by 15.5%.  The large

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  headcount reductions are a primary indication of resource constraints in gas

2  distribution." The Individual Defendants intentionally reduced and cut PG&E's gas

3  distribution headcount at a time when the company was adding more customers. The

4  Individual Defendants therefore knew that they were creating a high risk of a

5  catastrophic incident such as the explosions in Rancho Cordova and San Bruno. Even

6  after those incidents, Defendants continue to limit what the company spends on safety

7  in order to protect its profits.

8      287.   The 2013 Overland Report found that PG&E's budget documentation

9  process was woefully inadequate, and that that "[t]he available documentation for the

10  2008 to 2010 budget years demonstrates that **PG&E gave a relatively low priority**

11  **to gas safety spending** in those years:

12      The budget process started with initial budgets set by senior
        management. The basis for the initial budget targets was poorly
13      documented. The next major step in the process was the submission of
        initial budget requests by the various organizations included in the
14      budget. PG&E did not retain the gas distribution initial budget requests
        for the 2003 through 2008 budget years. PG&E cannot show how the
15      budget requests in those years were prioritized. The gas distribution
        budget requests for 2009 and 2010 were poorly documented.
16

17      The initial budget requests were reviewed and adjusted by a central
        budget committee and senior management. Those **processes were**
18      **completely undocumented.** PG&E did not retain the initial approved
        budgets for most of the years in the study period. PG&E cannot provide
19      the initial approved gas distribution expense budgets by MWC [Major
        Work Categories] for 2003, 2004, 2005, 2007 or 2008.
20

21      288.   These process failures are the responsibility of the Individual Defendants

22  – who have the ultimate responsibility for ensuring that operational and process safety

23  is a priority at PG&E, as reflected in the budget, and that there is adequate

24  documentation to show that those safety objectives are being met. Instead, PG&E

25  made safety a very low budget priority. Furthermore, PG&E's poor documentation

26  makes it impossible to assess the methodology behind PG&E's budgeting for

27  operational and process safety.

28      289.   The 2013 Overland Report also discussed PG&E's planning documents,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

which were used to determine PG&E's future plans for operating and maintaining its

gas pipeline network.  The 2013 Overland Report stated:

> **The 2003 to 2010 planning documents demonstrate a heavy emphasis on cost reduction and on limiting spending to budgeted amounts.  The 2003 to 2010 planning documents contain very little discussion of public safety**.

> The 2003 to 2005 planning documents contained benchmarking tables that compared PG&E to other gas distribution utilities.  The comparisons demonstrated that PG&E was spending significantly less on gas distribution O&M expenses than its peers.  **PG&E was also repairing far fewer leaks than its peers.**

> The 2003 to 2006 planning documents contained tables listing key gas distribution initiatives.  The initiatives demonstrated a heavy emphasis on cost reduction.  Cost reduction was a primary goal of 10 of the 18 initiatives.

> **The key metrics reported in the planning documents emphasized cost reduction rather than public safety or work quality**.

290.    The 2013 Overland Report also demonstrated that the Individual

Defendants were well aware of the deficiencies at PG&E and chose to ignore them.

> PG&E commissioned two consultant reviews of its preventative maintenance programs in 1995.  The consultant reports contain findings that were echoed repeatedly in internal and external reviews prepared in 2007 and later years.  **The 1995 consultant reports, and PG&E's 1997 internal compliance reviews, demonstrate the long history of PG&E's gas distribution management deficiencies.**

> PG&E implemented significant workforce reductions in 1993 and 1994.  PG&E continued to reduce its gas distribution workforce through 2010.  **The workforce reductions contributed to significant work quality issues identified by PG&E in 2007 and subsequent years.**

> Employee complaints about work practices and staffing levels prompted two significant internal audits in 2007.  The first was an internal audit of leak detection in the North Bay and North Coast Divisions.  The second was an internal audit of regulator station and valve maintenance in Marin County.  **The internal audits discovered critical deficiencies in leak survey and maintenance practices.  PG&E's follow-up investigations demonstrated the deficiencies were pervasive throughout its system.**

> The internal audit of leak detection in the North Coast Division  prompted PG&E to repeat its prior leak surveys in Sonoma County. The resurvey

- 110 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

process led to the discovery of systematic leak survey training and
operator qualification deficiencies.

3

PG&E conducted a study of its leak grading process in October 2007.  The
study conclusively demonstrated that PG&E's leak grading standards
were not being applied consistently in the field.

4

5

291.    The 2013 Overland Report confirmed that the Individual Defendants were

6

aware, for over a decade, that PG&E's operational and process safety procedures were

7

grossly inadequate and not being applied consistently. The Individual Defendants

8

were well aware that PG&E was understaffed and that the budget was insufficient to

9

ensure that PG&E's gas pipeline network was safe and secure. Nevertheless, the

10

Individual Defendants continued to push PG&E towards greater cost cutting at the

11

expense of safety, with full knowledge that they were creating a foreseeable increased

12

risk of a deadly explosion, such as those that occurred in Rancho Cordova and San

13

Bruno.

14

292.    The 2013 Overland Report also found that PG&E had determined that its

15

prior leak survey process was ineffective.  According to the 2013 Overland Report,

16

"PG&E identified a number of root causes for the leak survey deficiencies, including

17

inadequate planning, supervision and staffing.  During the period 1999 to 2006, the

18

number of Grade 1 leaks discovered by leak surveys decreased by 68 percent.  That

19

should have triggered a critical review of the leak survey process, but did not because

20

PG&E failed to analyze its leak survey results."  In other words, the PG&E

21

commissioned a critical survey of leaks in PG&E's gas pipeline network and then never

22

analyzed the survey.  PG&E therefore wasted all of the efforts of the individuals who

23

conducted the leak survey and recklessly and knowingly permitted the risk of a

24

catastrophic incident to continue to exist.

25

293.    In 2008, PG&E already knew, based on a report from consulting firm

26

Exponent, that there were "pervasive system-wide deficiencies in PG&E's maintenance

27

practices."  According to Exponent, "PG&E's written standards were not widely

28

understood or followed. Maintenance practices were not consistent across divisions.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Employees were performing activities based on their own personal determination of the

2  proper work methods.  PG&E did not have an accurate gas distribution asset registry.

3  The asset lists maintained by the divisions were incomplete and inaccurate." The 2013

4  Overland Report amplified:

> **The records prepared to document maintenance activities were inadequate.  The records did not provide much information about the work that was done.  The lack of information recorded on the records raised doubts about the quality of the work.  The lack of objective reliable data to verify work completion was an important control weakness.**
>
> Supervision of regulator station and valve maintenance was inadequate. The supervisors did not have enough time to adequately supervise all of the activities within their work scope.  Some supervisors were not qualified.  The poor quality of the maintenance records demonstrated that supervisor records reviews were not effective.  Prior Quality Assurance audits had failed to identify the systematic and recurring non-compliance with PG&E standards documented by Exponent.
>
> **Exponent concluded that a lack of accountability at multiple levels of PG&E's organization contributed to the deficiencies.** PG&E did not have adequate communication channels for employees to raise concerns.  Field personnel felt they had little influence on management about their immediate supervisor.

294.     The 2013 Overland Report also found that a 2009 report, issued prior to

the San Bruno explosion, **had already warned the Defendants that PG&E's**

**safety procedures and policies were inadequate**.  According to the 2013 Overland

Report, "PG&E discovered critical deficiencies in its record keeping for service lines

installed by residential subdivision developers.  Many of the records that the

developers were required to provide were missing.  **The problem was pervasive**

**system-wide**.  The root causes included wide-spread non-compliance with PG&E's

standards, inadequate record management controls, inadequate auditing and poor

communication between departments." The 2013 Overland Report concluded with a

**"Root Cause Analysis"** that states:

> Several recurring themes emerged from the review of past management deficiencies that explain, at least partially, the pervasiveness and root causes of the deficiencies.  Overland developed the themes into root cause

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

findings to provide insight into audit period spending patterns.  This Chapter presents those findings.

The evidence of serious deficiencies in the management of PG&E's gas distribution operations during the audit period is overwhelming.  Management largely failed to detect, or chose to ignore, the deficiencies until employees publically raised their concerns about operating practices at PG&E's annual shareholders' meeting in April 2007.

PG&E began corrective actions in October 2007.  The corrective  actions had mixed results, as demonstrated by PG&E's internal reviews.  After the San Bruno Incident (SBI), PG&E replaced most of its distribution executive management and is currently in the process of reforming its gas distribution operations.

Several key safety-related functions were inadequate during most of  the audit period.  PG&E's leak survey program was ineffective prior to 2008, as demonstrated by survey results.  PG&E's leak grading practices were inconsistent.  PG&E's process for responding to customer leak complaints was inadequate.

PG&E's maintenance processes were critically deficient as  demonstrated by Exponent's system-wide audit of regulator station and valve maintenance.  PG&E's damage prevention program was inadequate as demonstrated by PG&E's dig-in rates and internal reviews.  The Company's mapping processes were critically deficient as demonstrated by PWC's review and PG&E's internal audits.

PG&E's processes for collecting and organizing information about its gas distribution facilities were inadequate.  PG&E did not have an accurate Asset Register or GIS at any point during the audit period. Much of PG&E's asset knowledge was trapped in records that could not be electronically searched.  As a result, integrity management risk assessments required labor intensive manual record searches. Record keeping practices were inadequate throughout the audit period.  PG&E's maintenance and leak survey records were incomplete and inaccurate.  PG&E's leak survey data base lacked effective data quality controls.  Records were frequently missing and PG&E did not have controls to assure that its records were complete.

With one exception, PG&E's long-term gas safety programs were poorly-funded throughout the audit period.  Management viewed long-term gas safety programs as discretionary spending that could be deferred to meet budget targets.

295.    The 2013 Overland Report identified eight root causes for the pervasive deficiencies in PG&E's gas distribution management:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- **Insufficient management focus on work quality and public safety**;

- Ineffective communications between management and the field and among departments;

- Inadequate direction of the work methods used by field employees;

- Inadequate staffing and other resources;

- Ineffective supervision and quality control;

- Inadequate quality assurance;

- **Failure to collect and organize critical operating data**; and

- **Failure to analyze the data that was available.**

296.   The 2013 Overland Report noted that the "metrics used by management were focused on reducing unit costs instead of improving work quality." The report also noted that "[e]mployees had the impression that quality was not a high priority for management."

297.   According to the 2013 Overland Report, which is consistent with the reports of individual employees was that "[t]he metrics emphasized by management was focused on production over quality. Field supervisors did not understand the metrics and viewed them as punitive. The leak repair metric encouraged employees to find fewer leaks. One cost reduction initiative included a monthly report to encourage supervisors to downgrade leaks. The on-time appointment metric for Gas Service Representatives encouraged them to minimize the time spent on leak investigations. Work quality metrics were generally not tracked."

298.   The 2013 Overland Report noted that "[l]eak surveys are a critical component of a gas safety program. Leak survey was treated as low priority work. Leak surveyors were frequently diverted to other work and were then pressured to complete their scheduled surveys by end of month to meet compliance deadlines."

299.   In other words, PG&E had created a broken incentive system in which

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   PG&E employees were financially incentivized to find "no leak" or to "downgrade

2   leaks." These incentives were not designed to incentive employees to actually fix or

3   repair leaks but simply to categorize dangerous existing leaks as "non-leaks" or "low-

4   level leaks." This helped PG&E in protecting its short-term finances. However, from a

5   long-term view, this significantly harmed PG&E since it made a dangerous and

6   catastrophic incident inevitable. As the explosions in  Rancho Cordova and San Bruno

7   show, those risks became realities. The Individual Defendants, however, knew that

8   those risks were likely but still chose to ignore them.

9         300.    According to the 2013 Overland Report, **"[t]he pervasiveness of the**

10  **deficiencies demonstrates that their ultimate cause was ineffective executive**

11  **management.** The executives in charge of PG&E's gas distribution operations placed

12  excessive emphasis on cost containment and failed to properly manage the operations."

13  These failures are ultimately the responsibility of the Individual Defendants who are

14  top executives and directors of PG&E and PG&E Corp. and therefore owe fiduciary

15  duties of care and loyalty to PG&E, PG&E Corp., and their shareholders. The

16  Individual Defendants owed PG&E and PG&E Corp. the duty to exercise the utmost

17  care and diligence in the management, supervision and direction, both in terms of

18  direct leadership but also in setting policies and procedures and in developing

19  corporate culture. Through Individual Defendants' misconduct, they failed to exercise

20  leadership, established policies and procedures that created a high risk of a

21  catastrophic incident (which would significantly harm PG&E Corp, PG&E and their

22  shareholders), encouraged a corporate culture in which short-term profits superseded

23  safety, and ignored clear red flag warnings of safety problems. The Individual

24  Defendants knew or recklessly ignored reports for over a decade showing that safety

25  was a low priority at PG&E due to budget reductions for safety concerns, reduced

26  headcount and loss of technical expertise. The Individual Defendants made no effort to

27  rectify these errors and instead exacerbated them by implementing and maintaining

28  policies and procedures designed to cut costs, regardless of the impact such cuts would

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    have on safety.  Profits over safety became the driver of policy-making at PG&E

2    because of the Individual Defendants.

3          301.    As the 2013 Overland Report concludes, "concerns about PG&E's

4    corporate culture remain."

5                **8.     California Administrative Judges reprimanded PG&E
                          for intentionally concealing inadequate recordkeeping**
6

7          302.    In the aftermath of the 2010 San Bruno pipeline explosion, PG&E

8    continues to conceal its deficient recordkeeping.  As a result, in addition to the

     proposed $2.25 billion penalty for years of lax regulation compliance that resulted in
9
     the catastrophes such as the San Bruno and Rancho Cordova explosions, PG&E
10
     remains subject to fines for incomplete records, demonstrating that PG&E has failed to
11
     learn its lesson, even after deadly pipeline explosions.
12
           303.    In July of 2013, PG&E disclosed what it claimed were "newly discovered"
13
     problems with major transmission lines between San Carlos and Millbrae.  That
14
     information, however, was withheld at least for several months, if not longer.
15
     According to state regulators, PG&E used flawed documentation to support its claim
16
     that two Peninsula natural gas pipelines were safe.  With PG&E's history of shoddy
17
     recordkeeping, PG&E should never have continued to rely on inaccurate
18
     documentation, especially to validate its pipelines to be safe.  The very same reliance
19
     on inadequate recordkeeping played a major role in the 2010 San Bruno disaster, with
20
     PG&E failing to properly assess or test the integrity of its pipeline because it did not
21
     think, based on its notoriously incomplete and inaccurate documentation, that there
22
     was a seam in the pipeline and that a section had been cobbled together from scrap
23
     pipe from an unknown source.  PG&E's continuing problems reveals that PG&E has
24
     not changed its corporate philosophy and policies in a manner that will prevent
25
     another disaster, despite representations by PG&E's leadership that it had changed its
26
     ways.
27
           304.    According to a pair of administrative law judges for the CPUC, PG&E
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   sought to surreptitiously slip in major corrections to their pipelines as a routine filing

2   with the CPUC.  The filing occurred one day before the Fourth of July holiday.

3       305.   CPUC Administrative Judges Karen Clopton and Maribeth Bushey wrote

4   that "PG&E appears to be revealing a substantial error" and masking it as a "routine

5   correction."  They further explained that PG&E's conduct "could be seen as an **attempt**

6   **to mislead the commission and the public on the significance of this new**

7   **information**."  Clopton and Bushey are threatening to levy substantial fines against

8   PG&E for violating CPUC rules.

9       306.   One of the changes that PG&E made in the aftermath of the 2010 San

10  Bruno pipeline explosion was lowering the pressure on nearby Peninsula lines while it

11  verified the accuracy of their records.  Those lines included a backbone line that runs

12  from Milpitas to San Francisco, called Line 101, and a connector line between that pipe

13  and the line that blew up in San Bruno.

14      307.   In 2011, PG&E publicly declared the records for both lines were accurate

15  and sought to boost the pressure back to pre-disaster levels.

16      308.   A year later, in fall of 2012, PG&E dug up the connector line in San Carlos

17  to repair a minor leak and found that the pipe was of significantly lesser quality than

18  the company records indicated.  In other words, PG&E had represented to the CPUC

19  that their records were accurate, that the pipeline was safe, and that it should be

20  allowed to increase pressure in the pipeline. However, all of this was untrue, once again

21  putting PG&E in a position of operating its transmission lines in an unsafe manner.

22      309.   The records said that the connector line, known as Line 147, had robust

23  welded seams or no seams at all.  This means that there was little to no risk of a pipe

24  failure which could result in another catastrophic explosion. **The PG&E workers,**

25  **however, found that there were several stretches of pipe that had a**

26  **problematic type of welded seam.**

27      310.   In regards to Line 101, PG&E claims it "belatedly" realized in 2012 that it

28  had improperly relied on a 1989 water-pressure test to establish the line's strength in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Millbrae.  This meant that PG&E had been running the line in an urban area with

2    dangerously high pressure levels.

3         311.    PG&E acknowledged both errors in a July 3, 2013 filing with the CPUC,

4    long after it discovered the problem.  No explanation was provided for this delay in

5    reporting these problems. PG&E described these problems as data "errata."

6         312.    This alarmed both CPUC administrative judges, who wrote that "[t]he

7    continuing inaccuracy of PG&E's records and the happenstance means by which this

8    most recent instance of erroneous records was discovered" are troubling.  The judges

9    ordered that PG&E appear to explain its conduct before California state regulators.

10        313.    The timing of the filing (one day before the Fourth of July holiday) and the

11   flippant manner in which PG&E described dangerous pipeline problems as "errata"

12   raised serious questions about PG&E's continued misconduct because PG&E's

13   recordkeeping practices continue to be "an extraordinarily controversial issue" and the

14   subject of intense public interest.  PG&E's admission that it continues to make highly

15   dangerous decisions based on documents that it knows are flawed and inaccurate is

16   indefensible.  PG&E also continues to delay disclosing problems to the regulators and,

17   when it does make disclosures, it does not do so with complete transparency.

18        314.    Clopton and Bushey ordered PG&E officials to appear at a hearing on

19   September 6, 2013, and as a result of that hearing, they could recommend fines against

20   PG&E for as many as five different rules violations governing submissions to the

21   commission.

22        **9.    The CPUC forced PG&E to shut down its pipeline in San**
                  **Carlos because of continuing concerns that the pipeline**
23                **is unsafe**

24        315.    As further evidence that PG&E has not changed its ways, PG&E was

25   forced to shut down a gas pipeline (Line 147) in San Carlos while CPUC investigators

26   determine whether or not the gas pipeline was safe.  The line runs the length of San

27   Carlos beneath Brittan Avenue.

28        316.    On October 4, 2013, a San Mateo County judge ordered the potentially

                                          - 118 -

1    dangerous gas pipeline shut down, despite protests from PG&E that the gas pipeline

2    was safe.  With PG&E's notoriously unreliable recordkeeping, PG&E's protests were

3    not credible.  Four days later, on October 8, 2013, the CPUC issued a decision

4    upholding the decision to keep the gas pipeline shut.

5           317.   The decision to shut down the gas pipeline began after San Carlos officials

6    learned that a PG&E engineer had asked in an internal e-mail in 2012 whether the

7    company was "sitting on another San Bruno situation" in regards to the San Carlos

8    pipeline.  The PG&E internal e-mails that were received by the City of San Mateo

9    contain information about Line 147 after a leak was repaired in November of 2012.

10          318.   CPUC officials said that investigators will begin examining the pipeline to

11   "determine whether any immediate safety concerns are posed."  PG&E officials

12   acknowledged that portions of the 3.8 mile pipe were salvaged from another nearby

13   pipeline, a fact that was not reflected in PG&E's "official" records.

14          319.   Due to the justifiable lack of faith in PG&E's records, the City of San

15   Carlos is considering whether or not to spend $250,000 in order to hire experts to verify

16   that the pipeline under the city is safe.  "We don't want to overreact, but we don't want

17   to underreact either," San Carlos City Manager Jeff Maltbie said.  "We want to make

18   sure that the information that's been provided … is accurate."  The City of San Carlos

19   wants to hire legal and engineering experts to audit records, reports and information

20   PG&E has been ordered to submit to the California Public Utilities Commission as part

21   of the ongoing investigation of Pipeline 147.

22          320.   The fact that local public entities are being forced, even now, to spend

23   public monies to ensure that the gas pipelines near them are safe, demonstrates that

24   PG&E has not changed.  PG&E continues to maintain that its recordkeeping is

25   adequate, even though it was well known and is still known within the company that

26   its recordkeeping is riddled with serious gaps and inaccuracies.  Public entities and

27   California residents have little faith in statements by PG&E that pipelines are "safe"

28   because PG&E has proven that such statements are not reliable.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## IX.   DAMAGES TO PG&E AND PG&E CORP. CAUSED BY THE INDIVIDUAL DEFENDANTS

321.   The Individual Defendants' wrongdoing has already damaged the Company by over $2.2 billion in damages and fines relating to the San Bruno Explosion, as follows:

(a)   **$1.6 billion in fines** - these fines are comprised of $300 million paid to California's State General Fund, a one-time $400 million credit to the Company's natural gas customers, $850 million to fund future pipeline safety projects, and remedial measures that the PUC estimates will cost PG&E at least $50 million;

(b)   **$620 million in compensation** paid to settle damages claims relating to the San Bruno explosion, comprised of approximately $500 million to the victims and families of the San Bruno accident, $50 million to the City of San Bruno for costs related to recovery, and $70 million to support the city's and community's recovery efforts.[22]

322.   In addition, as the Company has admitted in filings with the U.S. Securities and Exchange Commission ("SEC"), PG&E faces a potential maximum alternative minimum fine **of another $1.13 billion** for the criminal charges in the Superseding Indictment.[23]   The criminal trial is scheduled to begin on March 22, 2016 in San Francisco.

323.   The Company's goodwill and reputation have been severely damaged by defendants' wrongdoing.  In its Form 10-Q filed with the SEC regarding the Company's Q3 2015 financial results, the Company specifically admitted "the harm to

---

[22]   *See* July 29, 2014 PG&E press release entitled "As Government Recasts Case, PG&E Reiterates Commitment to Safety and Underscores Its Position That Federal Charges Are Not Merited," available at http://PG&E.com/about/newsroom/ newsreleases/20140729/as_government_recasts_case_PG&E_reiterates_commitment_t o_safety_and_underscores_its_position_that_federal_charges_are_not_merited.shtml, last visited February 10, 2016.

[23]   *See* Q3 2015 Form 10-Q filed with the SEC on October 28, 2015, at p. 42.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  [PG&E and PG&E Corp.] reputations caused by the criminal prosecution of the

2  Utility, the state and federal investigations of natural gas incidents, [and] improper

3  communications between the CPUC and the Utility."

4      324.    The Company also faces the risk that the Court orders a third party

5  monitor to oversee its operations and that the Company could be debarred from

6  entering into federal procurement and non-procurement contracts and programs.  As

7  admitted by the Company in its Annual Report filed February 18, 2016:  "[Due to the

8  criminal indictment], The Utility also could incur material costs, not recoverable

9  through rates, to implement remedial measures that may be imposed by the court,

10  such as a requirement that the Utility's natural gas operations be supervised by a

11  third-party monitor. The Utility could also be suspended or debarred from entering

12  into federal procurement and non-procurement contracts and programs."[24]

13      325.    Other risks, as admitted by the Company, are:

14  "The trial and the Utility's conviction could harm the Utility's
15  relationships with regulators, legislators, communities, business
16  partners, or other constituencies and make it more difficult to recruit
   qualified personnel and senior management. Further, they could
17  negatively affect the outcome of future ratemaking and regulatory
   proceedings; for example, by enabling parties to challenge the Utility's
18  request to recover costs that the parties allege are somehow related to the
   criminal charges.

19  In addition, the Utility's conviction could result in increased regulatory or
20  legislative pressure to require the separation of the Utility's electric and
   natural gas businesses, restructure the corporate relationship between
21  PG&E Corporation and the Utility, or undergo some other fundamental
   corporate restructuring.  As discussed under the heading "Regulatory
22  Matters" in MD&A, the SED will evaluate PG&E Corporation's and the
   Utility's organizational structure in the CPUC's pending investigation to
23  examine the Utility's safety culture."[25]

24      326.    As a result of the Individual Defendants' breaches of fiduciary duty,

25  PG&E has expended millions of dollars on attorneys' fees and expenses relating to the

26

27  [24]    *See* 2016 Annual Report on Form 10-K, filed with the SEC Feb. 18, 2016, at p. 24.

28  [25]    *See* 2016 Annual Report on Form 10-K, filed with the SEC Feb. 18, 2016, at p. 24.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    lawsuits, Congressional hearings, state and federal investigations, and grand jury

2    proceedings mentioned herein.

3            **X.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

4            327.    Plaintiff brings this action derivatively in the right of and for the benefit

5    of PG&E to redress injuries suffered and to be suffered by PG&E. This is not a

6    collusive action to confer jurisdiction on this Court that it would not otherwise have.

7            328.    Plaintiff will adequately and fairly represent the interests of PG&E in

8    enforcing and prosecuting its rights.

9            329.    Plaintiff was a shareholder of PG&E at the time of the wrongdoing

10   complained of and has continuously been a shareholder and is a current PG&E

11   shareholder.

12           330.    Plaintiff incorporates by reference all preceding and subsequent

13   paragraphs as fully set forth herein.

14           331.    At the time of this filing, PG&E's Board consists of twelve members:

15   defendants Smith, Chew, Herringer, Kimmel, Meserve, Rambo, Williams, Miller,

16   Parra, Kelly, Fowler, and Earley. Plaintiff has not made any demand on the present

17   Board to institute this action because such a demand would be a futile, wasteful, and

18   useless act, as set forth below.

19           **A.    Demand Is Excused Because a Majority of the Current
                      Board Faces a Substantial Likelihood of Liability for**
20           **Causing the Company to Obstruct the NTSB**
                      **Investigation**
21

22           332.    Demand is futile because a majority of the current Board caused PG&E to

23   obstruct the NTSB investigation into the San Bruno gas explosion, causing the

24   Company to be indicted for federal obstruction of justice charges and subjecting the

25   Company to potential criminal fines, severe reputational damage, imposition of a third

26   party monitor over the Company's gas operations, being debarred from entering into

27   federal procurement and non-procurement contracts and programs, and other

28   substantial damages.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

333.    The NTSB began an investigation immediately after the San Bruno explosion on September 9, 2010. NTSB investigators were on-site for approximately two weeks after the explosion. In addition, NTSB investigators issued numerous requests for information and documents, interviewed witnesses, examined the ruptured pipe and the events leading to the explosion, and held three days of public hearings. The NTSB issued a public report on or about August 30, 2011, and concluded, among other things, that PG&E's Integrity Management program was both deficient and ineffective, and was a probable cause of the accident.

334.    The NTSB's investigation revealed that among other deficiencies, PG&E's records related to the establishment and calculation of the MOP and MAOP for Line 132 were incomplete and inaccurate.  As a result, on January 3, 2011, the NTSB issued three safety recommendations, two of which were designated "urgent."   The first urgent recommendation directed PG&E to "[a]ggressively and diligently search" for records related to pipelines in HCAs that did not have the MAOP established through prior hydrostatic testing. The second directed PG&E to calculate (based on the records found in response to the first urgent recommendation) the valid MAOP for pipelines that did not have the MAOP established through hydrostatic testing.

335.    Additionally, in or about September 2010, through in or about December 2010, the NTSB sent PG&E a series of data requests concerning instances where PG&E' s planned and unplanned pressure increases exceeded the 5-year MOPs and/or MAOPs of pipelines in HCAs.

336.    On February 22, 2011, as part of its response to the NTSB's data requests, PG&E attached a version of RMI-06 that provided that PG&E would only consider a manufacturing threat as unstable if the pressure on the line exceeded the 5-year MOP by 10% ("the 10% Version").  The cover sheet to the 10% Version indicated that it was prepared in February 2008, and approved in March 2008.

337.    On April 6, 2011, PG&E sent a letter to the NTSB, signed by Defendant William D. Hayes, withdrawing the 10% Version sent in February 2011, claiming it

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   was an unapproved draft.  The letter attached the original version of RMI-06 approved

2   in 2008, and a version of RMI-06 approved on April 5, 2011, neither of which included

3   the 10% language.  In the letter, PG&E claimed it had recently discovered that the

4   10% Version submitted to the NTSB included the cover sheet for the original version

5   of RMI-06 approved in 2008, and that PG&E had no indication that the version with

6   the 10% language was ever approved.

7          338.    Defendant Hayes, who signed the letter, reported at the time directly to

8   Defendant Geisha Williams, who is on the Board of Directors of PG&E.   Geisha

9   reported directly at the time to Peter Darbee, who was PG&E Corp.'s CEO, President,

10   and Chairman of the Board.  Upon information and belief, given the gravity of the

11   NTSB investigation and the fact that eight people died in the San Bruno explosion,

12   Hayes cleared his submissions to the NTSB, including the February 22, 2011 and

13   April 6, 2011 submissions, with both Williams, Darby, and the PG&E Corp. Board of

14   Directors before finalizing and submitting them to the NTSB.  Defendants and current

15   Board Members Chew, Herringer, Kimmel, Meserve, Miller, Parra, Williams, and

16   Rambo, therefore, all of whom were directors of PG&E Corp. at the time and

17   responsible for the Company's conduct with respect to the NTSB investigation, knew

18   of and approved the misleading submissions to the NTSB.  Since such directors

19   constitute a majority of the current Board, demand is excused since a majority of the

20   current Board acted in bad faith and breached their duties of loyalty and candor with

21   respect to the Company's response to the NTSB investigation, therefore causing the

22   Company to be indicted for obstruction of justice.

23          339.    In those 2011 submissions to the NTSB, PG&E did not disclose that, from

24   in or about 2009 through in or about April 2011, its Integrity Management group

25   followed the practice set forth in the 10% Version by only considering manufacturing

26   threats active and high-risk if the pressure exceeded the MOP by 10%. The letter also

27   failed to disclose that PG&E knew the 10% Version was in violation of Section

28   192.917(e) and the guidance issued by PHMSA with respect to Section 192.917(e).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

340.    The Board's knowledge of the NTSB submissions and their direct supervision over Hayes and Williams is also demonstrated by the fact that *the Board itself* hired and supervised both Hayes and Williams.  Hayes and Williams were hired at the same time.  When they were hired, PG&E Corp. put out a press release dated November 1, 2007 which stated that the Board itself hired them:  "PG&E Corporation today announced that its board of directors has elected Greg S. Pruett to senior vice president, Corporate Relations. In addition, the board of directors of PG&E Corporation's utility unit, Pacific Gas and Electric Company, has elected Patricia M. Lawicki as senior vice president and chief information officer for the utility; Geisha J. Williams as senior vice president, Energy Delivery; William D. Hayes as vice president, Maintenance and Construction; and Mark S. Johnson, vice president, Electric Operations and Engineering. 'Today's announcement reinforces the fact that we have incredible talent within our current team and that we also can enhance our management team from the outside as well,' said Peter A. Darbee, PG&E Corporation Chairman, CEO and President."[26]

### B.    A Majority of the Board Faces a Substantial Likelihood of Liability for Causing the Company to Violate Federal and State Pipeline Safety Regulations

341.    Defendants Chew, Herringer, Kimmel, Meserve, Parra, Rambo, and Williams cannot consider a demand because their decision to operate the Company in violation of the law is not a protected business decision and they all face a substantial likelihood of liability for breaching their fiduciary duties of loyalty, candor, and good faith. These defendants abdicated their fiduciary duties to PG&E.  They were either

---

[26]     *See* https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20151106_pge_corporation_apppoints_jason_p_wells_svp__chief_financial_officer last visited February 18, 2016.  As noted *supra*, the Boards of PG&E and PG&E Corp. were at all times comprised of the same exact individuals, with the sole exception of Defendant Johns, who currently only serves on the Board of PG&E.  Thus, current Board members and Defendants Chew, Herringer, Kimmel, Meserve, Miller, Parra, Williams, and Rambo, all of whom were directors of both PG&E and PG&E Corp. at the time, directly hired and supervised Defendants Hayes and Geisha Williams.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  informed of the Company's numerous safety violations or consciously or recklessly

2  violated their duty to stay informed about the core business of the Company. From

3  2004 to 2009, PG&E was responsible for 59% of the 410 "probable violations" of federal

4  or state pipeline-safety rules and regulations CPUC regulators identified during that

5  period, despite the fact that it operated only 41% of the state's pipelines. Also during

6  this period, PG&E was responsible for more "reportable incidents" than any other

7  company in the country. Included in that total are nine explosions that together

8  injured or killed at least sixteen people. Further, PG&E's own survey conducted in

9  2007 identified leaks and other problems in twenty-eight of thirty-two residential

10 areas that it sampled. Included in those areas is the Peninsula area, where San Bruno

11 is located.  All four of the residential distribution lines PG&E examined on the

12 Peninsula had leaks.  PG&E's November 2009 report failed to identify the cause of

13 leaks that the Company's own records identified as a defective longitudinal seam weld.

14 The San Bruno Incident was ultimately found to have been caused by the failure of a

15 longitudinal seam weld. As shown above, the failure to follow safety regulations

16 imposed by the PHMSA and CPUC has been sustained and systematic at PG&E.

17 Despite this knowledge, defendants Chew, Cox, Herringer, Parra, Kimmel, Meserve,

18 Rambo, and Williams failed to act to correct the Company's numerous safety issues,

19 resulting in the Company being forced to pay well over $2.2 billion in damages and

20 fines to-date, being indicted, and exposed to hundreds of millions of additional fines

21 and penalties in the pending criminal case set to commence March 22, 2106.  Such a

22 decision could not have been an action taken in good faith and is accordingly not

23 protected by the business judgment rule.  Furthermore, defendants Chew, Herringer,

24 Kimmel, Meserve, Rambo, Parra, and Williams's conscious failure to act in the face of

25 the overwhelming number of warnings is a breach of their duties of loyalty, candor,

26 and good faith, which is non-indemnifiable and thus subjects them to a substantial

27 ///

28 ///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  likelihood of liability.[27] Therefore, demand is excused.

2      342.   Moreover, Defendants Cox, Herringer, Meserve, and Rambo all served on

3  the Board prior to the San Bruno explosion, and were made aware between 2006 and

4  2010 of major maintenance problems with PG&E's gas distribution network, including

5  a very high volume of gas leaks, massive recordkeeping deficiencies, employees who

6  were frustrated that their safety concerns were unaddressed, and insufficient funding

7  for inspections and maintenance.  The Enterprise Risk Management Program

8  provided regular communications to such directors identifying potentially catastrophic

9  risks.  Investigations and reviews were provided in Board packages.  Nevertheless,

10 such directors made constant budget cuts at PG&E for maintaining pipeline

11 infrastructure, even though sufficient funds existed to fix these problems.  The routine

12 reduction of budgets for maintenance of gas transmission and distribution lines at a

13 time when the Company was facing an aging infrastructure constituted bad faith.

14     343.   Moreover, in 2009, PG&E charged its customers $5 million to fix the San

15 Bruno pipeline.  The Board of Directors, however, acquiesced in the Company's

16 decision to delay the repairs, citing other priorities.  The same year, however, the

17 Board approved $5 million in executive bonuses.  This constituted disloyal and self-

18 dealing conduct by the Board, as well as bad faith.

19     344.   In addition, from 2008 to 2010, the Board of Directors approved decisions

20 at PG&E to reduce compliance and other Integrity Management expenses by

21 consciously deciding to defer projects, in particular by deferring or downgrading

22 assessment methods to inadequate and less costly techniques.  Moreover, the Board

23 ────────────

24 [27]   Both PG&E and PG&E Corp. are California corporations.  California has many
more restrictions on indemnification and exculpation of officers and directors of California

25 corporations than does Delaware. California prohibits exculpation of directors and officers
for acts or omissions that involve the absence of good faith, for acts or omissions that

26 demonstrate a reckless disregard of duty to the corporation or its shareholders in
circumstances in which the officer or director was aware, or should have been aware, of a

27 risk of serious injury to the corporation or its shareholders, and for acts or omissions that
constitute an unexcused pattern of inattention that amounts to abdication of duty.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   caused PG&E to cease preparing metrics, goals, or annual reports for its gas

2   transmission pipeline Risk Management Program.  The Overland CPUC review

3   concluded that risk management continued to be a separate program "in name only

4   after 2004."

5          345.   In 2008, the Board approved the slashing of approved budgets for

6   Integrity Management by nearly 50% from what was requested in 2008 for compliance

7   and integrity activities, and a review provided to the Company's Directors at the time

8   (Darbee, Andrews, Cox, Herringer, Kimmel, Meserve, Johns, Miller, Rambo and

9   Williams) noted that "***expected flat funding in 2009 and 2010 will drive the***

10  ***program into non-compliance in 2012***."  Despite having actual knowledge of these

11  facts, such Defendants took no action to improve PG&E's governance and compliance,

12  thus abdicating their duties.

13         346.   The Board continued to approve budget cuts in 2009 and 2010.  The

14  Board was advised that actual funding in 2008 for compliance and safety was 35%

15  below the initial request and 16% below "minimum funding to achieve 2012

16  compliance."  PG&E's maintenance budget was 47% below the initial request and 25%

17  below the recommended minimum level.

18         347.   The Board was advised in 2009 that Integrity Management budget cuts

19  for that year resulted in deferring or eliminating replacement of over 44 miles of gas

20  transmission pipelines in high consequence areas.  PG&E also deferred 41 miles of

21  integrity management assessments of gas transmission pipelines.

22         348.   In 2010, the Board approved a budget that was reduced for the third

23  straight year and set $6.7 million below already-constrained 2009 levels.

24         349.   In 2010, the Board was aware that PG&E had consistently spent less on

25  safety and maintenance that what it represented to the CPUC was necessary.  A

26  CPUC report found that, for each year from 1997 to 2007, PG&E spent $39 million less

27  than the CPUC had authorized for pipeline safety and repairs (and thus more than

28  PG&E had been authorized by CPUC to collect from its customers in rate hikes).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    *Thus, as of 2007, the Board was aware that PG&E had intentionally spent less money*
2    *for the last ten years on maintenance and operations than it represented to CPUC was*
3    *necessary to ensure that PG&E's pipelines and infrastructure were safe.*

4    350.   Moreover, in 2007 the Board was advised that two significant internal
5    audits were performed in response to pervasive employee complaints about work
6    practices and staffing levels, and the Board was also advised of the results of the
7    audits.  One audit was performed in the North Bay and North Coast Divisions, and the
8    second in Marin County.  The internal audits discovered critical deficiencies in leak
9    survey and maintenance practices.  PG&E's follow-up investigations demonstrated the
10   deficiencies were pervasive throughout its system.

11   351.   The Audit Committee of the Board is responsible by its Charter for,
12   among other things: reviewing the adequacy of internal controls, external and internal
13   auditing programs, business ethics, and compliance with laws, regulations, and
14   policies that may have a material impact on the consolidated financial statements. The
15   Audit Committees of PG&E is composed of defendants Andrews, Chew, Herringer, and
16   Williams. Defendant Andrews has served as a member of the Audit Committee since
17   2003. Defendant Chew has served as a member of the Audit Committee since 2009.
18   Defendant Herringer has served as a member of the Audit Committee since 2006.
19   Defendant Williams is also Chairman of the Audit Committee and has been since at
20   least March 2005 and a member of the committee since March 2003. These defendants
21   were responsible as members of the Audit Committee for ensuring that PG&E's
22   internal controls were adequate and that the Company was in compliance with CPUC
23   rules and regulations. The significant safety violations alleged herein were so
24   pervasive that they could not have been the result of an isolated failure of oversight.
25   Indeed, the wrongdoing in question is strongly suggestive of a corporate culture that
26   regularly, consciously ignores sustained and systematic red flags. In light of the
27   number, duration, and severity of the violations, as well as the responsibilities
28   outlined in the Audit Committee Charter, the facts compel the conclusion that the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Audit Committee members had to have known about the frequency and extent of the

2   safety violations in question. Notwithstanding this knowledge, the Audit Committee

3   members have failed to take steps to assure and/or improve PG&E's compliance

4   record.  Furthermore, the Audit Committee members' conscious failure to act in the

5   face of the overwhelming number of warnings is a breach of their duty of loyalty,

6   which subjects them to a substantial likelihood of liability. Therefore, demand is

7   excused.

8       352.   The Compensation Committee[28] under its Charter is responsible for

9   reviewing and recommending to the independent members of the Board the salary and

10  other compensation of the CEO. Specifically, the 2007 Compensation Committee

11  Charter provides that it is the responsibility of the Compensation Committee to review

12  and, as applicable, approve: (i) executive compensation and benefits plans and

13  arrangements; (ii) short-term incentive plans that include officers; (iii) tax-qualified

14  pension plans; and (iv) equity-based plans for employees. The Compensation

15  Committee is currently comprised of defendants Cox, Rambo, and Williams.

16  Defendant Rambo has served on the Compensation Committee since 2005. Defendant

17  Williams has served on the Compensation Committee since 2005.  Defendant Cox is

18  also Chairman of the Compensations Committee and has been since at least 2005 and

19  a member of the committee since at least 2003.[29]  As members of the Compensation

20  Committee, these defendants are responsible for reviewing and recommending the

21  compensation of the Company's CEO.  Non-defendant Earley is PG&E's CEO,

22  President, Chairman of the Board, and director and has been since September 2011.

23

24  [28]     This committee is formerly known as the Nominating, Compensation, and
25  Governance Committee.  Prior to January 1, 2008, that committee performed the duties of
    the current Compensation Committee and the current Nominating and Governance
26  Committee.

27  [29]     Cox did not serve as Chairman or a member of the Compensation Committee
    from May 1 2011 to September 12, 2011, when he served as interim Chairman of the
28  Board, CEO, and President of PG&E.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Pursuant to his employment with PG&E, he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, Earley lacks independence from defendants Cox, Rambo, and Williams, members of PG&E's Compensation Committee, all of which face a substantial likelihood of liability. This lack of independence renders non-defendant Earley incapable of impartially considering a demand to commence and vigorously prosecute this action. Therefore, demand is excused.

353.    The Finance Committee, under its Charter, is responsible for advising and assisting the Board with respect to strategic plans and initiatives. Specifically, the Charter provides that the Finance Committee is responsible for presenting for the Board's review and concurrence: (i) a multi-year outlook for PG&E and its subsidiaries that incorporates, among other things, key current and emerging issues, strategic initiatives, risk factors, and projected financial results; and (ii) an annual financial performance plan for operating expense and capital spending budgets that reflect the first year of the approved multi-year outlook.  The Finance Committee is currently composed of defendants Cox, Kimmel, Williams, and Rambo.  Defendant Cox has served on the Finance Committee since 2004.  Defendant Kimmel has served on the Finance Committee since 2009.  Defendant Williams has served on the Finance Committee since at least 2003. Defendant Rambo is also Chairman of the Finance Committee and has been since 2008 and a member of the committee since 2004. As members of the Finance Committee, defendants Cox, Kimmel, Rambo, and Williams were responsible for reviewing and approving the Company's operating expense and capital spending budgets which severely curtailed spending on safety and IMP implementation. Defendants Cox, Rambo, and Williams were also members of the Compensation Committee. As members of the Compensation Committee, defendants Cox, Rambo, and Williams were responsible for reviewing and recommending the compensation of the Company's executive officers. Due to their memberships on the Finance and Compensation Committees, defendants Cox, Rambo, and Williams knew

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  that they were approving lavish compensation for the Company's executives at the

2  same time that they were approving budgets that curtailed spending on safety issues,

3  even though rate increases were specifically approved for that purpose. Such a

4  decision could not have been an action taken in good faith and is accordingly not

5  protected by the business judgment rule. Therefore, demand is excused.

6  354.   In September 2007, a report was provided to the Finance Committee

7  advising the directors that PG&E had inadequate gas and electric system safety

8  controls, and that these deficiencies had let to accidents.  The report also warned the

9  directors that "PG&E continues to experience potentially catastrophic equipment

10  failures where the inability to analyze and trend historical patterns or to review the

11  maintenance history of equipment has been identified as a contributing factor."

12  355.   In order to address these risks, new initiatives were being considered,

13  including the establishment  of an "asset registry to capture information about the

14  design, maintenance, and failure of gas and electric T&D equipment," improvements

15  in program implementation; improvements in collecting and maintaining operational

16  data in an accessible manner; and the implementation of a gas distribution system

17  integrity program to "assess threats to the distribution system, providing a basis for

18  appropriate system-wide inspection and mitigation measures to be taken in order to

19  address those threats." ***Yet the Finance Committee members never ensured that***

20  ***these new measures were effectively implemented***, thus breaching their duties of

21  good faith and loyalty.

22  356.   Despite the Individual Defendants having knowledge of the claims and

23  causes of action raised by the plaintiff, the current Board has failed and refused to

24  seek recover for PG&E for any of the wrongdoing alleged by plaintiff herein.

25  357.   PG&E has been and will continue to be exposed to significant losses due

26  to the wrongdoing complained of herein, yet the Individual Defendants and current

27  Board have not filed any lawsuits against themselves or others who were responsible

28  for that wrongful conduct to attempt to recover for PG&E any part of the damages

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  PG&E suffered and will suffer thereby.

2  ## XI.   CAUSES OF ACTION

3  ### COUNT I

4  ### Breach of the Fiduciary Duty of Loyalty – Self Dealing
### (Against the Individual Defendants)

5  358.   Plaintiff incorporates by reference and realleges each and every

6  allegation set forth above, as though fully set forth herein.

7  359.   This cause of action is brought against the Individual Defendants for

8  breach of the fiduciary duty of loyalty based on (a) breaching their duty of candor; and

9  (b) self-dealing transactions.

10  360.   The Individual Defendants owed the Company the fiduciary obligation of

11  loyalty, which mandates that the best interests of the corporation and its shareholders

12  take precedence over any interest possessed by a director, officer, or controlling

13  shareholder and not shared by the stockholders generally.  A breach of the duty of

14  candor constitutes a breach of the duty of loyalty since fiduciaries are not acting

15  loyally to the company when they fail to tell the truth.

16  361.   The duty of loyalty encompasses an obligation to act in good faith. A

17  director, officer, or other corporate fiduciary cannot act loyally toward the Company

18  unless he or she believes in good faith that his or her actions are in the Company's

19  best interests.

20  362.   A breach of the duty of loyalty can arise from either (a) a breach of the

21  duty of candor or (b) self-dealing transactions, in which a fiduciary is involved in

22  procuring for himself or herself a corporate benefit not available to the stockholders

23  generally.

24  363.   The Individual Defendants violated and breached their fiduciary duty of

25  loyalty by breaching their duty of candor and/or by engaging in acts of self-dealing on

26  terms that were not entirely fair to the Company.

27  364.   As described in detail above, the Individual Defendants failed to disclose

28  all truthful and material information about the Company's pipeline safety to the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   public, the SEC, and federal and state regulators; caused the Company to file a false

2   and misleading 2015 Proxy that urged shareholders to vote against a shareholder

3   proposal calling for the separation of the roles of Chairman and CEO, while making

4   false statements about the alleged lack of need for such proposal due to the Company's

5   allegedly strong corporate governance practices; caused the Company to pay

6   themselves substantial compensation and bonuses at the same time they caused the

7   Company to underspend on pipeline safety; caused the Company to engage in

8   improper *ex parte* communications with the CPUC; and caused the Company to fail to

9   cooperate with and actually obstruct the NTSB investigation into the San Bruno

10  explosion, as a result of which PG&E was forced to pay a $1.6 billion fine, was

11  criminally indicted, and faces hundreds of millions of dollars in additional potential

12  fines and damages.

13       365.    As a direct and proximate result of the Individual Defendants' actions

14  and breaches of their fiduciary obligations, the Company has suffered significant

15  damages, as detailed above.

16       366.    By virtue of the foregoing, the Individual Defendants are liable to the

17  Company for breaching their fiduciary duty of loyalty.

18       367.    Plaintiff, on behalf of PG&E, has no adequate remedy at law.

19                                       **COUNT II**
    **Breach of the Fiduciary Duty of Loyalty – Lack of Good Faith**
20                        **(Against All Individual Defendants)**

21       368.    Plaintiff realleges and incorporates by reference the allegations contained

22  above as though fully set forth herein.

23       369.    This cause of action is brought against the Individual Defendants for

24  breach of the fiduciary duty of loyalty based on a failure to act in good faith.

25       370.    Defendants owed the Company the fiduciary duty of loyalty, which

26  required them at all times to act in good faith and in the Company's best interests.

27       371.    These Defendants could not have acted in good faith if, for example, they

28  intentionally acted with a purpose other than that of advancing the Company's best

1  interests, acted with an intent to violate applicable law, or demonstrated a conscious
2  disregard for their duties.

3    372.    Defendants breached their fiduciary duty of loyalty and their obligation
4  to act at all times in good faith.

5    373.    Defendants knowingly participated in improper activities relating to the
6  Company's pipeline safety issues and federal and state investigations as described in
7  detail above.

8    374.    Alternatively, the Individual Defendants acted with conscious disregard
9  for whether their conduct in connection with these activities and with the other
10  activities described in this Complaint was in the Company's best interests and was
11  appropriate under positive law and the Company's policies.

12    375.    As a direct and proximate result of these Defendants' actions and
13  breaches of their fiduciary obligations, the Company has suffered significant damages,
14  as detailed above.

15    376.    By virtue of the foregoing, Defendants are liable to the Company for
16  breaching their fiduciary duty of loyalty and for failing to act at all times in good faith
17  and in the Company's best interests.

**COUNT III**
**Breach of the Fiduciary Duty of Care**
**(Against All Individual Defendants)**

18
19

20    377.    Plaintiff realleges and incorporates by reference the allegations contained
21  above as though fully set forth herein.
22
23    378.    This cause of action is brought against the Individual Defendants for
     breach of the fiduciary duty of care.
24
25    379.    The Individual Defendants owed the Company the fiduciary obligation to
     act at all times with due care for the Company's best interests in exercising their
26  responsibilities on behalf of the Company.
27
     380.    The Individual Defendants violated and breached their fiduciary duty of
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  care through conduct that amounts to at least gross negligence.

2      381.    In fact, the Defendants' conduct fell so far below the requirements of the

3  duty of care as to constitute a lack of good faith.

4      382.    As described in detail above, the Individual Defendants failed to disclose

5  all truthful and material information about the Company's pipeline safety to the

6  public, the SEC, and federal and state regulators; caused the Company to underspend

7  on pipeline safety; caused the Company to engage in improper ex parte

8  communications with the CPUC; and caused the Company to fail to cooperate with

9  and actually obstruct the NTSB investigation into the San Bruno explosion.

10     383.    These Defendants knew, or were grossly negligent in not knowing, that

11  the conduct described throughout this Complaint was unlawful.

12     384.    These Defendants' actions were outside the bounds of reason and

13  demonstrated a reckless indifference to the whole body of stockholders.

14     385.    As a direct and proximate result of these Defendants' actions and their

15  failure to fulfill their fiduciary duty of care, the Company has suffered significant

16  damages, as detailed above.

17     386.    By virtue of the foregoing, the Individual Defendants are liable to the

18  Company for breaching their fiduciary duty of care.

19     387.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

20                            **COUNT IV**
21  **Against all Individual Defendants for Waste of Corporate Assets**

22     388.    Plaintiff incorporates by reference and realleges each and every

23  allegation contained above, as though fully set forth herein.

24     389.    As a result of the Individual Defendants' wrongdoing, the Individual

25  Defendants have caused PG&E to waste corporate assets: (i) by paying undeserved

26  incentive compensation to certain of its executive officers; (ii) by incurring billions of

27  dollars in fines due to the safety violations; and (ii) by incurring billions of dollars of

28  legal liability and/or legal costs to defend defendants' unlawful actions.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

390.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

391.   Plaintiff, on behalf of PG&E, has no adequate remedy at law.

## COUNT V
### Against the Individual Defendants for Unjust Enrichment

392.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

393.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of PG&E. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to PG&E.

394.   Plaintiff, as a shareholder and representative of PG&E, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

395.   Plaintiff, on behalf of PG&E, has no adequate remedy at law.

## COUNT VI
### For Breach of the Duty of Honest Services
### (Against Defendants Geisha J. Williams, William D. Hayes, Peter A. Darbee, Anthony F. Earley, Jr., Kent M. Harvey, Christopher P. Johns, Dinyar B. Mistry, C. Lee Cox, and Nick Stavropoulos)

396.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

397.   This claim is brought derivatively on behalf of the Company against Defendants Geisha J. Williams, William D. Hayes, Peter A. Darbee, Anthony F. Earley, Jr., Kent M. Harvey, Christopher P. Johns, Dinyar B. Mistry, C. Lee Cox, and Nick Stavropoulos for breach of their undivided duty of loyalty to their employer.

398.   During at least a portion of the Relevant Period, all Defendants were employees of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

399.   Defendants breached their duty of loyalty to the Company by not acting solely in the Company's interests in performing their employment duties.

400.   Those breaches of duty consisted of the conduct alleged in this complaint including, without limitation, their conduct in causing the Company to (i) conceal the fact that Company was not spending necessary and available funds on required pipeline safety efforts; (ii) conceal the fact that the Company was not recording and maintaining adequate books and records regarding pipeline operation and safety, as required by federal and state laws and regulations; (iii) deceive the shareholders of the Company regarding the Company's compliance with federal and state laws and regulations regarding pipeline safety; and (iv) take actions to deceive the NTSB and obstruct its investigation into the 2010 San Bruno explosion which killed eight people. Defendants benefitted from their wrongdoing because they were allowed to retain their jobs in exchange for their unlawful conduct and because they received compensation that was directly tied to the Company's financial performance, which was greater than it would have been absent the Defendants' wrongful conduct.

401.   The Company was harmed by these Defendants' breaches of the undivided duty of loyalty.

402.   By reason of the foregoing, the Company was harmed and will continue to suffer harm as described in greater detail above.

**COUNT VII**
**Against All Defendants for Conspiracy to Breach Fiduciary Duties**

403.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

404.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  assisted each other in breach of their respective duties.

2      405.   During all times relevant hereto, the Individual Defendants collectively

3  and individually initiated a course of conduct that was designed to and did: (i) conceal

4  the fact that Company was not spending necessary and available funds on required

5  pipeline safety efforts; (ii) conceal the fact that the Company was not recording and

6  maintaining adequate books and records regarding pipeline operation and safety, as

7  required by federal and state laws and regulations; (iii) maintain the Individual

8  Defendants' executive and directorial positions at the Company and the profits, power

9  and prestige that the Individual Defendants enjoyed as a result of these positions; (iv)

10  deceive the shareholders of the Company regarding the Company's compliance with

11  federal and state laws and regulations regarding pipeline safety; (v) take actions to

12  deceive the NTSB and obstruct its investigation into the 2010 San Bruno explosion

13  which killed eight people; and (vi) breach their duty of candor, good faith, and loyalty

14  in communications to shareholders, including the 2015 Proxy in an effort to defeat a

15  shareholder proposal calling for the separation of the roles of Chairman and CEO in

16  order to provide independent oversight of management regarding safety issues.  In

17  furtherance of this plan, conspiracy and course of conduct, the Individual Defendants

18  collectively and individually took the actions set forth herein.

19      406.   The Individual Defendants engaged in a conspiracy, common enterprise

20  and/or common course of conduct.  During this time the Individual Defendants caused

21  the Company to conceal the true facts, as alleged herein.

22      407.   The purpose and effect of the conspiracy, common enterprise, and/or

23  common course of conduct by and among the Individual Defendants was, among other

24  things, to benefit themselves at the expense of the Company by granting themselves

25  excessive and inequitable compensation, derived by causing the Company to

26  underspend on pipeline safety issues.

27      408.   The Individual Defendants accomplished their conspiracy, common

28  enterprise and/or common course of conduct by causing the Company to violate federal

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and state laws and regulations governing the Company's operations.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

409.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

410.   As a direct and proximate result of the conspiracy, common enterprise and/or common course of conduct by and among the Individual Defendants, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

411.   Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VIII
### Aiding and Abetting Breaches of Fiduciary Duties
### (Against All Individual Defendants)

412.   Plaintiff realleges and incorporates by reference the allegations contained above as though fully set forth herein.

413.   This cause of action is brought against all Individual Defendants for aiding and abetting breaches of fiduciary duty.

414.   As alleged above, all Individual Defendants are current or former officers and/or directors of PG&E and/or PG&E Corp.  As such, all Individual Defendants owed fiduciary duties of good faith, loyalty, candor and care to the Company.  Through the conduct alleged herein, Defendants breached their fiduciary duties to the Company.  In the alternative, the conduct of all Defendants, whether or not it constituted an independent violation of fiduciary duty, constituted aiding and abetting the breach of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | fiduciary duties.

2 | 415.   All Defendants knew that the other Defendants' conduct violated those

3 | Defendants' fiduciary duties to the Company.

4 | 416.   As alleged above, Defendants substantially aided or encouraged the other

5 | Defendants to breach their fiduciary duties to PG&E. Such aid and encouragement

6 | included, without limitation, these Defendants' participation in knowing or reckless

7 | violation of federal and state pipeline safety rules and regulations, knowing or reckless

8 | disregard of the duties of candor, good faith, loyalty, and care, their participation in

9 | falsifying Company records relating to pipeline safety and the NTSB investigation,

10 | and/or active participation in the obstruction of the NTSB investigation.

11 | 417.   As alleged above, the Company was harmed by the other Defendants'

12 | breaches of their fiduciary duties.

13 | 418.   By reason of the foregoing, the Company has sustained and will continue

14 | to sustain damages as described in greater detail above.

15 | **XII.   PRAYER FOR RELIEF**

16 | WHEREFORE, plaintiff demands judgment against defendants as follows:

17 | A.   Against all of the Individual Defendants and in favor of the Company for

18 | the amount of damages sustained by the Company as a result of the Individual

19 | Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust

20 | enrichment;

21 | B.   Directing the Company to take all necessary actions to reform and

22 | improve its corporate governance principles and internal policies to comply with

23 | applicable laws and to protect the Company and its shareholders from a repeat of the

24 | damaging events described herein, including, but not limited to, putting forward for

25 | shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of

26 | Incorporation and taking such other action as may be necessary to place before

27 | shareholders for a vote the following Corporate Governance Policies:

28 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1          1.      a proposal to require the Company to elect an independent
2   Chairman of the Board and/or separate the roles of Chairman and CEO;

3          2.      a proposal to strengthen the Company's policies and procedures
4   regarding cooperation with federal and state investigations, specifically including any
5   investigation by the NTSB and CPUC and ensure that the Company does not impede
6   or obstruct in any way any governmental investigations regarding the Company's
7   operations;

8          3.      a proposal to strengthen PG&E's internal controls over regulatory
9   compliance and specifically with respect to its required pipeline inspection and
10  remediation practices;

11         4.      a proposal to strengthen the Board's supervision of operations and
12  develop and implement procedures for greater shareholder input into the policies and
13  guidelines of the Board; and

14         5.      a provision to permit the shareholders of the Company to nominate
15  at least three candidates for election to the Board;

16      C.      Extraordinary equitable and/or injunctive relief as permitted by law,
17  equity and state statutory provisions sued hereunder, including attaching,
18  impounding, imposing a constructive trust on or otherwise restricting defendants'
19  assets so as to assure that plaintiff on behalf of the Company has an effective remedy;

20      D.      Awarding to the Company restitution from the defendants, and each of
21  them, and ordering disgorgement of all profits, benefits, and other compensation
22  unjustly earned by the defendants;

23      E.      Awarding to plaintiff reasonable attorneys' fees, consultant and expert
24  fees, costs and expenses; and

25      F.      Granting such other and further relief as the Court deems just and
26  proper.

27  ///
28  ///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## XIII. JURY DEMAND

2

Plaintiff demands a trial by jury.

3    DATED: February 27, 2016          Respectfully submitted,

4                                      BOTTINI & BOTTINI, INC.
                                       Francis A. Bottini, Jr.
5                                      Albert Y. Chang
                                       Yury A. Kolesnikov
6

7                                      _____s/ Francis A. Bottini, Jr._____
                                           Francis A. Bottini, Jr.
8

9                                      7817 Ivanhoe Avenue, Suite 102
                                       La Jolla, California  92037
10                                     Telephone:   (858) 914-2001
                                       Facsimile:   (858) 914-2002
11                                     E-mail:      fbottini@bottinilaw.com
                                                    achang@bottinilaw.com
12                                                  ykolesnikov@bottinilaw.com

13                                     *Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Andrew S. Bushkin, verify that I am a shareholder of Nominal Defendant PG&E Corporation ("PG&E Corp."), and that I have continuously owned PG&E Corp. stock at all relevant times.  I have reviewed the allegations in this Verified Shareholder Derivative Complaint (the "Complaint").  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on February 23, 2016.

Andrew S. Bushkin